## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN JOSEPH KOEHLER,** | : | **NO: 3:12-CV-00291** |
| | : | |
| **Petitioner,** | : | **(Judge Caputo)** |
| | : | |
| **v.** | : | |
| | : | |
| **JOHN E. WETZEL,Secretary-** | : | **(THIS IS A CAPITAL CASE)** |
| **Designee, Pennsylvania Department** | : | |
| **of Corrections; LOUIS B. FOLINO,** | : | |
| **Superintendent of the State** | : | |
| **Correctional Institution at Greene;** | : | |
| **and MARIROSA LAMAS,** | : | |
| **Superintendent of the State** | : | |
| **Correctional Institution at Rockview,** | : | |
| | : | |
| **Respondents** | : | |

# M E M O R A N D U M

## I.      Introduction

Before the Court is a petition for writ of habeas corpus pursuant to 28 U.S.C. §
2254, filed by Petitioner John Joseph Koehler, a state inmate currently incarcerated at
the State Correctional Institution at Greene, in Waynesburg, Pennsylvania, under a
sentence of death.  Mr. Koehler is challenging his 1996 convictions and sentence in the
Court of Common Pleas of Bradford County, Pennsylvania.  For the reasons that follow,
the petition for writ of habeas corpus will be denied.


## II.      Background

On April 11, 1996, Mr. Koehler was found guilty of two counts of first degree
murder, two counts of conspiracy to commit murder, two counts of kidnapping, and one
count of burglary following a jury trial in the Bradford County court.  The Supreme Court
of Pennsylvania summarized the relevant facts as follows:

Regina Clark (Regina) and her nine-year-old son, Austin Hopper (Austin), were killed on April 18, 1995, by William Curley (Curley), at the urging and insistence of Appellant as part of his training of the young Curley for a future career as a "hit man." The bizarre facts regarding the deaths of Regina and Austin, as testified to by Curley at Appellant's trial, are as follows. Curley had known the Appellant since he was very young. By August of 1994, Appellant had told Curley that he was a hit man for the mob. Appellant repeated his claim of being a hit man many times to Curley. Appellant also spoke to Curley about his entering the "profession", promising that Curley could make "six digits" in the field. Curley, who turned eighteen on August 9, 1994, did not dismiss the idea out of hand because he ". . . thought it would be all right, cause I thought it was going to be more along the lines of people like drug dealers and mob men, people that would hurt innocent people." N.T. Vol. VII, p. 20. Accordingly, Appellant told Curley that he would train him for the business. Charline Benefield, with whom Appellant lived while in Arkansas in late 1994, also testified that Appellant had told her that he was training Curley to be a hit man. N.T. Vol. IV, p. 104.

On April 17, 1995, Curley was staying at the home of his friends Melissa Mack (Mack) and Ricky Hunsinger (Hunsinger). Curley received a message to call Appellant, which he did, and at that time Appellant told him he was bringing "two packages" to Curley and asked if he could "deliver them". Curley agreed. Appellant apparently met Regina while he was living in Arkansas. According to the testimony of Kerrien Ramsey (Ramsey), Ramsey also met Appellant in Arkansas, and, through him met and became friends with Regina, with whom Appellant was romantically involved. Ramsey accompanied Regina, Austin, and Appellant on the trip from Arkansas to New Jersey in late February or early March of 1995. Ramsey testified at trial that on April 16 or 17, 1995, while they were in the bedroom of his mother's apartment, Appellant showed Ramsey a loaded gun and told her that he would kill Regina before she left New Jersey to go back to Arkansas.

Curley also testified that in the early morning hours of April 18, 1995, while Mack, Regina and Austin remained at the house, Curley and Appellant drive to Lounsberry, New York, where Appellant was to pick up money wired to him through Western Union. It was on the drive to New York that Appellant explained that he wanted Curley to kill Regina. At trial Curley

2

testified that he told Appellant he did not want to do it, but Appellant insisted that he "had to", or Appellant would kill Curley. On the drive back to Pennsylvania, Appellant handed Curley a loaded .22 caliber Baretta to use for the murder. Also, on the return drive the pair spent approximately an hour driving around looking for a place to put Regina's body. They found an abandoned refrigerator in a dump, which Appellant examined, and then told Curley to place Regina's body inside the refrigerator. At this point Curley again told Appellant that he did not want to kill Regina, to which Appellant replied, "kill or be killed." N.T. Vol. VII, p. 47.

The pair returned to the Mack/Hunsinger house, picked up Regina and Austin, and then proceeded to Settlers Restaurant. Appellant entered the restaurant while Curley, Regina and Austin drove off, Regina having been told they were to pick up a car Appellant needed for the drive back to her home in Arkansas. In fact, Curley was to go to Stone Jug Road to kill Regina and Austin. The trio arrived at Stone Jug Road and stopped after Curley told Regina he had car problems. They got out of the car, and as Regina was looking for an oil leak, Curley pulled the gun and aimed it at her. (Regina was unaware of this.) Curley testified that he "couldn't do it," so he put the gun away and returned to Settlers Restaurant. At the restaurant, while Regina and her son sat in the car, Appellant again told Curley that he had to find some place to kill Regina. They then decided that the murder should take place at the house of Janet Schrader (Ms. Schrader). Curley knew and was friendly with Kirk Schrader (Kirk), the son of Ms. Schrader. The four drove to the Schrader home and Curley pulled the car into the garage, the location that Appellant had told Curley would be a good place to kill Regina and Austin. While Austin, Regina and Appellant entered the house, Curley remained alone in the garage. A short time later Appellant returned with Kirk and, in front of him, suggested possible ways to kill Regina. However, before any murder took place, Appellant and Curley left the Schrader residence for Wysox, Pennsylvania, and the parking lot of Citizens Bank. During the drive to Wysox, Curley again told Appellant that he did not think he could kill Regina. Appellant's response was that he had to kill her.

After Curley and Appellant returned to the Schraders', Curley entered the garage and Appellant went into the house. When Regina entered the garage, Curley shot her three times in the

3

head.  He then picked her up and placed her in the trunk of the car.  Appellant came to the garage, checked Regina's pulse, and said that she was still alive and told Curley that he should slit her throat.  Curley got a knife and then he and Kirk entered the car and drove off.   Curley testified that he heard a thumping noise coming from the trunk of the car shortly after he left the Schrader garage.

After dropping Kirk off at his friend Roger Hitchcock's (Hitchcock) house, Curley went on to the dump he had discovered earlier in the day. At the dump Curley took Regina's body from the trunk, slightly cut her throat with the knife, placed her body in the refrigerator, closed the refrigerator's door, left the dump and returned to the Schraders'.

When he returned, Appellant told Curley that he had to shoot Austin, too, since Austin was a "loose link."  At about 2:30 that afternoon Curley told Austin to come out to the garage and, when he did, Curley shot him three times in his head and at least twice in his body.  Curley picked up his body and placed it in the trunk of the car.  Appellant then came out to the garage and looked into the trunk at Austin's body. Curley then drove the car to "Snake Road" where he placed Austin's body in a sluice pipe.

Curley returned to the Schrader residence, where Appellant cleaned up the blood in the trunk of the car.  The two departed the Schrader home together and, after buying a chain, a lock and some spray paint, returned to the Mack/Hunsinger residence.  At dusk the two returned to the dump, to chain and lock the refrigerator containing the body of Regina.  The chain, however, was too short to circle the refrigerator.  The two then drove to "Twin Ponds," near the Schrader house, and, at Appellant's suggestion, Curley threw the knife and gun used in the murders into the pond.  Appellant then drove Curley back to the Mack/Hunsinger residence, left him and drove away alone.  The next Sunday, April 23, 1995, Curley moved to North Carolina.

The bodies of Regina and Austin were not immediately discovered.  It was not until April 26, 1995, when Richard Morris, searching for recyclables, came upon the refrigerator containing Regina's body and opened it. The state police were then called.  Mack heard that a body had been found in a refrigerator approximately half a mile from her home, and,

4

when she heard the news broadcast [of] a description of the clothing on the body, Mack recognized it as the clothing worn by Regina when she was at her residence in the early morning hours of April 18, 1995.  Mack called the police and later in the day identified the body of Regina at the Robert Packer Hospital, and she also informed the police that Regina had been traveling with a child.  Mack gave police permission to search her home, where the police recovered a can of spray paint, a lock and bullets.

The police went to North Carolina on April 28, 1995 to interview Curley.  Immediately after they arrived, Curley confessed to the shootings.  Curley was taken to the Goldsboro Police Department and, while en route, gave police the location where Austin's body could be found.  While in North Carolina, Curley also provided information concerning where the murder weapon could be found and provided details of the crimes.  Curley also implicated Appellant in the murders.  The police found Austin's body at approximately 11:00 p.m. on April 28, 1995.  On April 29, 1995, the police recovered the discarded gun and knife from Twin Ponds.

Appellant was arrested for the murders of Regina and Austin.  Trial testimony began on March 25, 1996.  In addition to the evidence outlined above, Isidore Mihalakis, M.D., a forensic pathologist, testified with reference to the injuries of Regina and Austin.  Dr. Mihalakis testified that the cause of Regina's death was a gunshot wound to the head and the manner of her death was homicide.  Dr. Mihalakis testified that the cause of Austin's death was multiple gunshot wounds and the manner of his death was homicide.

*Commonwealth v. Koehler*, 737 A.2d 225, 230-33 (Pa. 1999) (footnotes omitted)

("*Koehler-I*").

The penalty phase commenced on the day following the conclusion of the guilt phase, April 12, 1996.  The jury returned with two death sentences.  Specifically, with respect to the murder of Ms. Clark, the jury found one aggravating circumstance, that Mr. Koehler had been convicted of another murder occurring either before or at the time of Ms. Clark's murder, *see* 42 PA. CONS. STAT. § 9711(d)(11), and no mitigating

5

circumstances.  As to Austin Hopper's murder, the jury found the same aggravating circumstance and no mitigating circumstances, as well as the aggravating circumstance that, at the time of his death, Austin Hopper was less than twelve years old, *see* 42 PA. CONS. STAT. § 9711(d)(16).  Thereafter, the trial court formally imposed the sentences of death for the first degree murder convictions rendered by the jury.  In addition, Mr. Koehler was sentenced to two terms of imprisonment of five to ten years on the conspiracy convictions, two terms of imprisonment of ten to twenty years on the kidnapping convictions, and one term of imprisonment of five to ten years on the burglary conviction.

Represented by his trial counsel, Leonard J. Frawley, Esquire, and after disposition of post-trial motions in the trial court, Mr. Koehler filed a timely direct appeal to the Pennsylvania Supreme Court in January 1998,[1] raising fifteen (15) claims for relief.  Specifically, Mr. Koehler presented the following issues for review, as characterized by the Pennsylvania Supreme Court:

1.    Was the verdict against the weight of the evidence?

2.    Should Appellant's New Jersey statement have been suppressed?

3.    Should Appellant's Towanda statement have been suppressed?

4.    Should the Commonwealth's DNA evidence have been suppressed?

5.    Did the trial court err when it denied Appellant's continuance request?

---

[1] The appeal of a death sentence is made directly to the Pennsylvania Supreme Court rather than to Pennsylvania's Superior Court.  *See* 42 PA. CONS. STAT. § 9711(h).

6

6.      Did the trial court err in the seating of the jury panel?

7.      Did the trial court err in denying Appellant's request that Commonwealth witness Kerrien Ramsey undergo psychiatric evaluation?

8.      Did the trial court err in limiting introduction of evidence of Ramsey's drug use?

9.      Did the prosecutor commit prosecutorial misconduct?

10.     Did the trial court err in its instructions to the jury?

11.     Did the trial court err in its evidentiary hearing?

12.     Does Appellant's sentence violate the equal protection and due process clauses of the United States and Pennsylvania constitutions?

13.     Did the trial court err in limiting evidence that Appellant was "nice to children?"

14.     Did the trial court err in instructing the jury to disregard a portion of Appellant's counsel's closing argument during the penalty phase?

15.     Is the sentence imposed excessive?

*Koehler-I*, 737 A.2d 225 at 232-33.

The Pennsylvania Supreme Court affirmed Mr. Koehler's convictions and sentence by its order of September 2, 1999.[2]  *Koehler-I*, 737 A.2d 225.  Reargument

---

[2] Since the conclusion of Mr. Koehler's direct appeal, three warrants scheduling Mr. Koehler's execution have been signed by Pennsylvania governors.  Specifically, on February 7, 2000, then-Governor Thomas Ridge signed a warrant scheduling Mr. Koehler's execution for March 23, 2000.  *See* Execution Warrants Scheduled by Governor (1985 to present), http://www.cor.state.pa.us/portal/server.pt/community/death_penalty/17351 (last visited April 17, 2015).  By order dated February 28, 2000, the Pennsylvania Supreme Court stayed the execution.  *Id.*  Further, on October 18, 2000, then-Governor Ridge signed a warrant scheduling Mr. Koehler's execution for December 7, 2000.  *Id.*  By Order dated November 22, 2000, the United States District Court for the Middle District stayed the execution.  *See id.*; *Koehler v. Horn*, Civ. No. 3:00-CV-1932 (M.D. Pa.) (Caputo, J.).  Finally, on May 29, 2012, then-Governor Thomas Corbett signed a warrant scheduling Mr. Koehler's execution for July 25, 2012.  (*See*

was denied on October 27, 1999. *See id*. On October 2, 2000, Mr. Koehler's petition

for writ of certiorari was denied by the Supreme Court of the United States. *Koehler v.*

*Pennsylvania*, 531 U.S. 829 (2000).

On September 6, 2001, Mr. Koehler filed a petition for post-conviction relief

under Pennsylvania's Post-Conviction Relief Act ("PCRA"), 42 PA. CONS. STAT. ANN. §§

9541, *et seq*. In the petition, Mr. Koehler raised nineteen (19) issues. *See*

*Commonwealth v. Koehler*, 36 A.3d 121, 129-30 (Pa. 2012) ("*Koehler-II*"). An

evidentiary hearing was held on May 31, 2006, June 1, 2006, and March 1, 2007 in the

Bradford County court, now sitting as the PCRA court. *Id*. at 30. On June 30, 2009, the

PCRA court issued an opinion and order denying relief. *Commonwealth v. Koehler*,

CP-08-CR-000309-1995 (Bradford Ct. Com. Pl. Jun. 30, 2009). On July 22, 2009, Mr.

Koehler filed a Notice of Appeal to the Pennsylvania Supreme Court, raising thirteen

(13) issues for appeal. *See Koehler-II*, 36 A.3d at 131. On January 20, 2012, the

Pennsylvania Supreme Court affirmed the denial of the PCRA petition. *Id*., 36 A.3d

121. Mr. Koehler did not file a petition for writ of certiorari in the United States Supreme

Court.

On February 13, 2012, Mr. Koehler filed the instant petition for writ of habeas

corpus in which he alleges fifteen (15) claims for relief. (Doc. 1.) Specifically, those

claims are set forth as follows:

> I. The Commonwealth violated the dictates of *Brady*,
> *Banks* and *Napue* and defense counsel was
> ineffective for failing to adequately investigate and
> impeach these Commonwealth witnesses;

---

Doc. 8.) By Order dated June 11, 2012, the Court stayed the execution. (Doc. 11.)

II.   The Commonwealth's use of inconsistent and irreconcilable theories of prosecution between Petitioner and his Co-Defendant violated Petitioner's right to due process; counsel rendered ineffective assistance by failing to investigate;

III.   The trial court's inadequate and restrictive *voir dire* of Juror Smith and the subsequent denial of Mr. Koehler's challenge for cause violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution; counsel was ineffective for failing to adequately raise this claim at trial and on appeal;

IV.   Mr. Koehler is entitled to relief because the trial court's failure to excuse Juror Mary Ann Schwartz for cause, and defense counsel's failure to request such removal, deprived Mr. Koehler of his Sixth, Eighth and Fourteenth Amendment rights to due process and a fair and impartial jury;

V.   Trial counsel rendered ineffective assistance of counsel during the penalty phase of trial;

VI.   The trial court erred when he denied Petitioner's pre-trial request for a continuance;

VII.   Mr. Koehler was denied his right to confrontation, due process and effective assistance of counsel because the trial court permitted the prosecution to read a key Commonwealth witness's entire hearsay police interview to the jury and failed to give a cautionary instruction;

VIII.   Mr. Koehler was denied his rights against self-incrimination and to counsel because the prosecution introduced an allegedly inculpatory statement Mr. Koehler made during custodial interrogation after asking for an attorney and after his *Miranda* warnings had become stale;

IX.   Mr. Koehler was denied due process, a fair trial, reliable sentencing and effective assistance of counsel because the prosecutor engaged in repeated acts of prosecutorial misconduct which infected the entire

proceeding and prior counsel failed to object to some of this misconduct or to raise it on direct appeal;

X.  The trial court erred in disallowing cross-examination about Witness Kerrien Ramsey's drug use during the timeframe referenced in her direct testimony; counsel ineffectively litigated this claim at trial and on appeal;

XI.  Petitioner's first degree murder conviction must be vacated because, as a result of trial court error and ineffective assistance of counsel, the jury was not charged that presence and knowledge are insufficient to establish conspiracy beyond a reasonable doubt in violation of due process;

XII.  The trial court erroneously instructed the jury that it could infer Mr. Koehler's specific intent from the actions of his accomplice.  Counsel was ineffective for failing to litigate this issue.

XIII.  As a result of trial court error, prosecutorial misconduct and ineffective assistance of counsel, the jury considered non-statutory aggravating factors in violation of the Sixth, Eighth and Fourteenth Amendments.

XIV.  The court failed to instruct the jury that a life sentence means life without possibility of parole; trial counsel was ineffective for failing to request such an instruction; and

XV.  Cumulative error.

(Doc. 1.)  Respondents filed their response on May 20, 2013.  (Doc. 37.)  Mr. Koehler filed a reply on September 6, 2013.  (Doc. 48.)  Thus, Mr. Koehler's petition for writ of habeas corpus is now ripe for disposition.

III.    **Standards of Review**

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), went into effect and amended the standards for reviewing state court judgments in federal habeas petitions filed under 28 U.S.C. § 2254.  A habeas corpus petition pursuant to § 2254 is the proper mechanism for a prisoner to challenge the "fact or duration" of his confinement.  *Preiser v. Rodriguez*, 411 U.S. 475, 498-99 (1973).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Rather, federal habeas review is restricted to claims based "on the ground that [petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 68.

### A.     Exhaustion and Procedural Default

A habeas petitioner must clear two procedural hurdles before the Court may reach the merit of his habeas corpus petition: exhaustion of remedies and procedural default.

A habeas corpus petitioner may obtain relief in federal court only after he has exhausted his state court remedies.  28 U.S.C. § 2254(b)(1)(A).  The exhaustion requirement is grounded on principles of comity to ensure that state courts have the initial opportunity to review federal constitutional challenges to state convictions.  *Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000).  A state prisoner exhausts state remedies by giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  A habeas petitioner retains the burden of showing that all of the claims alleged have been "fairly presented" to the state

courts.  To "fairly present" a claim, a petitioner must present its "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999).  "[A] state habeas petitioner must present the 'substantial equivalent' of his federal claim to the state courts in order to give the state courts 'an opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 543 (3d Cir. 2014) (quoting *Picard v. Connor*, 404 U.S. 270, 277-78 (1971)).  A federal claim not fairly presented to the reviewing state court may be either unexhausted or procedurally defaulted.

A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).[3]  The petitioner has the burden of establishing that the exhaustion requirement has been met.  *Ross v. Petsock*, 868 F.2d 639, 643 (3d Cir. 1989); *O'Halloran v. Ryan*, 835 F.2d 506, 508 (3d Cir. 1987).

A petitioner's failure to exhaust state remedies will be excused if state procedural rules preclude him from seeking further relief in state courts.  *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000).  Although treated as technically exhausted, such claims are nonetheless procedural defaulted.  *Lines*, 208 F.3d at 160; *Coleman v. Thompson*, 501

---

[3]  Pursuant to Pennsylvania Supreme Court Order 218, effective May 9, 2000, issues presented to the County Common Pleas Court and then the Pennsylvania Superior Court either on direct or PCRA appeal, are considered exhausted for the purpose of federal habeas corpus relief under § 2254.  *See In re: Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases*, No. 218, Judicial Administration Docket No. 1 (May 5, 2000) (*per curiam*); *see also Lambert v. Blackwell*, 387 F.3d 210, 233-34 (3d Cir. 2004).

U.S. 722, 750-51 (1991).  Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedure rule, the claim is exhausted but procedurally defaulted.  *See Coleman*, 501 U.S. at 750.

A federal court cannot review the merits of procedurally defaulted claims unless the petitioner demonstrates either: (1) "cause" for the procedural default and "actual prejudice" as a result of the alleged violation of federal law;[4] or (2) failure to consider the claims will result in a "fundamental miscarriage of justice."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 223-24 (3d Cir. 2001).  To establish "cause," a petitioner must establish that "some objective factor external to the defense" impeded his ability to raise the claim in state court.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).   Once "cause" has been successfully demonstrated, a petitioner must then also prove "actual prejudice."  To establish "actual prejudice," "the habeas petitioner must show 'not merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'"  *Id*. at 494 (citing *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)).

Alternatively, procedural default may also be excused if a petitioner can demonstrate that a fundamental miscarriage of justice will occur, *i.e.* that he is "actually innocent" of the crimes against him.  *Edwards*, 529 U.S. at 451; *Wenger*, 266 F.3d at

---

[4]  Where petitioner fails to establish cause, the court need not reach the prejudice prong of the claim before denying it.  *See Smith v. Murray*, 477 U.S. 527, 533 (1986).

13

223-24.  A petitioner demonstrates a miscarriage of justice by showing a "constitutional

violation has probably resulted in the conviction of one who is actually innocent."

*Murray*, 477 U.S. at 496.  Actual innocence means factual innocence, not legal

insufficiency.  *Bousley v. United States*, 523 U.S. 614, 623 (1998).   "[A] petitioner

asserting actual innocence . . . must rely on 'reliable evidence - whether it be

exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical

evidence'" not presented at trial.  *Munchinski v. Wilson*, 694 F.3d 308, 337-38 (3d Cir.

2012) (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  New evidence which tends to

undermine the credibility of a witness "will seldom, if ever, make a clear and convincing

showing that no reasonable juror would have believed the heart of [the witness']

account of petitioner's actions.  *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992).

There exists a final, very narrowly carved, exception to the procedural default

rule.  The United States Supreme Court held in *Martinez v. Ryan*, ____ U.S. ____, ____,

132 S. Ct. 1309, 1320-21 (2012), that a petitioner may establish cause to excuse

procedural default of claims of ineffective assistance of trial counsel when post-

conviction review is the first time a petitioner can bring such claims and petitioner had

either ineffective collateral appeal counsel or no counsel at all.  The Court cautioned

that its holding did not apply to counsel's error in other kinds of proceedings, such as

appeals from initial-review collateral proceedings, second or successive collateral

petitions, or petitions for discretionary review in state appellate courts.  *Id*., 132 S. Ct. at

1320.  In order to establish such "cause," petitioner must show that collateral appeal

counsel was not appointed or was ineffective under the standard set forth in *Strickland*

14

*v. Washington*, 466 U.S. 668, 695 (1984). *Martinez*, 132 S. Ct. at 1318. Further, a petitioner must also demonstrate that the underlying ineffectiveness of trial counsel claim is "substantial" and has "some merit." *Id.*, 132 S. Ct. at 1318.

In this case, the Court will address exhaustion and procedural default in its discussion of each issue herein.

## B.    Merits Standard

Once a court has determined that the exhaustion requirement is met, and, therefore, that review on the merits of the issues presented in a habeas petition is warranted, the scope of that review is set forth in 28 U.S.C. § 2254(d). That section states, in relevant part, that exhausted claims adjudicated on the merits by the state courts are subject to review under the standard of whether they are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). AEDPA places the burden on the petitioner to make this showing. *Williams v. Taylor*, 529 U.S. 362 (2000).

The "contrary to" and "unreasonable application of" clauses of Section 2254 have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court judgment is "contrary to" federal law when it is "diametrically different, opposite in character or nature, or mutually opposed" to "clearly established" decisions of the United States Supreme Court. *Williams*, 529 U.S. at 405. This may occur if "the state court ignores or misapprehends clear precedent or it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Wilkerson v. Klem*, 412 F.3d 449, 452 (3d Cir. 2005) (quoting *Williams*, 529 U.S. at 406).  Alternatively, "[a]n 'unreasonable application' occurs when a state court 'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts[ ] of petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 519, 520 (2003)).  For the purposes of Section 2254(d)(1), "[i]t is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal citations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 75-76 (quoting *Williams*, 529 U.S. at 411).  Rather, "[t]he state court's application of clearly established law must be objectively unreasonable" before a federal court may grant relief.  *Andrade*, 538 U.S. at 75.

By its terms, Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  Thus, § 2254(d)(1)'s "clearly established Federal law" signifies the holdings, not the dicta, of Supreme Court decisions. *Howes v. Fields*, ___ U.S. ___, ___, 132 S. Ct. 1181, 1187 (2012).  Specifically, only Supreme Court law established at the time of the state court's

decision can be a basis for habeas relief under AEDPA.  *See Green v. Fisher*, ___ U.S.

___, ___, 132 S. Ct. 38, 44 (2011) ("§ 2254(d)(1) requires federal courts to 'focu[s] on

what a state court knew and did,' and to measure state-court decisions 'against this

Court's precedents *as of* '*the time the state court renders its decision*.'") (quoting *Cullen*

*v. Pinholster*, ___ U.S. ___, ___, 131 S. Ct. 1388, 1399 (2011) (emphasis added)).

Therefore, federal habeas review "is limited to the record that was before the state court

that adjudicated the claim on the merits."  *Cullen*, 131 S. Ct. at 1398.  Finally, "under

the AEDPA standard, the '[s]tate court[s'] relevant factual determinations are presumed

to be correct unless the petitioner rebuts [that] presumption by clear and convincing

evidence.'"  *McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 101 (3d Cir. 2012)

(quoting *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012) (citing 28 U.S.C. §

2254(e)(1)).

Turning to Section 2254(d)(2), the test for the "unreasonable determination of

facts" clause is whether the petitioner has demonstrated by "clear and convincing

evidence," 28 U.S.C. § 2254(e)(1), that the state court's determination of the facts was

unreasonable in light of the record.  *Rountree v. Balicki*, 640 F.3d 530, 537 (3d Cir.

2011) (citing *Rice v. Collins*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings,

moreover, are presumed correct; the petitioner has the burden of rebutting the

presumption by 'clear and convincing evidence.'"); *see also Simmons v. Beard*, 590

F.3d 223, 231 (3d Cir. 2009) ("Under the § 2254 standard, a district court is bound to

presume that the state court's factual findings are correct, with the burden on the

petitioner to rebut those findings by clear and convincing evidence.").  Further, as with

Section 2254(d)(1), the evidence against which a federal court measures the

reasonableness of the state court's factual findings is the record evidence at the time of

the state court's adjudication.  *Rountree*, 640 F.3d at 538 (citing *Cullen*, 131 S. Ct. at

1401-03).

     Further, the United States Supreme Court has clarified the test a district court

must apply before granting relief where the court finds constitutional error:

> [I]n § 2254 proceedings a court must assess the prejudicial
> impact of constitutional error in a state-court criminal trial under
> the "substantial and injurious effect" standard set forth in
> *Brecht v. Abrahamson*, 507 U.S. 619 (1993), whether or not
> the state appellate court recognized the error and reviewed it
> for harmlessness under the "harmless beyond a reasonable
> doubt" standard set forth in *Chapman v. California*, 386 U.S.
> 18 (1967).

*Fry v. Pliler*, 551 U.S. 112, 121-22 (2007).  Thus, even if the Court concludes that

constitutional error occurred in the state court, the Court may not grant relief unless the

error "had a substantial and injurious effect or influence in determining the jury's

verdict."  *Brecht*, 507 U.S. at 631; *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008).

     In addition, the Supreme Court has stated, "If this standard is difficult to meet,

that is because it was meant to be."  *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.

Ct. 770, 786 (2011).  Section 2254(d) "preserves authority to issue the writ in cases

where there is no possibility fairminded jurists could disagree that the state court's

decision conflicts with [Supreme Court] precedents.  It goes no farther."  *Id*.  Further, it

was designed to be difficult "to ensure that state-court judgments are accorded the

finality and respect necessary to preserve the integrity of legal proceedings within our

system of federalism."  *Martinez*, 132 S. Ct. at 1316.

Finally, AEDPA scrutiny is applicable only if the state court adjudicated the

petitioner's claims "on the merits."  28 U.S.C. § 2254(d); *see Appel v. Horn*, 250 F.3d

203, 210 (3d Cir. 2001).  "An 'adjudication on the merits' has a well settled meaning: a

decision finally resolving the parties' claims, with *res judicata* effect, that is based on the

substance of the claim advanced, rather than on a procedural, or other, ground."

*Rompilla v. Horn*, 355 F.3d 233, 247 (3d Cir. 2004), *rev'd on other grounds*, *Rompilla v.*

*Beard*, 545 U.S. 374 (2005) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.

2001)).  Further, an "adjudication on the merits" can occur at any level of state court.

*Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).  However, "to qualify as an

'adjudication on the merits,' the state court decision must finally resolve the claim.  This

means that the state court's resolution of the claim must have preclusive effect."  *Id*.

(citing *Rompilla*, 355 F.3d at 247 (quoting *Sellan*, 261 F.3d at 311)).  Further, as the

Supreme Court has more recently explained:

> A judgment is normally said to have been rendered "on the
> merits" only if it was delivered after the court . . . heard and
> *evaluated* the evidence and the parties' substantive
> arguments.  And as used in this context, the word "merits" is
> defined as *the intrinsic rights and wrongs of a case* as
> determined by *matters of substance*, in distinction from matters
> of form.  If a federal claim is rejected as a result of sheer
> inadvertence, it has not been evaluated based on the intrinsic
> right and wrong of the matter.

*Johnson v. Williams*, ___ U.S. ___, ___, 133 S. Ct. 1088, 1097 (2013) (emphasis in

original) (citations omitted) (internal quotation marks omitted).  Where a state court has

not reached the merits of a claim thereafter presented to a federal habeas court, the

deferential AEDPA standards do not apply, and the federal court must exercise *de novo*

review over pure legal questions and mixed questions of law and fact.  *Simmons v. Beard*, 581 F.3d 158, 165 (3d Cir. 2009) (citing *Appel*, 250 F.3d at 210).  However, the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence.[5]  *Simmons*, 581 F.3d at 165 (citing *Appel*, 150 F.3d at 210).

### C.     Ineffective Assistance of Counsel Standard

Because several of Mr. Koehler's habeas claims presented herein raise the issue of whether his counsel was effective, the Court will set forth the applicable standard here.  A claim for ineffective assistance of counsel is governed by the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on an ineffective assistance claim, a petitioner must show that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficient representation was prejudicial to the petitioner.  *Id*. at 688; *see also Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007).  In determining whether counsel has met the objective standard of reasonableness, courts must be highly deferential towards trial counsel's conduct.  *See Strickland*, 466 U.S. at 686.  "In assessing counsel's performance, 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  There is a 'strong presumption' that counsel's performance was reasonable."  *Jermyn v. Horn*, 266 F.3d 257, 282 (3d Cir. 2001)

---

[5] In fact, "the § 2254(e)(1) presumption of correctness applies regardless of whether there has been an 'adjudication on the merits' for purposes of § 2254(d)."  *Thomas*, 570 F.3d at 116 (quoting *Nara v. Frank*, 488 F.3d 187, 200-01 (3d Cir. 2007)).

(alteration in original) (citations and quotations omitted).  Counsel cannot be deemed ineffective for failing to raise a meritless claim.  *See United States v. Saunders*, 165 F.3d 248, 253 (3d Cir. 1999).  To satisfy the prejudice prong, a petitioner must show a reasonable probability that, but for the errors of his or her counsel, the outcome of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.

The two-prong test for ineffective assistance of counsel established in *Strickland* "qualifies as 'clearly established Federal law'" for purposes of AEDPA.  *Rainey v. Varner*, 603 F.3d 189, 197 (3d Cir. 2010) (quoting *Williams*, 529 U.S. 362 at 391).[6] Thus, under § 2254(d)(1)-(2), the relevant inquiry in assessing ineffectiveness claims that have been adjudicated on the merits is whether the state court's decision involved an unreasonable application of *Strickland* or is based on an unreasonable determination of the facts.  *Jacobs v. Horn*, 395 F.3d 92, 107 n.9 (3d Cir. 2005); *Werts*, 228 F.3d at 204.  In conducting this analysis, the Court is cognizant that:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S.] at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so, [*Knowles v. Mirzayance*, 556 U.S. 111 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at 123-25.

---

[6]   Pennsylvania applies the same test for ineffective assistance of counsel as the federal courts.  *Werts*, 228 F.3d at 203.  In Pennsylvania, the ineffective assistance of counsel standard requires the petitioner to "rebut the presumption of professional competence" by demonstrating: "(1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interest; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different."  *Commonwealth v. Sneed*, 899 A.2d 1067, 1076 (Pa. 2006) (citing *Commonwealth v. Pierce*, 786 A.2d 203, 213 (Pa. 2001)).  If the petitioner fails to satisfy any of the standard's prongs, the claim will be rejected.  *Id.*

*Harrington*, 131 S. Ct. at 788; *see also Knowles*, 556 U.S. at 123 ("[B]ecause the

*Strickland* standard is a general standard, a state court has even more latitude to

reasonably determine that a defendant has not satisfied that standard." (citing

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Finally, the reviewing court must evaluate counsel's performance in light of the

totality of the evidence.  *Strickland*, 466 U.S. at 695-96; *see also Jacobs*, 395 F.3d at

106-07.  It is the petitioner's burden to establish both deficient performance and

resulting prejudice in order to state an ineffective assistance of counsel claim.

*Strickland*, 466 U.S. at 697; *see also Jacobs*, 395 F.3d at 102.


**IV.    Discussion**

Mr. Koehler's habeas petition contains fifteen (15) claims for relief and involves

both the guilt phase and the penalty phase of his trial.  The Court will address his

claims in turn.

> **A.    Claim I - The Commonwealth violated the dictates of *Brady,***
> **       *Banks* and *Napue* and defense counsel was ineffective for failing**
> **       to adequately investigate and impeach [two] Commonwealth**
> **       witnesses.**

Mr. Koehler contends that the Commonwealth violated *Brady v. Maryland*, 373

U.S. 83 (1963), when it failed to disclose to the defense separate agreements it had

purportedly entered into with two Commonwealth witnesses, William Curley and Kirk

Schrader.  After careful review, the Court will deny habeas relief on this claim.

In *Brady*, the Supreme Court held that "suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment." *Brady*, 373 U.S. at 87.  To

establish a *Brady* violation, a petitioner must demonstrate that: (1) evidence was

suppressed by the state, either willfully or inadvertently; (2) the evidence is favorable to

the accused, either because it is exculpatory or impeaching; and (3) that the evidence

was material to the outcome of the case.  *Strickler v. Greene*, 527 U.S. 263, 281-82

(1999).  The materiality standard is satisfied when the evidence places the "whole case

in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*,

514 U.S. 419, 434-35 (1995).  Further, this standard is satisfied "if there is a reasonable

probability that, had the evidence been disclosed, the result of the proceeding would be

different." *Strickler*, 527 U.S. at 281-82.  In order for evidence to be material, it is not

necessary that the evidence establish by a preponderance that disclosure of the

evidence would have resulted in an acquittal.  *Kyles*, 514 U.S. at 434-35.  However, in

making a determination of materiality, the assessment of the omitted evidence's impact

must take account of the cumulative effect of the suppressed evidence in light of the

other evidence, not merely the probative value of the suppressed evidence standing

alone. *Id*. at 436-37.

Here, Mr. Koehler argues that the Commonwealth failed to disclose separate

agreements with two of its witnesses, William Curley and Kirk Schrader.  The Court will

discuss these witnesses separately.

### 1.    William Curley

Mr. Koehler raises two issues surrounding the Commonwealth's alleged failure to

disclose impeachment evidence related to Mr. Curley.  First, Mr. Koehler claims that,

prior to his trial, Mr. Curley entered into an agreement with the Commonwealth whereby

he would testify against Mr. Koehler in exchange for the dismissal of numerous felony

charges in his separate proceeding, a bench trial.  Mr. Koehler argues that this

agreement constituted important impeachment evidence that the Commonwealth was

required to disclose under *Brady* and its progeny.  In addition, Mr. Koehler claims that

his trial counsel rendered ineffective assistance by not only failing to discover and utilize

this agreement in order to impeach Mr. Curley, but also by failing to go to the

courthouse and review Mr. Curley's criminal case file.  Had defense counsel reviewed

the file, he would have discovered the trial court's order dismissing the felony charges

and could have then used that information, with or without the Commonwealth's

agreement, to impeach Mr. Curley's credibility.  The Court will address these issues in

turn after setting forth a relevant background.

### a.    Background

The Commonwealth tried Mr. Curley and Mr. Koehler separately, prosecuting Mr.

Curley first.  *See Koehler-II*, 36 A.3d at 128.  As the Pennsylvania Supreme Court

recited,

> Curley waived his right to a jury, and proceeded to a bench trial
> based on stipulated facts on March 6, 1996.  Immediately prior
> to Curley's trial, however, the Commonwealth *nolle prossed* all
> the lesser charges against Curley, and proceed[ed] to
> prosecute him for two counts of first degree murder and one
> count of burglary.  During Curley's trial, the Commonwealth's
> theory of criminal liability was that although Appellant solicited
> Curley to kill Clark and Hopper, Curley acted with his own free
> will in carrying out the crimes.  Curley was thereafter convicted
> of two counts of first degree murder and one count of burglary.
> On March 25, 1996, after Curley was convicted, but prior to his
> penalty proceeding, Appellant's trial commenced.

24

*Id*.  As such, prior to his sentencing proceeding, Mr. Curley testified against Mr. Koehler at his trial.  Notably, the Pennsylvania Supreme Court acknowledged that Mr. Curley's testimony was "critical to the prosecution as it served as the primary evidence that [Mr. Koehler] not only solicited Curley to kill the victims, but also threatened to kill Curley if he did not carry out the murders."  *Koehler-II*, 36 A.3d at 133.

Immediately prior to Mr. Curley's testimony at Mr. Koehler's trial, defense counsel, Leonard J. Frawley, Esquire, requested a side bar in order to clarify whether Mr. Curley understood the possible ramifications of his testimony on his own upcoming sentencing hearing.  (Doc. 51, Notes of Testimony, Trial, 3/28/1996 a.m., Part 1, Vol. VII, at 1-3 ("Trial NT 3/28/1996 a.m. Part 1 Vol. VII").)  After the court confirmed with Mr. Curley's counsel, Kyle Rude, Esquire, that Mr. Curley was not given any immunity in exchange for his testimony, District Attorney Robert McGuinness stated, "The only thing that was told to him is that, if he testified truthfully, that it could be considered by whoever makes the decision as a mitigating circumstance and that the Commonwealth would agree that it would be a mitigating circumstance."  (*Id*. at 3.)  Further, during his direct testimony, Mr. Curley confirmed that he received no promises from the District Attorney, the State Police, or the trial court in exchange for testifying against Mr. Koehler.  (Doc. 51-2, Notes of Testimony, Trial, 3/28/1996 a.m., Part 3, Vol. VII, at 125-26 ("Trial NT 3/28/1996 a.m. Part 3 Vol. VII").)  In fact, he testified that, at his own sentencing hearing, he was still facing the possibility of the death penalty or life imprisonment.  (*Id*. at 126.)  On cross-examination, however, Mr. Curley acknowledged that he had not pleaded guilty in his own proceedings, and when defense counsel asked Mr. Curley, "[Y]ou come in here today and you tell the jury this story, believing

25

that the – the testimony cannot be used against you and hoping that, by telling this story, you might avoid being executed by the State of Pennsylvania, isn't that also correct?", Mr. Curley answered in the affirmative.  (*Id*. at 133-35.)  In addition, during his closing argument, the District Attorney stated, "seems to me that you can believe what Bill Curley told you.  Did he get anything for his testimony?  As far as Trooper Madigan and I know, he got a date on May 20th, 1996, right here, to see if he lives or dies."  (Doc. 50-70, Notes of Testimony, Trial, 4/10/1996 a.m., Part 1, Vol. XXVI, at 17 ("Trial NT 4/10/1996 a.m. Part 1 Vol. XXVI").)  For his part, defense counsel made the following statement regarding Mr. Curley's testimony against Mr. Koehler:

> [Mr. Curley] had about a one hour trial and was found guilty. But his case is not over.  He still has the right and the intention to move the appellate court to set aside that decision of Judge Smith [to not suppress his statement to police].  He still wants the appellate courts to say that that statement cannot be used against him.  He still wants to fight it.  He still wants his freedom.  And, yes, he cooperates when he comes in here, but he realizes that if the statement is not suppressed, there are two possibilities for him.  One is life imprisonment and one is death.  And the chances of avoiding death are greater, if he comes in here and he testifies.  The chances of avoiding the death penalty are greater, if he says, I did it, but I really didn't want to.  It was John Koehler that made me do that.

(Doc. 50-72, Notes of Testimony, Trial, 4/10/1996 a.m., Part 2, Vol. XXV, at 71-72 ("Trial NT 4/10/1996 a.m. Part 2 Vol. XXV").)

Further, the Pennsylvania Supreme Court succinctly set forth the evidence presented at the PCRA hearing in support of, and in opposition to, this claim.  As stated by the state court, Mr. Koehler presented the following:

> In support of this claim, Appellant presented at the PCRA hearing the testimony of Attorney Kyle Rude, Curley's defense counsel.  Attorney Rude testified that Curley had no incentive

26

to testify against Appellant because District Attorney McGuinness had refused "to take the death penalty off the table." N.T. Jun. 1, 2006, at 27.  Attorney Rude further stated that on March 6, 1996, immediately prior to Curley's bench trial on stipulated facts, he asked District Attorney McGuinness to "drop any of the charges" against Curley.  *See id.* at 28 (wherein Attorney Rude testified that "[a]t the last moment we agreed or I asked Mister McGuinness if he would be willing to drop any of the charges, just prior to the case stated trial.  And that was not something that was for Mister Curley's testimony, but I call it a last little push - a nudge, at the end, before the case stated trial").  While conceding that the District Attorney did not expressly agree to dismiss the charges at issue in exchange for Curley's testimony against Appellant, Attorney Rude testified that the Commonwealth actually dismissed such charges shortly after he requested the same.  *Id.* at 53, 58, 74. Appellant characterizes such action as an undisclosed deal between the Commonwealth and Curley, which the Commonwealth had an obligation to disclose to Appellant.[FN8]

> FN8.  Also in support of this claim, Appellant presented his trial counsel's testimony that he was unaware that a series of charges against Curley had been dropped prior to Curley's trial, and had he been aware, he would have used this evidence to impeach Curley's testimony during Appellant's trial.  *Id.* at 13.

*Koehler-II*, 36 A.3d at 134.  As further stated by the state court, the Commonwealth

countered this evidence with the following:

> The Commonwealth, however, presented evidence at the PCRA hearing disputing the existence of an undisclosed deal between Curley and the Commonwealth.  Specifically, the Commonwealth presented the testimony of District Attorney McGuinness who explained that he agreed to *nolle pros* several charges against Curley prior to Curley's bench trial solely because he desired to make the case easier for the trial judge to render a prompt decision, as he wanted to have at least the guilt phase of Curley's trial concluded prior to Appellant's trial.  *Id.* at 100.  District Attorney McGuinness testified that the Commonwealth had very strong evidence against Curley supporting two counts of first degree murder and burglary, and was not concerned with the kidnapping and

misdemeanor charges.  *Id.*  He further definitively stated that dismissing the lesser charges was never part of an agreement with Curley to obtain his testimony against Appellant.  *Id.* at 99. Rather, District Attorney McGuinness emphasized, the full extent of the Commonwealth's agreement with Curley, as explained on the record at Appellant's trial, was that the Commonwealth agreed to stipulate that Curley's cooperation in Appellant's prosecution would serve as mitigating evidence at Curley's sentencing.  *Id.*

*Koehler-II*, 36 A.3d at 134.

### b.    State Court Decision

In its decision affirming the denial of PCRA relief on this claim, the Pennsylvania

Supreme Court concluded:

> The PCRA court credited the testimony of District Attorney McGuinness and found as a matter of fact that there was no undisclosed agreement between Curley and the Commonwealth.   Consistent with both District Attorney McGuinness' testimony at the PCRA hearing and Curley's testimony at Appellant's trial, the PCRA court held that the only consideration for Curley's testimony was that it would serve as mitigating evidence at Curley's sentencing hearing - a fact of which Appellant's jury was keenly aware.  The court concluded that the "deal" that Appellant faulted the Commonwealth for not disclosing did not exist, thus, there was no *Brady* violation.

> The Commonwealth argues that there is ample support in the record for the PCRA court's factual finding that no undisclosed agreement existed between the Commonwealth and Curley, thus, no impeachment evidence was suppressed.  It relies on the testimony of District Attorney McGuinness, as referenced above, as well as Curley's testimony at Appellant's trial that the only benefit he received in exchange for his testimony against Appellant was that such testimony would serve as mitigating evidence at Curley's sentencing.  The Commonwealth points out that the PCRA court credited the testimony of District Attorney McGuinness, and that this Court cannot, pursuant to Appellant's suggestions, reweigh the evidence presented.

> Upon careful review of the record, we agree with the

Commonwealth that there is ample support for the PCRA court's factual finding that the Commonwealth's dismissal of lesser criminal charges prior to Curley's murder trial did not serve as consideration for Curley's subsequent testimony at Appellant's trial. *See id*. at 99 (where District Attorney McGuinness indicates that the agreement with Curley did not, in any way, include the dismissal of certain charges against Curley). Because there was no undisclosed agreement between the Commonwealth and Curley regarding the dismissal of charges against Curley, no exculpatory or impeaching evidence existed that the Commonwealth had an obligation to disclose under *Brady*. Appellant was, therefore, properly denied collateral relief on this claim.[FN9]

> FN9. In connection with this *Brady* issue, Appellant argues that trial counsel was ineffective for failing to investigate adequately and impeach Curley with the undisclosed agreement he entered into with the Commonwealth. The PCRA court did not address this independent claim. Because we have concluded that no such agreement existed, trial counsel cannot be deemed ineffective for failing to discover and utilize the agreement to impeach Curley. Accordingly, this specific claim of ineffectiveness fails for lack of arguable merit.

*Koehler-II*, 36 A.3d at 134-35.

### c.    Analysis

Initially, as to exhaustion, Mr. Koehler presented these issues in the state courts, and the Pennsylvania Supreme Court partially addressed them in its decision affirming the denial of PCRA relief. *See Koehler-II*, 36 A.3d at 133-135. First, the state court addressed whether there was an undisclosed agreement between the Commonwealth and Mr. Curley constituting impeachment evidence that the Commonwealth was required to disclose under *Brady*. *Id.* Second, the state court addressed whether trial counsel could be deemed ineffective for failing to discover and utilize the agreement in

order to impeach Mr. Curley.  *Id.* at 135 n.9.  Because the state's highest appellate

court addressed the merits of these issues, the Court will apply the deferential AEDPA

standard of review to their disposition here.  Further, because that state court made a

factual determination with respect to these issues, the Court will presume those factual

findings are correct unless Mr. Koehler rebuts those findings by clear and convincing

evidence.  *See* 28 U.S.C. §§ 2254(d)(2), (e)(1); *see also Rice*, 546 U.S. at 338-39

("State-court factual findings . . . are presumed correct; the petitioner has the burden of

rebutting the presumption by 'clear and convincing evidence.'").  The Pennsylvania

Supreme Court did not, however, address the merits of Mr. Koehler's claim that trial

counsel was ineffective for failing to review Mr. Curley's file and discover the trial court

order dismissing the felony charges in his case and then use that information to

impeach him during Mr. Koehler's trial.  Without a merits review in the state courts, this

Court will apply *de novo* review to that issue.

### i.   *Brady* Analysis

In its decision, the Pennsylvania Supreme Court determined that no exculpatory

or impeaching evidence in the form of an agreement existed between the

Commonwealth and Mr. Curley regarding dismissal of some charges, and thus the

Commonwealth had no duty to disclose this action under *Brady*.  *See Koehler-II*, 36

A.3d at 135.  Upon review, the Court agrees with the state court's decision.

Notably, the state court based its decision on a factual finding that "the

Commonwealth's dismissal of lesser criminal charges prior to Curley's murder trial did

not serve as consideration for Curley's subsequent testimony at Appellant's trial."  *Id.*  In

doing so, the state court first acknowledged that, when Mr. Curley testified at Mr.

Koehler's trial, the Commonwealth had agreed that his cooperation with authorities

would serve as mitigating evidence at his own upcoming sentencing proceeding.  *Id*. at

133.  In a side bar, the District Attorney confirmed this fact.  (Trial NT 3/28/1996 a.m.

Part 1 Vol. VII 3.)  Mr. Curley further testified that he received no other promises from

the District Attorney, State Police, or the trial court in exchange for his testimony.  (*Id*. at

125-26.)

　　The state court next looked to the relevant testimony presented at Mr. Koehler's

PCRA hearing.  Mr. Curley's attorney testified at the hearing that, although he asked

the District Attorney to drop some charges against Mr. Curley prior to his bench trial, the

District Attorney did not expressly agree to do so in exchange for Mr. Curley's testimony

against Mr. Koehler.  *Koehler-II*, 36 A.3d at 134.  However, shortly thereafter, the

District Attorney actually did dismiss such charges against Mr. Curley.  *Id*.  The

Pennsylvania Supreme Court noted that it was this action by the District Attorney that

marked the undisclosed deal now alleged by Mr. Koehler.  *Id*.

　　District Attorney McGuinness also testified at the PCRA hearing.  The

Pennsylvania Supreme Court noted, *inter alia*, that the District Attorney explained that

he agreed to drop several charges against Mr. Curley solely because he wished to

make the case easier for the trial judge to render a prompt decision.  *Id*.  He believed

he had strong evidence against Mr. Curley supporting the two counts of first degree

murder and burglary and was not concerned with the lesser charges of kidnapping and

several misdemeanors.  *Id*.  Importantly, the District Attorney definitively stated that

31

dismissing those lesser charges was never part of an agreement with Mr. Curley to obtain his testimony against Mr. Koehler. *Id*. Rather, the only deal the Commonwealth had with Mr. Curley was to stipulate that his cooperation in Mr. Koehler's prosecution would serve as mitigating evidence in Mr. Curley's sentencing. *Id*. This deal was placed on the record in Mr. Koehler's trial, and, therefore, is not at issue here as a possible *Brady* violation.

After reviewing the record, the Pennsylvania Supreme Court agreed with the PCRA court's decision to credit the District Attorney's testimony and to find as a matter of fact that there was no undisclosed agreement between Mr. Curley and the Commonwealth regarding dismissal of charges. *Koehler-II*, 36 A.3d at 134-35. In particular, the state court noted that District Attorney McGuinness had testified that the deal with Mr. Curley regarding his testimony in exchange for its consideration as mitigating evidence in his own case - a deal well known to all parties, the trial court and the jury in Mr. Koehler's case - did not, in any way, include dismissal of certain charges against Mr. Curley. *See id.*, 36 A.3d at 135. As a result, the state court concluded that, with no undisclosed agreement between the Commonwealth and Mr. Curley regarding dismissal of charges, there existed no exculpatory or impeaching evidence that the Commonwealth had a duty to disclose under *Brady*. *Id*.

In light of this evidence recited and relied upon by the Pennsylvania Supreme Court, and in the absence of a contrary showing by Mr. Koehler, this Court concludes that Mr. Koehler has not rebutted the state court's findings with clear and convincing evidence. *See* 28 U.S.C. § 2254(d)(2), (e)(1). The state court's decision that there was

no undisclosed agreement and, therefore, nothing further for the Commonwealth to disclose under *Brady*, is not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1)-(2).

### ii.   *Strickland* Analysis

Next, Mr. Koehler argues that his trial counsel rendered ineffective assistance in two ways with respect to Mr. Curley's testimony.  First, he claims that trial counsel failed to discover and utilize an undisclosed agreement between the Commonwealth and Mr. Curley in order to impeach Mr. Curley at Mr. Koehler's trial.   The Pennsylvania Supreme Court addressed this claim on the merits in *Koehler-II*.  Specifically, it determined that, because no agreement between the Commonwealth and Mr. Curley existed, trial counsel cannot be deemed ineffective for failing to discover and utilize the agreement to impeach Mr. Curley.  *Koehler-II*, 36 A.3d at 135 n.9.  Upon review, and based on the Court's agreement with the Pennsylvania Supreme Court over that conclusion regarding the nonexistence of an undisclosed agreement, the Court further agrees with the state court's decision regarding the ineffectiveness claim, as it is not contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1).  Nor is it an unreasonable determination of the facts in light of the evidence presented in state court.  § 2254(d)(2).  Thus, Mr. Koehler is not entitled to habeas relief on this claim.

Second, in addition to arguing that trial counsel failed to discover an agreement between the Commonwealth and Mr. Curley, Mr. Koehler also argues that counsel

failed to review Mr. Curley's file and discover the trial court order dismissing the felony charges in his case and then use that information to impeach him during Mr. Koehler's trial.  The Pennsylvania Supreme Court did not address this issue, and thus the Court now will review it *de novo*.

As to the deficient performance prong of the *Strickland* analysis, Mr. Koehler argues that reviewing the court file of a co-defendant who is testifying against your client is a "basic investigative step" any reasonable attorney would undertake in preparing to cross-examine such a witness.  (Doc. 1 at 33.)  Trial counsel's failure to do so, argues Mr. Koehler, constitutes ineffective assistance of counsel.  (*Id*.)

Satisfying *Strickland*'s investigation mandate ultimately turns on counsel's adherence to the professional standards for investigation at the time of trial.  In defining what constitutes a complete investigation in this matter, therefore, the Court looks to the prevailing professional norms as they existed in 1996.

In 1996, the ABA Standard for Criminal Justice ("Standard") stated:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

1 ABA Standards for Criminal Justice: Prosecution Function and Defense Function, 4–4.1 (2d ed.1982 Sup.); *see also Strickland*, 466 U.S. at 688–89 (discussing the use of ABA standards as guides for determining "prevailing norms of practice"); *Rompilla*,

355 F.3d at 259 n.14 (referring to the ABA standards as "important guides" although cautioning against viewing them as "a codification of the requirements of the Sixth Amendment").  The ABA standards, coupled with *Strickland*'s explicit language requiring a thorough investigation into facts relevant to both guilt and sentencing, show that an investigation into all matters surrounding the facts of the case was the foundation of reasonable representation during a trial's guilt phase in 1996.  *See Strickland*, 466 U.S. at 690-91.

During the PCRA hearing in the instant case, Mr. Koehler's attorney, Attorney Frawley, testified that at no point in time did he go to the courthouse to review Mr. Curley's prosecution file.  (Doc. 50-88, Notes of Testimony, PCRA Hearing, 5/31/2006 p.m., Part 1, at 38-39 ("PCRA NT 5/31/2006 p.m. Part 1").)  Had Attorney Frawley reviewed Mr. Curley's file prior to Mr. Koehler's trial, he would have discovered the trial court's order dismissing the lesser charges against Mr. Curley.  While this evidence would not have necessarily led to the discovery of any exculpatory evidence, Attorney Frawley testified that he would have raised it during Mr. Koehler's trial in order to attack Mr. Curley's credibility.  (*Id*. at 39.)  There is nothing in the record showing that such a failure on the part of Attorney Frawley had a strategic purpose.  Rather, it appears that counsel's investigation of Mr. Curley as a potential witness, which did not include personally reviewing his separate prosecution file readily available at the courthouse, was not the result of the type of reasoned tactical decision to which the Court owes deference under *Strickland*.

This Court recognizes that "[t]he right to counsel does not require that a criminal

35

defense attorney leave no stone and no witness unpursued." *Blystone v. Horn*, 664

F.3d 397, 423 (3d Cir. 2011) (quoting *Jermyn*, 266 F.3d at 308 (alteration in original)

(quotation marks omitted)).   However, the Sixth Amendment "require[s] a reasoned

judgment as to the amount of investigation the particular circumstances of a given case

require." *Jermyn*, 266 F.3d at 308; *see also Strickland*, 466 U.S. at 691.   From a review

of the record in this case, and cognizant that the Court is acting with the benefit of

hindsight and in accordance with the *Strickland* mandate, the Court finds that counsel's

amount of investigation into Mr. Curley with respect to his potential testimony was not

the result of any such reasoned judgment.   Rather, counsel's failure to perform the

basic step of looking into Mr. Curley's readily available prosecution file was not

reasonable.

Turning to *Strickland*'s prejudice prong, while trial counsel could have presented

to the jury Mr. Curley's trial court record showing some lesser charges had been

dropped, counsel simply could not have shown the jury that these charges were

dropped as part of an agreement between the Commonwealth and Mr. Curley, thereby

giving a benefit in exchange for testifying against Mr. Koehler.   In fact, Mr. Curley

himself testified at Mr. Koehler's trial that he received no promises from the District

Attorney, the State Police, or the trial court in exchange for testifying against Mr.

Koehler, (Trial NT 3/28/1996 a.m. Part 1 Vol. VII 125-26), and that he was still facing

the possibility of the death penalty or life imprisonment, (*id*. at 126), but was only hoping

that, by testifying at Mr. Koehler's trial, he could avoid the death penalty, (*id*. at 126).   In

light of what the jury heard with regard to Mr. Curley's motivation for testifying, the Court

is not persuaded that, had counsel presented this evidence of Mr. Curley's court record, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 694. Mr. Koehler was not prejudiced by counsel's failure to discover and use Mr. Curley's trial court record and, thus, Mr. Koehler's claim of ineffectiveness fails.

### 2.    Kirk Schrader

Mr. Koehler also raises two issues here surrounding the non-disclosure of impeachment evidence relating to Mr. Schrader. First, Mr. Koehler claims the Commonwealth failed to disclose evidence that Mr. Schrader had entered into a non-prosecution agreement with the Commonwealth in exchange for his cooperation against Mr. Koehler. Second, Mr. Koehler argues that trial counsel was ineffective for failing to do more than read the police report authored by Trooper Madigan which, incidentally, contained information regarding the Trooper's account of the non-prosecution agreement with Mr. Schrader. Had trial counsel "call[ed] Schrader's attorney and inquire[d] if his reading of the Madigan police report was correct," (Doc. 34 at 34), Mr. Koehler contends, trial counsel would have learned about the existence of the non-prosecution agreement and would have then had impeachment evidence to attack Mr. Schrader's credibility. The Court will address these issues in turn after setting forth a relevant background.

### a.    Background

Mr. Schrader testified at Mr. Koehler's trial on behalf of the Commonwealth. Specifically, as set forth by the Pennsylvania Supreme Court,

> Schrader testified at Appellant's trial that he observed Curley
> and Appellant discuss plans to kill Clark, and that later that

37

day, he heard gunshots being fired in his garage, and saw
Curley in the garage with his arm extended.  The cars in the
garage purportedly blocked Schrader's view of Curley's gun
and Clark.

*Koehler-II*, 36 A.3d at 135.

During his opening statement to the jury, Mr. Koehler's defense counsel,

Attorney Frawley, stated the following regarding Mr. Schrader's testimony:

> How credible is Kirk Schrader?  He's going to come here, . . .
> he's going to take an oath, and he's going to say this man was
> involved.  And the D.A.'s going to say believe him.
>
> * * *
>
> [W]hen he finally implicates my client, it's after he's got an
> attorney, and about that time the District Attorney comes up to
> him and says we're giving you immunity.  We won't prosecute
> you.

(Doc. 50-16, Notes of Testimony, Trial, 3/25/1996 a.m., Part 1, Vol. I, at 43, 44 ("Trial

NT 3/25/1996 a.m. Part 1 Vol. I").)

Immediately prior to Mr. Schrader's testimony at Mr. Koehler's trial, the trial court

conducted a side bar with counsel.  (Doc. 50-55, Notes of Testimony, Trial, 04/03/1996

a.m., Part 2, Vol. XVII, at 66-71 ("Trial NT 4/3/1996 a.m. Part 2 Vol. XVII").)  Contrary to

his opening, Attorney Frawley stated that Mr. Schrader had *not* been given immunity in

exchange for his testimony, and expressed concern that Mr. Schrader may not

understand that the information he would testify to could be used against him.  (*Id*. at

67-68.)  In response, District Attorney McGuinness stated that he had personally

communicated to Mr. Schrader that any testimony he gives could be used against him,

as had several investigators, a detective, and his own defense counsel.  (*Id*. at 68-69.)

The court then called Mr. Schrader to the bench and they had the following exchange:

38

| | |
|---|---|
| Trial court: | You've discussed with your attorney the possibility that your testimony today might be used in some fashion against you, you discussed that? |
| Mr. Schrader: | Yeah. |

* * *

| | |
|---|---|
| Trial court: | [A]nd [your attorney] has consulted you and advised you about whether you should or should not testify here today, am I correct? |
| Mr. Schrader: | Correct. |
| Trial court: | [I]s it your choice to testify today and answer questions freely, Is that right? |
| Mr. Schrader: | That's right. |

(*Id.* at 70.) Further, in open court, the District Attorney had the following exchange with

Mr. Schrader:

| | |
|---|---|
| District Attorney: | What is your understanding about your status as potentially being charged in this case? |
| Mr. Schrader: | That I could be charged. |

* * *

| | |
|---|---|
| District Attorney: | Can [your testimony at trial] be used against you? |
| Mr. Schrader: | Yes sir. |
| District Attorney: | Are you getting any favors from me or Trooper Madigan or from any police source for coming in here today and testifying? |
| Mr. Schrader: | No I'm not. |
| District Attorney: | Have you been made any promises? |

> Mr. Schrader:          No sir.

(*Id.* at 109.)

On the next day of trial, former District Attorney Robert Fleury testified about his meeting with Mr. Schrader that took place approximately one (1) year prior to Mr. Koehler's trial.[7]   (Doc. 50-61, Notes of Testimony, Trial, 4/4/1996 a.m., Part 2, Vol. XIX, at 67-68 ("Trial NT 4/4/1996 a.m. Part 2 Vol. XIX").)   Attorney Fleury wanted to question Mr. Schrader about some inconsistencies in his previous statements to police.  (*Id.* at 69.)  Further, he testified that, "I told him, Mr. Schrader, he wasn't even being advised of his rights at that time, he was not a suspect. . . .  I told him that if I find out later that [he's] not telling everything as it is, then watch out."  (*Id.*)  Attorney Fleury then clarified that "watch out" meant that Mr. Schrader should be prepared for possible prosecution.  (*Id.*)  Attorney Fleury also testified that he did not discuss immunity with Mr. Schrader.  (*Id.* at 69-70.)

In addition, during his closing argument, District Attorney McGuinness specifically argued that Mr. Schrader had no offers of immunity in exchange for his testimony against Mr. Koehler:

> In opening statement, you heard Kirk Schrader is not to be believed, he's testifying under a grant of immunity.  What grant of immunity?  Did Bob Fleury give him one?  Was a court order produced to show that he got a grant of immunity?  What did he tell you?  The testimony he's given right there can be used against him.

(Trial NT 4/10/1996 p.m. Vol. XXVI 21).)

---

[7] Attorney Fleury was Bradford County's District Attorney at the time of the murders. However, Attorney McGuinness assumed that duty prior to Mr. Koehler's trial, and, thus, prosecuted the case.

The Pennsylvania Supreme Court summarized the subsequent relevant facts with respect to prosecution of Mr. Schrader, as recited in part by Mr. Koehler, as follows:

> Although Schrader had no charges pending against him at the time of Appellant's trial, Appellant points out that Schrader was arrested one month later and charged with hindering apprehension or prosecution, aiding consummation of a crime, and criminal conspiracy, stemming from the instant murders. The Commonwealth's information charged that Schrader, knowing that Curley had already killed Clark upon Appellant's direction, intentionally aided Curley and Appellant in an unlawful objective by supplying the .22 caliber bullets, which Curley used to shoot Hopper.  *See Commonwealth v. Schrader*, Trial Ct. Slip Op., May 27, 1997, at CP-08-CR-286-1996, at 1-2. Following Schrader's arrest, he filed an omnibus pre-trial motion seeking, *inter alia*, dismissal of the charges on the grounds that he had entered into a non-prosecution agreement with the Commonwealth.
>
> After conducting an evidentiary hearing on Schrader's motion to dismiss, the trial court credited the testimony of Schrader's defense counsel, which established that District Attorney Robert Fleury[FN10] entered into a non-prosecution agreement with Schrader on May 5, 1995, nearly one year before Appellant's trial.  The court found that the agreement provided that if Schrader would testify truthfully at Appellant's trial, District Attorney Fleury would not prosecute him for any offenses related to the instant murders.  The court in *Schrader* concluded that Schrader upheld his end of the agreement by testifying against Appellant. *Id*. at 19.  The court further noted that a May 5, 1995 police report prepared by Trooper Nicholas Madigan indicated that District Attorney Fleury informed Schrader that he was being interviewed as a witness in Appellant's prosecution, rather than as a suspect, and that Schrader would not be prosecuted in connection with the murders of Clark and Hopper.  Accordingly, on May 22, 1997, more than one year after Appellant's trial, the trial court dismissed the charges against Schrader based on the existence of a non-prosecution agreement.[FN11]
>
> > FN10.  It becomes relevant that District Attorney Fleury was the predecessor to District Attorney

41

> McGuinness, as referenced in the previous claim.
>
> FN11.  The trial judge who granted Schrader's motion to dismiss was the same trial judge who presided over Appellant's PCRA proceedings.

*Koehler-II*, 36 A.3d at 136.

In response to Mr. Koehler's argument before the state court, the Commonwealth contended that "the controlling inquiry is not whether Schrader ever entered into a non-prosecution agreement, but whether Schrader believed such agreement was valid at the time he testified against Appellant."  *Id*. at 137.  Further, as set forth by the Pennsylvania Supreme Court,

> In support of its position, the Commonwealth relies on the testimony provided by District Attorney McGuinness at Appellant's PCRA hearing.  District Attorney McGuinness testified that when he assumed his role of attorney for the Commonwealth after District Attorney Fleury held that position, he personally informed Schrader, prior to Appellant's trial, that there was no binding agreement between him and the Commonwealth, that the Commonwealth would not make any offer, and that Schrader could testify as a witness for the prosecution or not, as it was his choice.  N.T. Jun. 1, 2006, at 121-22.  The Commonwealth argues that District Attorney McGuinness' testimony in this regard is consistent with Schrader's testimony at Appellant's trial and District Attorney McGuinness' on-the-record representation to the court at Appellant's trial, which established that there was no agreement between Schrader and the Commonwealth at that particular point in time.  N.T. Apr. 3, 1996, Vol. XVII, at 68 (where District Attorney McGuinness informs the court at Appellant's trial that he personally informed Schrader, as did a trooper and investigator, that the information Schrader was about to testify to could be used against him); *id*. at 108-09 (where Schrader testifies at Appellant's trial that he is not testifying under immunity, that he understands that he could be charged for offenses related to the murders of Clark and Hopper, and that he received no promises of favors in exchange for his testimony).

*Id.*

## b.    State Court Decision

In light of the circumstances set forth above, the Pennsylvania Supreme Court

affirmed the denial of PCRA relief on this claim with respect to a purported undisclosed

agreement with Mr. Schrader, concluding:

> The PCRA court expressly credited the testimony of District Attorney McGuinness, and found that "at the time Schrader testified at [Appellant's] trial, the non-prosecution agreement clearly had been repudiated by the Commonwealth, whether lawfully or not, and Schrader himself acknowledged that he had no form of immunity."  PCRA Ct. Opinion, Jun. 30, 2009, at 8.  The PCRA court went on to state that "there is not a scintilla of evidence that when Schrader testified at [Appellant's] trial, he believed there was any promise of leniency from the Commonwealth.  In short, there was no undisclosed agreement which might have impeached Schrader and no undisclosed exculpatory evidence."  *Id.* at 8-9.

> The PCRA court further held that, contrary to Appellant's contentions, Schrader's testimony was not critical to Appellant's prosecution because even without such testimony, "the evidence points ineluctably to [Appellant's] guilt beyond a reasonable doubt."  *Id.* at 9.  Thus, the court concluded that even if Appellant could establish that Schrader testified under an undisclosed non-prosecution agreement, Appellant was not prejudiced by the Commonwealth's failure to disclose the same.  *Id.*

> We conclude that the PCRA court's factual findings are supported by the record and its legal conclusions are free from error.  There was ample evidence of record to support the finding that Schrader believed that his testimony at Appellant's trial could subsequently be used against him, and, therefore, had no incentive to fabricate testimony in exchange for favorable treatment by the Commonwealth.  As noted by the Commonwealth, this was established by the testimony of District Attorney McGuinness at Appellant's PCRA evidentiary hearing, and the testimony of Schrader, himself, at Appellant's trial, as referenced above.  N.T. Jun. 1, 2006, at 121-22, N.T.

Apr. 3, 1996, Vol. XVIII, at 108-09.  Considering that the PCRA court credited the testimony establishing that Schrader believed the non-prosecution agreement had been revoked, it strains logic to conclude that Appellant could have used such agreement to impeach Schrader's testimony to demonstrate bias on the part of Schrader.  This *Brady* claim, therefore, fails.

*Koehler-II*, 36 A.3d at 137-38.[8]

---

[8] In the pretrial hearing in Mr. Schrader's subsequent criminal proceedings, *see supra*, Attorney Fleury provided testimony essentially identical to what he had testified to during Mr. Koehler's trial.  (Doc. 48-1, Ex. 12, *Commonwealth v. Schrader*, 96-CR-00286 (Bradford Ct. Com. Pl.), Notes of Testimony, Omnibus Pre-trial Hearing, 11/22/1996, at 10-11, 17-19 ("Pretrial NT").)  Specifically, when asked if he ever entered into an agreement with Mr. Schrader where he would not be prosecuted for his testimony in Mr. Koehler's trial, Attorney Fleury stated:

> Never used any words to that nature.  I do specifically recall telling [Mr. Schrader] and his parents, I believe, were there too, as far as I was concerned, at that time, he was not considered a suspect.  He was not even going to be advised of his constitutional rights, but never used any statement that he was not going to be prosecuted or anything, just . . . that he wasn't a suspect.

(*Id*. at 11.)  Further, when asked why the associated police report, authored by Trooper Madigan, made a reference to Attorney Fleury informing Mr. Schrader that prosecution would not be sought against him for his involvement, Attorney Fleury responded:

> I think this report is Trooper Madigan kind of paraphrasing, you know, what he believed was the tone of the conversation, but I don't recall of that subject ever coming up, that he would not be prosecuted, that he was being interviewed as a potential witness, just simply – I think that was certainly implied, that he was to be a witness, cause he certainly had some information on the case, but . . . I'm absolutely sure I told him that he was not a suspect.

(*Id*. at 18.)  Unfortunately, Mr. Koehler has not provided Trooper Madigan's police report for the Court's review in connection with this issue.  However, during Trooper Madigan's testimony at Mr. Koehler's trial, Trooper Madigan read his report into the record.  (*See* Doc. 50-52, Notes of Testimony, Trial, 4/3/1996 p.m., Part 2, Vol. XVIII, at 64-70 ("Trial NT 4/3/1996 p.m. Part 2 Vol. XVIII").)  He read, *inter alia*, the following statement from his report: "District Attorney Fleury told Schrader, he was being interviewed as a witness in this case, not as a suspect, and informed him that prosecution would not be sought against him for his involvement." (*Id*. at 64.)  He further testified that Attorney Fleury "explained to Mr. Schrader that, at that point in the investigation, we had no reason to believe that he was involved in the killings, so, at that time, prosecution was not going to be sought against him." (*Id*. at 70-71.)  Trooper Madigan did not recall Attorney Fleury offering Mr. Schrader immunity, though.  (*Id*. at 71.)  Notably, Trooper

####     c.      Analysis

In its decision, the Pennsylvania Supreme Court determined that, based on the

factual finding that Mr. Schrader believed that any non-prosecution agreement had

been revoked prior to his testimony at Mr. Koehler's trial, there was no exculpatory or

impeaching evidence in the form of a non-prosecution agreement for Mr. Schrader that

the Commonwealth had a duty to disclose under *Brady*.  *Koehler-II*, 36 A.3d at 137-38.

Upon review, the Court agrees with the state court's decision.

The state court based its decision on a factual finding that "there was no

undisclosed agreement [at the time of Mr. Koehler's trial] which might have impeached

Schrader and no undisclosed exculpatory evidence."  *Id*. (quotation marks omitted).  In

doing so, the court noted there was "ample evidence" to support a finding that Mr.

Schrader believed his testimony at Mr. Koehler's trial could subsequently be used

against him, and, therefore, he had no reason to fabricate testimony in exchange for

favorable treatment.  *Id*. at 138.  Such "ample evidence" included the testimony of

---

Madigan subsequently testified at Mr. Schrader's pretrial hearing, "I specifically remember
District Attorney Fleury saying that Mr. Schrader was not a suspect. *The subsequent sentence
regarding prosecution may have been an inference on my part*." (Pretrial NT 44) (emphasis
added). In fact, Trooper Madigan later testified that he had no recollection of Attorney Fleury
saying to Mr. Schrader that he would not be prosecuted for his involvement in the crimes. (*Id*.
at 51.) Even so, Mr. Schrader's defense counsel, W. Marshall Dawsey, Esquire, testified at the
same hearing that he did, in fact, hear Attorney Fleury tell Mr. Schrader that, if he would
cooperate in the case against Mr. Koehler, he would not be prosecuted for his involvement in
the crimes. (*Id*. at 66.) Given the discrepancies in the testimony of all relevant witnesses here,
and without the opportunity to review the police report, the Court is simply not willing to accept
Mr. Koehler's present argument that Attorney Fleury's statements regarding his interview with
Mr. Schrader were "false testimony," (*see* Doc. 1 ¶ 45). *See also infra*, pp. 46-48. Rather,
regardless of any findings made by the state court in Mr. Schrader's case, Mr. Koehler has
failed to rebut the state court's factual findings *in this case* as to District Attorney McGuinness'
testimony that he revoked any possible non-prosecution agreement with Mr. Schrader prior to
his testimony at Mr. Koehler's trial with clear and convincing evidence. *See* 28 U.S.C. §
2254(e)(1).  Thus, the Court will not disturb the state court factual findings made in this case.

District Attorney McGuinness at the PCRA hearing, as well as the testimony of Mr.

Schrader himself. *Id*. Each testified that a non-prosecution agreement did not exist at

the time of Mr. Schrader's testimony at Mr. Koehler's trial. In fact, the Pennsylvania

Supreme Court acknowledged that the PCRA court had credited this testimony which

established that Mr. Schrader believed the non-prosecution agreement had been

revoked at the time of Mr. Koehler's trial. *Id*.

In light of the evidence recited and relied upon by the Pennsylvania Supreme

Court, and in the absence of a contrary showing by Mr. Koehler, this Court concludes

that Mr. Koehler has not rebutted the state court's factual findings with clear and

convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The state court's decision that there

was no undisclosed agreement which may have impeached Mr. Schrader and no

undisclosed exculpatory evidence, is not contrary to, or an unreasonable application of,

clearly established federal law, or an unreasonable determination of the facts. 28

U.S.C. § 2254(d)(1)-(2).

Further, in the response to Mr. Koehler's habeas petition, Respondents contend

that he has pointed to "no clearly established federal law to the effect that a revoked

agreement with a witness constitutes *Brady* material when both the prosecution and the

witness act under the belief that there is no valid agreement." (Doc. 37 at 25.) In reply,

Mr. Koehler repackages his challenge here as a violation under *Giglio v. United States*,

405 U.S. 150 (1972). Even with this repackaging, Mr. Koehler's claim fails.

As stated above, in *Brady*, 373 U.S. 83 (1963), the United States Supreme Court

held "that suppression by the prosecutor of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87.  In *Giglio*, the Supreme Court extended *Brady* to certain impeaching evidence, holding that, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of required *Brady* disclosure]." *Giglio*, 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

In *Giglio*, the Government's case depended almost entirely on the testimony of a witness whom the Government promised it would not prosecute if he testified.  The trial prosecutor had not himself made the agreement and was unaware of it, but the Court charged him with knowledge of the agreement made by his predecessor.  The Court held that, because the evidence was relevant to the jury's assessment of the credibility of the witness, a new trial would be "required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury[.]'" *Id.* at 154 (quoting *Napue*, 360 U.S. at 271).

Upon review, the Court finds that the instant case does not present a *Giglio* violation.  In order to establish such a violation, Mr. Koehler must show that: (1) Mr. Schrader committed perjury; (2) the prosecution knew or should have known of his perjury; (3) the testimony went uncorrected; and (4) the testimony was material, meaning that there is a reasonable likelihood that the false testimony could have affected the verdict. *See, e.g.*, *Guzman v. Sec'y Dep't of Corr.*, 661 F.3d 602, 613-14 (11th Cir. 2011); *Lambert v. Blackwell*, 387 F.3d 210, 242-43 (3d Cir. 2004); *Steele v.*

*Beard*, 830 F. Supp. 2d 49, 75 (W.D. Pa. 2011).

There is no evidence that Mr. Schrader committed perjury at Mr. Koehler's trial or that the Commonwealth knew or should have known of any alleged perjury. As the Pennsylvania Supreme Court found, "There was ample evidence of record to support the finding that Schrader believed that his testimony at [Mr. Koehler's] trial could subsequently be used against him, and, therefore, had no incentive to fabricate testimony in exchange for favorable treatment by the Commonwealth." *Koehler-II*, 36 A.3d at 138. Again, that "ample evidence" included testimony from both District Attorney McGuinness and Mr. Schrader that a non-prosecution agreement did not exist at the time of Mr. Schrader's testimony at Mr. Koehler's trial. In addition, former District Attorney Fleury testifed that he did tell Mr. Schrader he was not considered a suspect, but never told him he would not be prosecuted. Trooper Madigan acknowledged that he may have simply inferred the statement regarding non-prosecution from District Attorney Fleury recorded in his report. Further, Mr. Koehler fails to demonstrate that "there is any reasonable likelihood that the false testimony could have affected the verdict." As set forth herein, the Commonwealth presented significant evidence independent of Mr. Schrader's testimony to prove to the jury that it was Mr. Koehler who conspired with, and in fact expressly directed, Mr. Curley to kill Regina Clark and Austin Hopper. For these reasons, Mr. Koehler's *Giglio* claim will be denied.

Even if Mr. Koehler demonstrated that Mr. Schrader's testimony implicated his federal constitutional rights - and here he has not - any error would be harmless in light of the other evidence introduced at his trial. As set forth in *Brecht*, the harmless error evaluation requires that, in order to grant habeas relief, a federal habeas court must

48

find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  *See also Guzman*, 661 F.3d at 622-23 (applying *Brecht* harmless error analysis to a *Giglio* claim); *Rosencrantz*, 568 F.3d at 588-92 (same).  "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quotation marks omitted); *Bond*, 539 F.3d at 276.  Because the Court is not in grave doubt that the introduction of Mr. Schrader's testimony had a "substantial and injurious effect or influence" on the jury's verdict, any error was harmless under *Brecht*.  Thus, for this additional reason, Mr. Koehler is not entitled to habeas relief on this claim.

Turning to the ineffectiveness issue, Mr. Koehler claims that trial counsel was ineffective for failing to do more with this issue related to Mr. Schrader than review Trooper Madigan's police report.  He also asserts that he litigated this ineffectiveness claim in state court in post-conviction review and appeal.  (Doc. 1 ¶ 72.)  However, upon review and based on the record presented, the Court concludes that this ineffectiveness claim was not, in fact, presented to the state courts.  First, in the PCRA proceedings in state court, Mr. Koehler's counsel, the same counsel representing Mr. Koehler in these habeas proceedings, expressly stated that he was not asserting an ineffectiveness claim associated with the Mr. Schrader issue.  Specifically, counsel had the following exchange regarding this issue:

> Mr. Moreno:     [W]e're not claiming that Mr. Frawley was ineffective, we're claiming that the

|  | Commonwealth failed to turn over the fact that they had a non-prosecution agreement with Mr. Schrader, that's what we're alleging.  This isn't an IAC claim, ineffective assistance of counsel - |
|---|---|
| Mr. Carusone: | I thought I saw it in there, I thought that was imbedded in your, in your petition that there was also an allegation of ineffectiveness against Mr. Frawley for failing to uncover this information.  If that's been withdrawn then – |
| Mr. Moreno: | I don't think as far as the Schrader agreement goes. |

(Doc. 50-89, Notes of Testimony, PCRA Hearing, 5/31/2006 p.m., Part 2, at 89-90

("PCRA NT 5/31/2006 p.m. Part 2 89-90").)  Second, in the state court opinions

provided to the Court, there is no mention, let alone discussion, of an ineffectiveness

claim associated with this Mr. Schrader issue.  Therefore, the Court deems this

ineffectiveness claim procedurally defaulted.  Because Mr. Koehler has failed to show,

or even argue, cause and/or prejudice for the procedural default, the Court will deny this

claim.  Nevertheless, even if the Court were to examine the merits of such a claim,

because the Court has found the associated *Brady* claim to be without merit, it follows

that counsel cannot be ineffective for failing to raise and pursue a meritless claim.  *See*

*Strickland*, 466 U.S. at 691 (reasoning counsel's performance cannot be deficient

based on a failure to advance meritless claims).

In sum, for the reasons stated above, Mr. Koehler is not entitled to relief on any

aspect of this claim, including the issues regarding Mr. Curley and Mr. Schrader, as well

as the ineffective assistance of counsel issues.

**B.    Claim II - The Commonwealth's use of inconsistent and irreconcilable theories of prosecution between Petitioner and his Co-Defendant violated Petitioner's right to due process; counsel rendered ineffective assistance by failing to investigate.**

In this claim, Mr. Koehler argues that his right to due process under the Fifth and Fourteenth Amendments was violated when the Commonwealth employed inconsistent and irreconcilable theories of prosecution presented first in Mr. Koehler's trial and later during the penalty phase of the trial of his co-Defendant, Mr. Curley.  Specifically, Mr. Koehler seeks a new trial and sentencing hearing because the jury convicted and sentenced him on the basis of testimony from Mr. Curley that the Commonwealth later discredited during Mr. Curley's sentencing hearing.  After careful review, the Court will deny habeas relief on this claim.[9]

## 1.    Background

Prior to his separate sentencing hearing on convictions related to the killings of Ms. Clark and Austin Hopper, Mr. Curley testified at Mr. Koehler's trial.  On direct examination by the Commonwealth, Mr. Curley testified that Mr. Koehler told him he was a hit man and encouraged Mr. Curley to pursue the same "career."  (Trial NT 3/28/1996 a.m. Part 1 Vol. VII 18-19.)  Mr. Curley thought being a hit man "would be all right" because he was expecting to be hired to kill "people like drug dealers and mob

---

[9] In the heading of this claim, Mr. Koehler also states that counsel rendered ineffective assistance here by failing to investigate. (Doc. 1 at 33.)  However, in his petition and supporting memorandum of law, Mr. Koehler makes no argument in support of this subclaim related to ineffective assistance of counsel. (*See* Doc. 1 ¶¶ 73-77; Doc. 34 at 33-41.)  Rather, Mr. Koehler's only mention of counsel's performance is set forth in a footnote supporting his contention that his due process claim is entitled to *de novo* review before this Court. (*See* Doc. 48 at 30 n.7.)  In the absence of any argument by Mr. Koehler in favor of his position with respect to ineffectiveness, set forth only as a sub-claim only in Claim II's heading, the Court will not address this undeveloped ineffectiveness argument.

men, people that would hurt innocent people." (*Id*. at 20.)  As a result, Mr. Curley

began a physical training regimen with Mr. Koehler as his mentor, including weight

training and sparring.  (*Id*. at 26-27.)

When Ms. Clark and Austin Hopper arrived in Pennsylvania, Mr. Koehler told Mr.

Curley that he wanted him to kill them.  (*Id*. at 40.)  According to Mr. Curley, when he

responded that he did not want to kill them, Mr. Koehler "told me I had to, that, if I didn't,

he'd kill me." (*Id*.)  Later, Mr. Koehler provided Mr. Curley with a gun he was to use to

kill them.  (*Id*. at 42-43.)  Mr. Curley remained reluctant, according to his testimony, but

Mr. Koehler told him "kill or be killed." (*Id*. at 47.)  Following this testimony, Mr. Curley

described other events, including his botched attempt to shoot Ms. Clark on Stone Jug

Road outside the presence of Mr. Koehler, (*id*. at 54-57), a conversation with Mr.

Koehler at the Schrader residence about whether to hit Ms. Clark over the head with a

hammer instead of shooting her with the gun, (*id*. at 63), showing the gun to Mr.

Schrader, (*id*. at 64), and discussing with Mr. Koehler where to bury Ms. Clark, (*id*. at

65-66).

Even after detailing these events, Mr. Curley testified that he was reluctant to kill

Ms. Clark and Austin Hopper, but Mr. Koehler told him he "had to." (*Id*. at 67.)  Further,

after describing in detail the killings of Ms. Clark and Austin Hopper, including Mr.

Koehler's involvement and directives regarding how to carry out the shootings, and

where to put the victims' bodies and weapons used, (*id*. at 75-120), Mr. Curley testified

that he killed the two victims because he was "fearing for [his] life and [his] family's life,"

(*id*. at 125).  However, on cross-examination, Mr. Curley admitted that Mr. Koehler

never told him that he would hurt his family. (*Id.* at 136.)  In addition, when defense

counsel asked why he did not give an excuse to Mr. Koehler in order to avoid shooting

the victims, Mr. Curley responded, "Because, at that point, I didn't think there was any

excuse to get out of it." (*Id.* at 180.)

During the Commonwealth's closing argument, District Attorney McGuinness

described how both Mr. Curley and Mr. Koehler carried out the homicides, and

characterized Mr. Curley as "an eighteen year old kid that got sucked in by that guy [Mr.

Koehler]." (Trial NT 4/10/1996 p.m. Part 1 Vol. XXVI 18.)  Further, in describing one

theory of the case to the jury based on Mr. Koehler serving as an accomplice,[10] District

Attorney McGuinness stated, "Of course, the evidence is he solicited, commanded,

encouraged and requested William Curley to commit murder." (*Id.* at 31.)  Finally, when

summarizing the Commonwealth's theory of the case at the end of his argument,

District Attorney McGuinness stated,

> The conspiracy [between Mr. Koehler and Mr. Curley] is born
> in that car and it never stops until the two people are dead.
> The promise is, Mr. Curley, this is your chance to be initiated
> into the world of hit men, you'll make a lot of money and you'll
> be something special, rather than just an eighteen year old kid,
> working at County Recovery Service.  Only an eighteen year
> old kid would buy it, unfortunately, this one did.
>
> * * *
>
> Then there is the session with driving to Wysox to pump the
> young eighteen year old boy up, encourage him, get him going,
> tell him he has to do this, kill or be killed, the whole routine.

---

[10] The other theory, as described by District Attorney McGuinness as "separate" and
"distinct," was based on Mr. Koehler's role as a co-conspirator.  (Trial NT 4/10/1996 p.m. Part 1
Vol. XXVI 31-32.)

(*Id*. at 36-37; 38.)

For defense counsel's part, in his closing Attorney Frawley challenged Mr.

Curley's credibility as to Mr. Koehler's involvement in the murders. (Doc. 50-71, Notes

of Testimony, Trial, 4/10/1996 a.m., Part 1, Vol. XXV, at 13-14 ("Trial NT 4/10/1996

a.m. Part 1 Vol. XXV"); (Trial NT 4/10/1996 a.m. Part 2 Vol. XXV 48; 49; 52; 58-59; 60;

65; 70; 72).) By way of example, Attorney Frawley argued:

> You really think William Curley thought that John Koehler was a hit man? John Koehler had nothing. But it doesn't stop there. At a point, he says, I'm afraid, because he's a hit man and he said he'd kill me and I was afraid for my family. Now, the evidence that suggests that he was afraid for his family is really, really far fetched, I would suggest.

(Trial NT 4/10/1996 a.m. Part 2 Vol. XXV 66-67.) In addition,

> William Curley is going to say that he was really afraid. Well, there was [a] point, Ladies and Gentlemen, when William Curley had the gun. John Koehler didn't. Did he use the gun to arrest John Koehler? Did he use the gun to take Regina and take Austin and remove the two potential victims? No. When John Koehler was at Settler's Restaurant, where was William Curley? He had a car, he had a gun, he had himself, he had Regina, he had Austin and he was in an area where there were small communities around, places that he could go to. Did this man, in fear, do anything to protect himself and the victims? No. He wasn't in fear. He pulled that trigger and he pulled the trigger because he wanted to.

(*Id*. at 68.) Attorney Frawley also generally argued Mr. Curley's active solitary

involvement in the crimes as opposed to a conspiracy with Mr. Koehler. (*See id.*

*generally*.)

At Mr. Koehler's sentencing hearing, the Commonwealth referenced Mr. Curley

several times to the jury in its opening and closing statements. In describing the

aggravating circumstance of the contract killing, District Attorney McGuinness stated,

"Mr. Koehler . . . told William Curley that, as a condition to receiving six figure sums for doing future killings, he had to do this threshold crime and kill these two people."  (Doc. 50-77, Notes of Testimony, Sentencing, 4/12/1996 a.m. Part 1, at 11 ("Sentencing NT 4/12/1996 a.m. Part 1").)  In addition, in describing mitigating circumstances, District Attorney McGuinness stated,

> First, you are to consider and determine whether it's a mitigating circumstance that Mr. Koehler was an accomplice, that he didn't pull the trigger.  Well, as you already know, based on your findings, the killing, in this case, occurred because William Curley squeezed the trigger with a five pound pull, but the force that William Curley used to pull that trigger was nothing compared to the force that Mr. Koehler used to squeeze Mr. Curley.  Young Mr. Curley opted out of this crime several times, but the vice was there.  He kept squeezing and squeezing and squeezing 'till that eighteen year old boy did it.  Now, the fact that the eighteen year old boy pulled the trigger, is that mitigated in this case, because this man squeezed him instead of the trigger?  You can find not.

(*Id*. at 28-29.)  Attorney Frawley provided the following counterpoint in his closing at sentencing:

> There is another mitigating circumstance and that is the fact that John Koehler did not pull the trigger, did not kill Regina or her son.  Now, the District Attorney has said that he pushed and he pushed and he forced William Curley to commit those murders.  That's just not the case.  I mean, I go back to one moment on that fateful day when William Curley was in the garage with Kirk Schrader and he takes the gun and he says, hey, look at this.  That tells you a lot about a state of mind.  He was a voluntary participant.  That doesn't make the defendant's conduct less outrageous. But the outrageousness of his conduct is not an aggravating circumstance.

(*Id*. at 35-36.)

Turning to Mr. Curley's sentencing hearing, the Commonwealth, again through District Attorney McGuinness, explained the following mitigating circumstance:

> [T]he defense has also asked you [to] find the mitigating circumstance the defendant was under . . . the influence of extreme mental or emotional disturbance. Well, you've heard the tape and you've heard that the defendant said it was like kill or be killed. He never really said that John Koehler said kill or be killed, in quotes. You heard the tape and you saw the transcript. Do you see that anywhere other than the defendant said it was like that? Now, John Koehler is the kind of guy, the Commonwealth doesn't disagree, that would make representations like that . . . .

(Doc. 48-2, Notes of Testimony, Curley Sentencing, 5/24/1996, at 5-6 ("Curley Sentencing NT 5/24/1996").) District Attorney McGuinness then launched into an extensive narrative about the relationship between Mr. Curley and Mr. Koehler, and the roles each played in the killings of Ms. Clark and Austin Hopper. He included the following statements:

> [W]hen Mr. Koehler wants [Mr. Curley] to do some criminal activity, what does he say? He says, yeah, I can do it. Sure. Come on up.
>
> * * *
>
> [Y]ou also heard . . . that [Mr. Curley] said he thought it would be neat to be a hit man, and the doctor said he told him that he had fantasies about being a professional killer, killing world leaders.
>
> * * *
>
> [Mr. Curley] went down to Arkansas and spent time with Mr. Koehler and was training to be a hit man, thinking about killing Chrissy Long and Ricky Kelly and then he gets back together with him. You decide based on what you heard, is he doing this because he's afraid of the guy – because we all know he's away from him. Is he doing it because he's afraid of the guy or is he doing it because he thinks it's neat?
>
> * * *
>
> John Koehler was giving him orders, no doubt about it. No

56

doubt about it he was telling him what to do.  And he was a bad guy.  But did he dominate him?  Did he control him?  He couldn't make him do the killings in Arkansas, could he?  He couldn't make him do the killings on Stone Jug Road.  Now, when he did the killings in the garage, why is that different?

* * *

[Mr. Curley] cooperated [with Mr. Koehler].  That's true.  And he did it voluntarily and as you can see, he didn't get much for it.

* * *

[Mr. Curley] did [the killings] on the advice of John Koehler, and he did it because it was his intent to do it.  He thought about it all day and he did it.  And he had chances to get away.  He could have left Stone Jug Road.  He didn't have to call Mr. Koehler back.  He had lots of chances, but this is what he chose to do.

(*Id.* at 7; 11; 11-12; 13; 14; 18.)  In contrast to District Attorney McGuinness' statements, in his closing statement Attorney Frawley repeatedly emphasized Mr. Koehler's "kill or be killed" threat to Mr. Curley.  (*Id.* at 24; 26; 30.)  In addition, he argued that Mr. Curley "had to kill two innocent people to save his life, to save the life of his family."  (*Id.* at 26.)

## 2.   State Court Decision

In its decision affirming the denial of PCRA relief on this claim, the Pennsylvania Supreme Court concluded that the substantive due process claim was waived because Mr. Koehler could have raised it in his direct appeal filed in January 1998.  *Koehler-II*, 36 A.3d at 140.  As a result of this decision based on waiver, Respondents argue that this claim is procedurally defaulted.  However, at the time of Mr. Koehler's direct appeal in January 1998, the Pennsylvania Supreme Court was still applying the "relaxed"

57

waiver rule by which this Court might "reach the merits of claims brought by capital

defendants which might otherwise have been barred by waiver." *Wilson v. Beard*, 589

F.3d 651, 658 (3d Cir. 2009).[11]  Thus, the doctrine of procedural default does not apply

to the state court's waiver decision here, and the Court will review the merits of this due

process claim *de novo*.

### 3.    Analysis

The Due Process Clause prohibits the Commonwealth from "depriv[ing] any

person of life, liberty, or property."  U.S. Const. amend. XIV, § 1.  To prevail on his due

process claim, Mr. Koehler must prove that he was deprived of "fundamental elements

of fairness in [his] criminal trial." *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (internal

quotation marks and citation omitted).  This is no simple task.  The Supreme Court has

"defined the category of infractions that violate 'fundamental fairness' very narrowly,

based on the recognition that, beyond the specific guarantees enumerated in the Bill of

Rights, the Due Process Clause has limited operation." *Medina v. California*, 505 U.S.

---

[11] In *Commonwealth v. McKenna*, 383 A.2d 174 (Pa. 1978), the Pennsylvania Supreme Court stated that it had a "duty to transcend procedural rules" in death penalty cases because procedural rules "cannot be exalted to a position so lofty as to require this Court to bind itself to the real issue – the propriety of allowing the state to conduct an illegal execution of a citizen." *Id*. at 181.  This doctrine came to be known as the "relaxed waiver rule."  Under this rule, the Pennsylvania Supreme Court reviewed the merits of all claims raised in capital cases, whether on direct appeal or in post-conviction proceedings, regardless of any alleged waiver by the defendant.  However, in November 1998, the Pennsylvania Supreme Court decided *Commonwealth v. Albrecht*, 720 A.2d 693 (Pa. 1998), in which the court refused to apply its relaxed waiver rule to issues raised for the first time in the petitioner's PCRA petition.  After that decision abandoning the relaxed waiver rule, for some time the rule was not "firmly established and regularly applied."  Nevertheless, at the time Mr. Koehler filed his direct appeal in January 1998, the Pennsylvania Supreme Court was still applying the relaxed waiver rule.  Thus, to apply the *Albrecht* rule "retroactively to bar consideration of [Mr. Koehler's] claim . . . would therefore apply a rule unannounced at the time of petitioner's trial and consequently inadequate to serve as an independent state ground . . . ." *Ford v. Georgia*, 498 U.S. 411, 424 (1991).

437, 443 (1992).  In order to satisfy due process, Mr. Koehler's trial must have been fair, not perfect.  *See United States v. Hastings*, 461 U.S. 499, 508 (1983).

Mr. Koehler argues that the Commonwealth's use of inconsistent prosecutorial theories at his and Mr. Curley's trials rendered his trial fundamentally unfair.  He also claims that the factually inconsistent theories have rendered his capital sentence unreliable under the Eighth Amendment.  Upon review, the Court finds that both arguments fail.

First, with respect to Mr. Koehler's substantive due process claim, his inconsistent-theories argument fails because it is not grounded in clearly established federal law.  Clearly established federal law "refers to the holdings, as opposed to *dicta*, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The United States Supreme Court has addressed a State's use of inconsistent prosecutorial theories on only one occasion.  *See Bradshaw v. Stumpf*, 545 U.S. 175 (2005).  In *Bradshaw*, the Supreme Court considered a petitioner's challenge to his guilty plea of aggravated murder and attempted aggravated murder, and, more specifically, the viability of the prosecutor's use of inconsistent theories involving two co-defendants who were tried separately.  *Id*. at 184-87.  Below, the United States Court of Appeals for the Sixth Circuit has held that the prosecution's use of inconsistent theories as to the identity of the shooter violated due process and required the invalidation of the defendant's guilty plea.  *See id*. at 189.  However, on appeal the Supreme Court rejected the petitioner's argument that inconsistent arguments about the identity of the triggerman at his trial and the trial of his co-perpetrator required reversal of the

convictions.  *Id*. at 187.  Rather, it reasoned that the identity of the triggerman was immaterial because the intent element of the offense did not require the defendant to pull the trigger.  *Id*. at 182-85.  The Court did note, however, that the use of allegedly inconsistent theories may have had an effect on sentencing, but remanded for a further determination of the claim, "express[ing] no opinion on whether the prosecutor's actions amounted to a due process violation, or whether any such violation would have been prejudicial."  *Id*. at 187.

Indeed, before *Bradshaw*, "the Supreme Court had not suggested that inconsistent prosecutorial theories could constitute a due process violation."  *DeCastro v. Branker*, 642 F.3d 442, 457-58 (4th Cir. 2011).  Justice Thomas' remarks in his *Bradshaw* concurrence confirm this: the "[Supreme] Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."  *Bradshaw*, 545 U.S. at 190 (Thomas, J., concurring.)  Most importantly, the *Bradshaw* Court did *not* hold that the use of inconsistent theories in the separate prosecutions of two defendants violates the right to due process.  Further, the Court is not willing to read *Bradshaw*'s holding as extending due process protections to facts like those before the Court.  Simply stated, there is no clearly established federal law to which Mr. Koehler can attach his inconsistent-theories claim.  Thus, the substantive due process claim fails at the threshold.  *See Littlejohn v. Trammel*, 704 F.3d 817, 852-53 (10th Cir. 2013) (holding petitioner's inconsistent-theories claim fails at the threshold because it is not based on clearly established federal law).

Even if the Court was to consider the essence of Mr. Koehler's claim, as it relates to both the guilt and sentencing phases of his trial, such a claim fails because

60

Mr. Koehler has not demonstrated that the prosecution presented inconsistent theories going to the core of its case.  As to his due process sub-claim, the Court notes that the law does not provide that every inconsistency amounts to a due process violation requiring reversal.  A due process violation only occurs when the inconsistency exists in the core theory of the prosecutor's case.  *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000).[12]  Further, as to his other sub-claim involving sentencing, based on a review of the record presented,[13] the Court rejects Mr. Koehler's argument that the Commonwealth "misrepresented the evidence it presented to his sentencing jury based upon the arguments it made to Curley's sentencing jury."  (Doc. 48 at 33.)

To be clear, Mr. Koehler contends that the Commonwealth's argument at Mr. Curley's sentencing hearing regarding the roles of Mr. Curley and Mr. Koehler in the

---

[12] In *Smith v. Groose*, the United States Court of Appeals for the Eighth Circuit found reversal was necessary where the State selectively presented different statements of the same witness at the petitioner's trial and a co-defendant's trial.  *Id.*, 205 F.3d at 1051-52.  The version of the facts given in the two statements were in direct conflict and could not both be true. During the first trial, to obtain a conviction of one defendant the State used a statement from a witness that the victims were dead when the second group of perpetrators arrived on the scene. Subsequently, at the trial of the other defendant who was part of the second group of perpetrators, the State did not produce the first statement and instead produced another statement given by the same witness in which he said that the victims were still alive when the second group of perpetrators arrived on the scene.  The Eighth Circuit Court of Appeals found it was a violation of due process for the State to present "inherently factually contradictory theories" as to what point the victims were killed and who was present in order to secure the most convictions.  *Id.*

[13] In the case of Mr. Curley's sentencing proceeding, the Court has only been provided with the parties' closing arguments, as well as the trial court's charge to the jury.  (Doc. 48-2, Ex. 13, Notes of Testimony, *Commonwealth v. Curley*, 95-CR-0308, Bradford Ct. Com. Pl. (Smith, J.), Trial (Penalty Phase only), Closing Arguments & Charge.)  Without the full transcript of Mr. Curley's trial, the Court cannot properly evaluate the *evidence* or *testimony* presented; rather, the Court will address only Mr. Koehler's claim with respect to the *arguments*, which are not evidence or testimony.  *Compare McNeill v. Branker*, 601 F. Supp. 2d 694, 707 (E.D. N.C. 2000) (performing full review of transcripts of the petitioner's and co-defendant's trials, including evidence and testimony presented as well as closing arguments, in finding that the State did not use inconsistent prosecution theories).

killings rendered Mr. Koehler's conviction and sentence fundamentally unfair because

that argument differed from the evidence the Commonwealth presented at Mr.

Koehler's trial.  The Court disagrees.  Rather, at both Mr. Koehler's trial and the portion

of Mr. Curley's trial the Court has been provided, the Commonwealth's theories of

prosecution were consistent.  At both trials, it was argued that Mr. Curley committed the

murders at Mr. Koehler's request and insistence.  From what the Court can infer from

the Commonwealth's closing argument at Mr. Curley's trial, the Commonwealth did not

perform in a misleading or deceitful manner at either trial.  It did not present a different

and incomplete set of facts in support of different theories of culpability for the same

crimes.  *See Stumpf v. Robinson*, 722 F.3d 739, 749 (6th Cir. 2013) (citing *Thompson*

*v. Calderon*, 120 F.3d 1045, 1056 (9th Cir. 1997) ("The prosecutor presented markedly

different and conflicting evidence at the two trials.") (emphasis added), *vacated on other*

*grounds*, 523 U.S. 538 (1998)).  The Commonwealth did not offer different or

contradictory testimony from witnesses presented at both trials.  *Stumpf*, 722 F.3d at

749 (citing *Groose*, 205 F.3d at 1051); *see supra* note 12, at 61.  Nor did the

Commonwealth omit evidence of Mr. Koehler's or Mr. Curley's guilt or innocence in its

presentation at either trial.  *Stumpf*, 722 F.3d at 749 (citing *In re Sakarias*, 106 P.3d

931, 936-37 (Ca. 2005) (discussing prosecutor's omission of key evidence in each of

the two prosecutions of co-defendants, leading to conviction of both)).

> At Mr. Koehler's trial, Mr. Curley testified that Mr. Koehler encouraged him to

become a hitman, and killing Ms. Clark and Austin Hopper was presented as part of

that plan.  He testified to his reluctance to do so and spoke of Mr. Koehler's threats to

himself and his family.  However, Mr. Curley also detailed his own active involvement,

as well as Mr. Koehler's, in planning and executing the murders.  The Commonwealth's closing arguments at both phases of Mr. Koehler's trial emphasized all of these points. Not only did District Attorney McGuinness stress that Mr. Koehler "solicited, commanded, encouraged, and requested" that Mr. Curley commit the murders, (Trial NT 4/10/1996 p.m. Part 1 Vol. XXVI 31), as well as "squeezed" him until he did so, (Sentencing NT 4/12/1996 a.m. Part 1 28-29), he also argued that Mr. Curley was "sucked in" by Mr. Koehler and willingly participated in the crimes, (Trial NT 4/10/1996 a.m. Part 1 Vol. XXVI 18; 36-37).

At his closing argument in Mr. Curley's sentencing, District Attorney McGuinness repeated Mr. Koehler's "kill or be killed" threat to Mr. Curley, but reminded the jury that only Mr. Curley testified to that statement.  He also stressed the cooperative relationship between Mr. Curley and Mr. Koehler but that Mr. Koehler was the "mastermind" of their plan.  (*See* Curley Sentencing NT 5/24/1996 13; 18) ("John Koehler was giving him orders, no doubt about it."; "[Mr. Curley] did [the killings] on the advice of John Koehler").  But rather than focusing on Mr. Koehler's role in the crimes, as he did in Mr. Koehler's trial, District Attorney McGuinness downplayed that role in order to highlight Mr. Curley's participation.  Importantly, it was, in fact, Mr. Curley's sentencing and *not* Mr. Koehler's at that point.  Nevertheless, all of the prosecutor's arguments were proper, as each rested on a full evidentiary record, and each set of factfinders had the opportunity to consider that full record.  Further, in response to each argument, defense counsel responded by either challenging Mr. Curley's credibility or by refuting the Commonwealth's theory that Mr. Koehler forced Mr. Curley to commit the murders. Thus, the Court concludes that the Commonwealth's theories at each trial

were not "inconsistent" or "misleading," as each emphasized the role of the defendant

at issue in his respective case and did so without eliminating the culpability of the other

defendant.  These arguments were not so unfair that they violated the Due Process

Clause or the Eighth Amendment.   Mr. Koehler is not entitled to habeas relief on this

claim.

> **C.      Claim III - The trial court's inadequate and restrictive *voir dire* of Juror Smith and the subsequent denial of Mr. Koehler's challenge for cause violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution; counsel was ineffective for failing to adequately raise this claim at trial and on appeal.**

In this claim, Mr. Koehler argues that his right to an impartial jury was violated

when Juror Lorraine Smith was permitted to remain on the jury after it was discovered

that she was related to several Commonwealth witnesses.  Upon careful review, the

Court will deny habeas relief on this claim.

The background of this claim is as follows.  Mr. Koehler claims that, at trial, a

police officer testified that Mr. Koehler had previously stayed with a Kevin Collins.  After

recognizing the name, Juror Smith disclosed to the court that she is related by marriage

to Kevin Collins, a Commonwealth witness.[14]   The trial court subsequently conducted

an in Chambers *voir dire* of Juror Smith.  (*See* Doc. 51-3, Notes of Testimony, Trial,

4/9/1996) ("Trial NT 4/9/96").)  The court had the following exchange with Juror Smith:

> Q:     Ms. Smith, can you state for the record more precisely
>         how it is that you know the name, Kevin Collins?
>
> A:      Kevin Collins is my husband's sister's son.

---

[14] Kevin Collins is the step-father of William Curley, the primary Commonwealth witness in Mr. Koehler's trial.  *See Koehler-I*, 737 A.2d at 238 n.21.

Q:     Okay, do you know Mr. Collins yourself?

A:     I have seen him before, but we just haven't had that much to do with him.  You know, we just haven't had that much contact with him.

Q:     Okay, have you ever met him, been introduced to him?

A:     Yeah, I guess, I must have.  I get them mixed up, cause there's - he has brothers and I get them mixed up, but -

Q:     Okay, do you - have - have you ever had a conversation with him that you know of?

A:     Other than just, hello, could have been, you know, something like that.

Q:     Okay, do you know - do you know anything about him?

A:     No.

Q:     Do you know where he works?

A:     No.

Q:     Do you know where he lives?

A:     No.

(*Id*. at 1-2.)  Later, when the trial court asked her whether, based on the relationship with Mr. Collins she described, she would be able to be a fair and impartial juror, she responded that she could be fair and would be able to do the right thing.  (*Id*. at 3-4.) After further questioning of Juror Smith by defense counsel and the trial court, Attorney Frawley requested that the juror be removed and replaced with an alternate.  (*Id*. at 4-11.)  Attorney Frawley noted that Juror Smith was not aware that Mr. Collins was the step-father of William Curley, a key Commonwealth witness.  (*Id*. at 10.)  He opined, however, that once Ms. Smith knew of the relationship between Mr. Curley and Mr.

65

Collins she would not be able to be objective and fair in her deliberations.  (*Id.*)  The trial court denied counsel's request and allowed the trial to proceed with Ms. Smith serving as a juror.  (*Id.* at 11.)

In connection with the denial of counsel's request, Mr. Koehler now also contends that he was denied the right to effective assistance of counsel at trial and on direct appeal with respect to Juror Smith.  Specifically, he argues that, even though counsel attempted to question Juror Smith about whether her grand-nephew, Kevin Collins, had an effect on her decision-making, he ineffectively failed to renew that line of questioning after it was discovered that Juror Smith was related to the Curleys.  Mr. Koehler claims that, had counsel made the appropriate objections, it is likely that Juror Smith would have been found to hold a bias against Mr. Koehler and would have been removed.  Finally, he contends that counsel on direct appeal failed to properly raise and argue this issue.

The Pennsylvania Supreme Court first addressed this issue on direct appeal. *Koehler-I*, 737 A.2d at 237-39.  Citing state law, and recognizing that "[t]he decision on whether to disqualify [a juror] is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion," *Id.* at 238 (citing *Commonwealth v. Wilson*, 672 A.2d 293, 299 (Pa. 1996)), the state court noted the trial court's explanation of its reasons for denying counsel's motion for removal as follows: "the juror's relationship to Curley was attenuated.  The juror dutifully came forward to disclose the relationship once she became aware of it and she testified credibly that the relationship would not affect her ability to act impartially," *Id.* (citing Trial Court Opinion at 15-16).  In light of this reasoning, the state court found that the trial court did not

abuse its discretion when it refused to excuse Juror Smith since it was in the best position to assess the credibility of the juror and it could properly refuse to excuse a juror if it believed the juror would be fair and impartial.  *Id*. at 238-29.

Further, in its decision affirming the denial of PCRA relief, the Pennsylvania Supreme Court reviewed the ineffective assistance of counsel claim and denied relief. *Koehler-II*, 36 A.3d at 141-42.  In finding that Mr. Koehler "fail[ed] to demonstrate how appellate counsel's presentation of the claim on direct appeal was constitutionally deficient," the state court agreed with the PCRA court as follows:

> The PCRA court summarily rejected this claim, holding that Appellant failed to satisfy his burden of demonstrating ineffectiveness because he failed to produce evidence that counsel's chosen course of action lacked a reasonable basis designed to effectuate his client's interests.    PCRA Ct. Opinion, Dec. 30, 2009, at 1.  Similarly, finding that Appellant had failed to explore appellate counsel's reasoning at the PCRA hearing, the court concluded that he had not overcome the presumption that appellate counsel provided effective representation.

*Id.*, 36 A.3d at 141.

Under the Sixth and Fourteenth Amendments, a defendant may not be deprived of any liberty without due process of law and in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.").  The bias of a juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as a matter of law.  *United States v. Wood*, 299 U.S. 123, 133 (1936).

The principal way in which the right to trial by "indifferent" jurors is secured is

through the system of challenges exercised during *voir dire*.  A court must excuse a prospective juror if actual bias is discovered during *voir dire*.  *Accord Morgan v. Illinois*, 504 U.S. 719, 729–730 (1992) ("*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.") (internal quotations and citations omitted).  Bias can be revealed by a juror's express admission of that fact, but more frequently, the reality of bias must be revealed by circumstantial evidence.  *Id*.  The United States Constitution does not require a new trial every time a juror has been placed in a potentially compromising situation because it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).

The question of bias is one of fact and best determined by the trial court's own assessment of a juror's impartiality, credibility and demeanor.  *See Patton*, 467 U.S. at 1036; *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).  Under AEDPA, such factual determinations are "presumed to be correct," 28 U.S.C. § 2254(e)(1), and a petitioner, like Mr. Koehler, bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  *Id*.  Accordingly, the reviewing court should not easily second-guess the conclusion of the trial court who heard and observed the *voir dire* first-hand.  *See Rosales-Lopez*, 451 U.S. at 188.  Therefore, the question that the Court must answer is whether there is fair support in the record for the state court's conclusion that Juror Smith would be impartial.

68

Based on the totality of Juror Smith's responses, this Court concludes that there is simply not the kind of clear and convincing evidence of bias that is needed to rebut § 2254(e)(1)'s presumption.  Accordingly, under § 2254(e)(1)'s presumption of correctness, the trial court's decision to retain Juror Smith as a juror was correct and Mr. Koehler's attorney would have had no basis to appeal this claim.  As such, the Pennsylvania Supreme Court's affirmance of the trial court's determination that Juror Smith testified credibly that her family relationships would not affect her ability to act impartially, was not an unreasonable determination of the facts.  Rather, not only was the court's determination in accordance with Pennsylvania law, there was no evidence that the decision was made in a manner violative of the Constitution.  Consequently, Mr. Koehler is not entitled to habeas corpus relief as to this claim.

Because Mr. Koehler's underlying claim lacks merit, he "cannot successfully argue that counsel's failure to object at trial, or raise the claim on direct appeal denied [him] [his] constitutional right of representation."  *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000).  Success or failure on the *Strickland* claim, in other words, is linked with success or failure on Mr. Koehler's underlying claim.[15]  *See Strickland*, 466 U.S. at 691 (reasoning counsel's performance cannot be deficient based on a failure to advance meritless claims).

---

[15] In light of this decision on the underlying merit of the claim, the Court need not apply *de novo* review to Mr. Koehler's additional argument that the *voir dire* of Juror Smith about her family relationship to witnesses in the case was unconstitutionally restricted by the trial court. (*See* Doc. 34 at 61.)

**D.** **Claim IV - Mr. Koehler is entitled to relief because the trial court's failure to excuse Juror Mary Ann Schwartz for cause, and defense counsel's failure to request such removal, deprived Mr. Koehler of his Sixth, Eighth and Fourteenth Amendment rights to due process and a fair and impartial jury.**

In this claim, Mr. Koehler argues that his right to an impartial jury was violated when Juror Mary Ann Schwartz, an alternate juror, was not removed after she informed the trial court that she remembered seeing Mr. Koehler in a vehicle with another adult and a child at a gas station approximately one year prior to the child victim's death in this case. Mr. Koehler also claims that trial counsel was ineffective for failing to request the removal of Juror Schwartz after she indicated that she was disturbed by the memory of seeing the child with Mr. Koehler. Upon careful review, the Court will deny habeas relief on this claim.

The trial court held a separate *voir dire* of Juror Schwartz upon being informed of her recollection of seeing Mr. Koehler with a child. (Doc. 50-35, Notes of Testimony, Trial, 3/28/1996, Vol. IX ("Trial NT 3/28/96 Vol. IX").) Juror Schwartz advised the court that she had a disturbing feeling that, approximately one year before, she may have seen Mr. Koehler in a vehicle at a gas station with another adult and a young boy, and remembered wondering why the child was not in school. (*Id*. at 1.) This observation was not related in any way to the murders at issue in this case. (*Id*. at 3.) Nevertheless, Juror Schwartz indicated that her recollection upset her, causing her to remain awake the entire previous night and to be late for court. (*Id*. at 7.) The trial court asked Juror Schwartz whether her observation would affect her ability to serve fairly and impartially and confidently as a juror. (*Id*. at 4.) Initially, Juror Schwartz responded that she was not sure. (*Id*.) Ultimately, she told the trial court that her

70

feelings would not affect her ability to perform her role as a juror, (*id*. at 6), and that she would only decide the case on the evidence presented in the courtroom, (*id*. at 8).

After the trial court, the Commonwealth, and defense counsel each questioned Juror Schwartz about her observation and feelings, as well as her ability to serve as a juror, the trial court concluded that there was nothing in her answers to suggest that she could not be a fair and impartial and competent juror. (*Id*. at 10.)  Thus, the court ruled that there was no basis for excusing her for cause. (*Id*.)  Neither party objected to the trial court's ruling, and defense counsel did not raise a related claim on direct appeal.

Mr. Koehler now contends that the trial court erred in not removing Juror Schwartz based on her recollection.  He also argues that trial counsel had no reasonable basis for not objecting to the court's decision not to excuse Juror Schwartz, or for failing to adequately raise and preserve this issue on direct appeal.

In its decision affirming the denial of PCRA relief, the Pennsylvania Supreme Court found as follows:

> The PCRA court summarily rejected this claim, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness. It held that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests.  PCRA Ct. Opinion, Dec. 30, 2009, at 1.  The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal. *Id*. at 6.

> We agree that Appellant is not entitled to relief.  "The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor." *Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 682 (2009) (citing *Commonwealth v.*

71

> *Wilson*, 543 Pa. 429, 672 A.2d 293, 299 (1996)). The decision of whether to disqualify a juror is within the discretion of the trial court and will not be reversed in the absence of an abuse of discretion. *Id*. Here, the record supports the trial court's initial finding that Schwartz was able to set aside her recollection of observing Appellant in the past, and base her verdict on the evidence. Thus, the trial court did not err in failing to dismiss her for cause, and trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. *See Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125, 1156 (2009) (holding that counsel cannot be deemed ineffective for failing to raise a meritless claim).

*Koehler-II*, 36 A.3d at 143-44.

As with Claim III, based on the totality of Juror Schwartz's responses, this Court concludes that there simply is not the kind of clear and convincing evidence of bias that is needed to rebut § 2254(e)(1)'s presumption of correctness. Accordingly, under § 2254(e)(1)'s presumption of correctness, the trial court's decision not to remove Juror Schwartz was correct and Mr. Koehler's attorney would have had no basis to appeal this claim. As such, the Pennsylvania Supreme Court's affirmance of the trial court's determination that Juror Schwartz was able to set aside her recollection of possibly seeing Mr. Koehler in the past, and base her verdict on the evidence alone, was not an unreasonable determination of the facts. The Pennsylvania Supreme Court's decision was in accordance with Pennsylvania law, and there was no evidence that it was made in a manner violative of the Constitution. Consequently, Mr. Koehler is not entitled to habeas corpus relief as to this claim.

Because Mr. Koehler's underlying claim lacks merit, he "cannot successfully argue that counsel's failure to object at trial, or raise the claim on direct appeal denied [him] [his] constitutional right of representation." *Mannino*, 212 F.3d at 840. Success or

failure on the *Strickland* claim, in other words, is linked with success or failure of Mr.

Koehler's underlying claim.  *See Strickland*, 466 U.S. at 691 (reasoning counsel's

performance cannot be deficient based on a failure to advance meritless claims).

> **E.     Claim V - Trial counsel rendered ineffective assistance of counsel during the penalty phase of trial.**

In this claim, Mr. Koehler contends that trial counsel was ineffective for failing to

conduct a more thorough investigation into his background for purposes of presenting

additional mitigating evidence at the penalty phase.  After careful review, the Court will

deny habeas relief on this claim.

> **1.     Background**

> **a.     Penalty Phase**

During the penalty phase, the Commonwealth presented one witness, Austin

Hopper's grandmother, who confirmed he was nine years old when he was murdered.

(Sentencing NT 4/12/1996 a.m. Part 1 19-21.)  Defense counsel, Attorney Frawley,

presented one witness, Mr. Koehler's mother, Louise Joy Tumminia.  (*Id*. at 21-25.)  Ms.

Tumminia testified that, when he was young, Mr. Koehler lived at home with both his

parents, but his father would leave the home for weeks at a time.  (*Id*. at 22.)  However,

Mr. Koehler's parents separated when he was seven years old.  (*Id*.)  After Mr.

Koehler's father left the home, Mr. Koehler's older sister cared for him while his mother

worked.  (*Id*. at 24.)

Ms. Tumminia further testified that Mr. Koehler's father showed no affection

towards Mr. Koehler as a child.  (*Id*. at 24.)  One year at Christmastime when Mr.

Koehler was young, Mr. Koehler's father brought an abundance of presents for one of

Mr. Koehler's younger sisters, but very few for Mr. Koehler.  (*Id*. at 25.)  After Mr.

Koehler's parents argued about this, Mr. Koehler's sisters ended up giving him some of

their own gifts.  (*Id*.)

At his closing argument, Attorney Frawley stated the following with respect to Mr.

Koehler's upbringing:

> The reality here is that we had a child that, basically, grew up
> on his own.  He had no father that cared, he had no father that
> was there, and he had a mother that cared so much that she
> was working and working and working to make the minimal
> amount of money that was needed to take care of her children.
> He grew up on his own.  That does not justify what he did, but
> how many of us had to go through that kind of childhood?  And
> I ask that you consider that experience in determining what's
> an appropriate sentence in this case.

(*Id*. at 35.)

At the end of testimony and closing arguments, the trial court charged three

aggravating circumstances, as offered by the Commonwealth: (1) the defendant

contracted to pay another person or had conspired to pay another person for the killing

of the victim; (2) the defendant has been convicted of another murder committed either

before or at the time of the offense at issue; and, with respect to the murder of Austin

Hopper, (3) the victim was a child under twelve years of age.  (*Id*. at 38.)  The trial court

also charged the jury with two mitigating circumstances: (1) the character of the

defendant; and (2) the circumstances of the offense.  (*Id*.)  After deliberating for

approximately three and one-half hours, the jury returned a verdict of death on both

counts of first degree murder.  With respect to the murder of Regina Clark, the jury

found one aggravating circumstance, namely the defendant has been convicted of

another murder committed either before or at the time of the offense at issue, and no

mitigating circumstances.  As to the murder of Austin Hopper, the jury found two

aggravating circumstances, namely the defendant has been convicted of another

murder committed either before or at the time of the offense at issue and the victim was

a child under twelve years of age, and no mitigating circumstances.

### b.    PCRA Proceedings

At the PCRA proceedings, Mr. Koehler, represented by new counsel, presented

the testimony of trial counsel, as well as additional family or friend testimony and the

testimony of a mental health expert.  The Commonwealth countered with its own mental

health expert testimony.  That evidence is as follows, in relevant part.

### i.    Trial Counsel Testimony

Attorney Frawley represented Mr. Koehler at trial and through direct appeal.  At

the PCRA hearing, Attorney Frawley recollected that he did not use co-counsel for the

case, but did have an investigator.  (PCRA NT 5/31/2006 p.m. Part 1 4.)  He tasked the

investigator with contacting prospective witnesses and soliciting information from them.

(*Id*. at 5.)  With respect to gathering information from Mr. Koehler himself, Attorney

Frawley indicated that Mr. Koehler was "very cooperative," (*id*. at 8), and, in fact, was a

"great client," (*id*. at 54).

Attorney Frawley testified that he focused primarily on the guilt phase,

explaining,

> [D]uring the entire time that I represented John, he indicated
> to me that he was not guilty, and I felt an obligation, when my
> client says that he's not guilty, to do everything in my power to
> either obtain evidence that establishes innocence or would
> have created a reasonable doubt at trial.  I spent a great
> amount of time on the guilt phase because the facts relating to
> guilt were immense.

* * *

> [A]nd finally, if, if you win the guilt phase of the trial, you don't
> have to worry about mitigation and sentencing.

(*Id*. at 5-6.)  He also testified that any gathering of mitigation information that he did do

would have taken place during the guilt phase of the trial.  (*Id*. at 15.)

With respect to the presentation of background witnesses, Attorney Frawley

stated that he secured the testimony of Mr. Koehler's mother in order to describe his

upbringing and home life, as well as inform the jury that "growing up there was no one

there to take care of John, and that there was some abuse by the father."  (PCRA NT

5/31/2006 p.m. Part 2 71.)  He believed Mr. Koehler's mother would be the best person

to describe his home life to the jury.  (*Id*. at 72.)  Attorney Frawley also testified that,

after interviewing Mr. Koehler's ex-wife, Holly Hayden, he "never thought to myself boy,

you know, there's a lot of information that's going to help us at sentencing, if there's a

sentencing, no."[16]  (*Id*. at 65.)

---

[16] Attorney Frawley testified that, after he interviewed Ms. Hayden, he saw a "striking parallel" between the relationship between Mr. Koehler and Ms. Hayden and the one between Mr. Koehler and Mr. Curley.  (PCRA NT 5/31/2006 p.m. Part 2 63.)  He elaborated as follows:

> Although John had told me, always told me that he was innocent, I
> think there was a point at which I thought that he was guilty, but that
> didn't limit my investigation on his behalf.  But I, at some point
> thought, you know, what would be the motive here, and I don't know
> exactly when I developed this idea, but I thought to myself maybe
> the motive is control.  You know, the ultimate control is to take
> someone's life except that the so to speak ultimate . . . control is to
> get someone else to take someone's life.  I thought that John was
> one that really loved to manipulate, and when you see my notes in
> regard to my conversation with Holly Hayden (sic), she says for
> example that she had a child and she was basically not allowed to
> leave unless the child remained with John, that would force her to
> come back.

* * *

With respect to calling a mental health expert or presenting any other relevant evidence regarding mental health issues, Attorney Frawley testified that he did not have Mr. Koehler evaluated by a mental health professional prior to the sentencing hearing. (PCRA NT 5/31/2006 p.m. Part 1 12.)  At the time he requested a continuance of trial, however, Attorney Frawley also requested that Mr. Koehler be "thoroughly evaluated" because Mr. Koehler had told him that he had a tumor and was going to die.  (*Id*.)  He also stated that, at some point prior to trial, he concluded that Mr. Koehler was a sociopath, "but didn't really think that there was much mitigation that would be found by way of a psychologist or psychiatrist."  (*Id*. at 16-17.)  Despite this belief, Attorney Frawley testified that, prior to trial, he consulted with a clinical psychologist who provided him with videotape information about sociopaths to assist him in determining Mr. Koehler's state of mind.  (*Id*. at 17; PCRA NT 5/31/2006 p.m. Part 2 58-59.) Nonetheless, Attorney Frawley was "never, sufficiently, persuaded that there were significant emotional issues that would be beneficial to John Koehler that I concluded that a [sic] expert had to be brought in."  (Doc. 50-91, Notes of Testimony, PCRA Hearing, 6/1/2006, Part 1, at 6-7 ("PCRA NT 6/1/2006 Part 1").)  He also had no

---

> She said that she once, to get out of the house, went into the bathroom and climbed through the window to get out.  That he encouraged her to, encouraged her to kill her sister's ex, and I saw, I thought my god this is an attempt at total control manipulation, and then I was struck by the parallel.
>
> * * *
>
> Holly told me that if she, John told her if she ever got div[orced], or filed for divorce he'd kill her.

(*Id*. at 63-65; 66-67.)

recollection of providing the clinical psychologist with any records concerning Mr. Koehler for an evaluation.  (*Id*. at 12-13.)

Finally, as to the presentation of background materials, Attorney Frawley testified that, prior to the sentencing hearing, he did not gather any records on Mr. Koehler other than what was provided to him by the Commonwealth.  (PCRA NT 5/31/2006 p.m. Part 1 13-14.)  The Commonwealth's documentation included the police and laboratory reports.  (*Id*. at 13.)  Attorney Frawley did state that while numerous interviews were conducted, there was no strategic reason for not gathering documentation such as Mr. Koehler's school and medical records.  (*Id*. at 14.)

### ii.    Additional Family/Friend Testimony

In addition to Attorney Frawley's testimony, counsel for Mr. Koehler presented two family and friend witnesses.  These witnesses provided information on Mr. Koehler's childhood experiences in the family home.  Specifically, Tracy Glover, Mr. Koehler's younger sister and one of his three siblings, testified that their parents would often argue both before and after the divorce.  (Doc. 50-83, Notes of Testimony, PCRA Hearing, 5/31/2006 a.m., Part 1, at 28 ("PCRA NT 5/31/2006 a.m. Part 1").)  At times the children were present when the arguments would get physical with shoving.  (*Id*. at 28-29.)  In addition, their father would drink alcohol in their presence and become intoxicated.  (*Id*. at 31.)  He would spank the children when he was intoxicated, or beat them, including Mr. Koehler, with a belt.  (*Id*. at 31-32.)  However, after the parents divorced, Mr. Koehler's father only visited the home about two times per month.  (*Id*. at 30.)

Ms. Glover described the family home situation after the divorce as follows.  Mr.

78

Koehler's mother had several jobs that kept her out of the home for five to six days per week.  (*Id*. at 34.)  The children were in charge of the cooking, laundry, and other chores, but not much was done so the house was messy.  (*Id*. at 34-35.)  In addition, the family had little money and often there was not much food in the home.  (*Id*. at 33, 37.)

As children, Ms. Glover and her sister suffered from depression and attempted suicides.  (*Id*. at 40-44.)  Mr. Koehler's only health issue as a child was asthma.  (*Id*. at 44.)  However, when he was older, he complained to Ms. Glover of high blood pressure and depression.  (Doc. 50-84, Notes of Testimony, PCRA Hearing, 5/31/2006 a.m., Part 2, at 57 ("PCRA NT 5/31/2006 a.m. Part 2").)

Ms. Glover admitted that she did not spend much time with Mr. Koehler when they were young, but described him as a loner.  (PCRA NT 5/31/2006 a.m. Part 1 44, 48.)  As a teenager, Mr. Koehler would often move between his parents' homes.  (*Id*. at 45.)  None of the children graduated from high school.  (*Id*. at 39.)

Ms. Glover testified that she was interviewed by Attorney Frawley two times prior to the sentencing hearing, but was never called to testify.  (PCRA NT 5/31/2006 a.m. Part 2 53-55.)  She added that she would have testified had she been asked.  (PCRA NT 5/31/2006 a.m. Part 1 46.)

Joanne Budinas, a friend of Ms. Glover's who grew up around the Koehler family, testified about her observations of the family home after the parents' divorce. (*Id*. at 6-24.)  She knew that Mrs. Koehler was working two jobs and that the children were in charge of themselves.  (*Id*. at 11.)  The house was in disarray and the family did not have much money, nor did they keep much food in the home.  (*Id*. at 12-13.)  When

79

Mr. Koehler's father was there, he and Mrs. Koehler would fight often and in the

presence of the children.  (*Id*. at 15.)  Ms. Budinas observed Mr. Koehler's father

intoxicated and irritable.  (*Id*. at 16-17.)  She also saw bruises on Ms. Glover that she

stated were a result of the father's beatings.  (*Id*. at 16.)

Ms. Budinas met Attorney Frawley prior to trial, but he asked no questions of her.

(*Id*. at 17.)  However, she would have testified at the sentencing hearing had she been

asked to do so.  (*Id*. at 18.)

### iii.    Mental Health Expert Testimony

At the PCRA hearing, Mr. Koehler's counsel presented the testimony of one

mental health professional.  In its case in rebuttal, the Commonwealth presented its

own mental health expert.  Again, no mental health expert testimony was presented

during the sentencing phase of trial.  A summary of the PCRA testimony is set forth

below.

Edward J. Dougherty, Ed. D., a psychologist with a focus in child development

and forensic psychology, testified that he conducted a clinical evaluation of Mr. Koehler

in anticipation of the PCRA proceedings.  (PCRA NT 5/31/2006 a.m. Part 2 58-98).

(*See also* Doc. 50-85, Notes of Testimony, PCRA Hearing, 5/31/2006, a.m., Part 3

("PCRA NT 5/31/2006 a.m. Part 3"); Doc. 50-86, Notes of Testimony, PCRA Hearing,

5/31/2006, a.m., Part 4 ("PCRA NT 5/31/2006 Morning Part 4"); Doc. 50-87, Notes of

Testimony, PCRA Hearing, 5/31/2006, a.m. Part 5 ("PCRA NT 5/31/2006 a.m. Part 5").)

In connection with the evaluation, Dr. Dougherty reviewed numerous records from Mr.

Koehler's case, including the sentencing hearing transcript, affidavits of family

members, Mr. Koehler's military and school records, his medical and background

80

records from the Pennsylvania Department of Corrections, and Mr. Koehler's sister's

school records.[17]  (PCRA NT 5/31/2006 a.m. Part 2 83-84.)  He also conducted a

clinical interview of Mr. Koehler that lasted approximately four to five hours.  (*Id*. at 83.)

At that interview, Dr. Dougherty performed a battery of tests on Mr. Koehler "to

tease out various aspects of personality."[18]  (*Id*. at 85.)  An intelligence test revealed Mr.

Koehler to be of average intelligence with no severe impairment.  (*Id*. at 88.)  Further, in

response to his assertion that he had memory problems, Mr. Koehler's malingering test

results confirmed that he was not faking such problems.  (*Id*. at 89-90.)  Other results

for Mr. Koehler included the following traits: (1) reading level was "fourth grade plus;"

(PCRA NT 5/31/2006 a.m. Part 3 112); (2) displays hypochondriasis, (*id*. at 112-13); (3)

no depression, (*id*. at 113); (4) alienation, (*id*. at 113-14); (5) no schizophrenia, (*id*. at

115); (6) impulsive expression, (*id*. at 115-16); (7) social introvert, (*id*. at 116); and (8)

self deprecation, (*id*. at 116-17).[19]

In his review of Mr. Koehler's family and social history records, Dr. Dougherty

---

[17] The Court has not been provided directly with any background materials such as Mr. Koehler's medical, school, or medical records from the DOC, for review.  As such, the Court can only review the PCRA testimony referring to such records.

[18] Dr. Dougherty administered the Kauffman Adolescent Adult and Adult Intelligence Test; the Test of Memory Malingering (Nuff Connect Section); the Basic Personality Inventory; and the Short Category Test.  (PCRA NT 5/31/2006 a.m. Part 2 87-91.)

[19] On cross-examination, counsel for the Commonwealth asked a series of questions with regard to any diagnoses that Dr. Dougherty did *not* attribute to Mr. Koehler.  (PCRA NT 5/31/2006 a.m. Part 4 171-81.)  According to Dr. Dougherty, these diagnoses *not* attributed to Mr. Koehler included: borderline personality disorder, histrionic personality disorder, narcissistic personality disorder, avoidant personality disorder, dependent personality disorder, obsessive compulsive personality disorder, schizotypo personality, severe dissociative symptoms, mental retardation, learning disorders, communication disorder, cognitive disorder, substance related disorder, schizophrenia or other psychotic disorders, mood disorders, anxiety disorders, and impulse control disorders not otherwise elsewhere classified.  (*Id*.)

found that Mr. Koehler "had . . . rather chaotic, hectic early developmental years." (PCRA NT 5/31/2006 a.m. Part 2 94.)  He moved often as a child when his parents were still married.  (*Id*. at 95.)  He missed a lot of school, and by the age of seven he had a speech impediment.  (*Id*. at 96-98.)  Also, at a time when his sisters were having mental health problems, young Mr. Koehler "withdrew.  John would hide away.  And that was his way of handling life."  (PCRA NT 5/31/2006 a.m. Part 3 101-02.)  By age eleven, Mr. Koehler started telling elaborate stories about having millions of dollars, tons of clothes, and completing many successful ventures.  (*Id*. at 108.)  In addition, when he turned eighteen, Mr. Koehler joined the United States Army.  (*Id*. at 106.)  Mr. Koehler told Dr. Dougherty that he received letters of commendation while there, but in fact, he was discharged for being absent without official leave ("AWOL").  (*Id*. at 106-07.)  Mr. Koehler also told Dr. Dougherty that he started drinking alcohol when he was fifteen, and used it excessively until he was twenty-five, or until 1985.  (*Id*. at 103.) However, other family members stated they never saw him using alcohol or drugs.  (*Id*.)

In addition to identifying Mr. Koehler's personality problems, including a borderline personality disorder, Dr. Dougherty diagnosed Mr. Koehler with "attention deficit hyperactive disorder" ("ADHD").  (*Id*. at 109.)  He described him as a combination of two types of ADHD, one being predominately "attentive," and the other being predominantly "impulsive."  (PCRA NT 5/31/2006 a.m. Part 5 200.)  He further defined ADHD as a "neurological impairment that effects [sic] the executive functioning area of the brain," with "the inability to attend, the inability to complete tasks, the inability to . . . act unimpulsively."  (PCRA NT 5/31/2006 a.m. Part 3 109-10.)

82

After a review of Mr. Koehler's background records and conducting the clinical interview, Dr. Dougherty summarized his findings with respect to Mr. Koehler as follows: "A chaotic family background and an unstable environment, which contributed to his ability to deal with human beings in a positive way; an untreated attention deficit hyperactive disorder; and a developed borderline personality disorder, which interfered [with] his ability to function appropriately at all times." (*Id*. at 130.) However, on cross-examination, he also noted that, despite the diagnosis of ADHD, Mr. Koehler "has the intelligence that he could carry out this crime," and knows the difference between right and wrong. (PCRA NT 5/31/2006 a.m. Part 5 227, 231.) Importantly, too, after the Commonwealth thoroughly cross-examined Dr. Dougherty on his recollection of the facts of the case on record and Mr. Koehler's current state of mind, counsel effectively pointed out that Dr. Dougherty had nothing in his notes relating to the two types of ADHD Mr. Koehler exhibited, hyperactivity and implusivity. (*Id*. at 208.) As such, Dr. Dougherty characterized his diagnosis as "preliminary," and admitted that he "would probably feel more comfortable if I saw [Mr. Koehler] two or three more times." (*Id*. at 209-10.)

Turning to the Commonwealth's case on rebuttal, John O'Brien, M.D., a psychiatrist, testified that he also evaluated Mr. Koehler in connection with the PCRA proceedings. (Doc. 50-80, Notes of Testimony, PCRA Hearing, 3/1/2007, Part 1 ("PCRA NT 3/1/2007 Part 1").) (*See also* Doc. 50-81, Notes of Testimony, PCRA Hearing, 3/1/2007, Part 2 ("PCRA NT 3/1/2007 Part 2"); Doc. 50-82, Notes of Testimony, PCRA Hearing, 3/1/2007, Part 3 ("PCRA NT 3/1/2007 Part 3").) As part of his evaluation, Dr. O'Brien reviewed family member affidavits, the prior mental health

evaluation from Dr. Dougherty, related legal documents such as court decisions and penalty phase transcripts, the police investigative report, and various background records of Mr. Koehler.  (PCRA NT 3/1/2007 Part 1 38-44.)  He also conducted a clinical interview of Mr. Koehler at SCI-Graterford in June 2006.  (*Id*. at 14.)

From his review of the background materials, Dr. O'Brien noted that he did not find any support for a diagnosis of ADHD, as there was no record of Mr. Koehler ever being evaluated or treated for the condition.  (PCRA NT 3/1/2007 Part 2 51.)  He also found nothing in Mr. Koehler's records to suggest he suffered from a personality disorder in his past.  (*Id*. at 59.)  Further, on cross-examination, in first referring to the psychiatric history of Mr. Koehler's sisters, Mr. Koehler's counsel asked Dr. O'Brien if childhood abuse can cause psychiatric symptoms, to which Dr. O'Brien replied, "Yes, it can in . . . some individuals . . . and in some individuals, it causes absolutely nothing. And in Mr. Koehler's case, he has no symptoms."  (PCRA NT 3/1/2007 Part 3 102.)

Upon conducting the clinical interview, Dr. O'Brien found inconsistencies between Mr. Koehler's responses and family member affidavits with regard to his childhood home life.[20]  (PCRA NT 3/1/2007 Part 1 29-30.)  Dr. O'Brien also found Mr. Koehler's thought content "was devoid of any symptoms of psychosis."  (*Id*. at 20.)  A cognitive capacity screening examination of Mr. Koehler demonstrated no symptoms of cognitive limitation or impairment.  (*Id*. at 25-26.)  Additionally, he showed no symptoms

---

[20] Unlike what his sister and mother reported, Mr. Koehler described his overall childhood experience to Dr. O'Brien as "alright."  (PCRA NT 3/1/2007 Part 1 28.)  He indicated that he himself was not physically or sexually abused as a child and, while he agreed that his parents often argued, "he'd never seen anyone injured and was unaware of any of the alleged serious abusive interaction between his parents."  (*Id*. at 29-30.)

to suggest he had an attention deficit problem.  (*Id*. at 36.)

After reviewing the background records and conducting the interview, Dr. O'Brien made the following conclusions, mainly in disagreement with Dr. Doughtery's findings. First, he found that Mr. Koehler "has some narcissistic personality traits and may or may not have character based difficulties with sustained interpersonal relationship[s] with women."  (*Id*. at 46.)  He also found that any of those character based difficulties would qualify him for a personality disorder not otherwise specified.  (*Id*. at 47.)  As to Mr. Koehler's mental condition, both at that time and the time of the murders and trial, Dr. O'Brien concluded that, based on his clinical interview, Mr. Koehler "doesn't have symptoms of or warrant a psychiatric diagnosis and, specifically, doesn't manifest signs or symptoms of attention deficit disorder."  (*Id*. at 47.)  He also did not believe that, at the time of the offense, Mr. Koehler was under the influence of an extreme mental or emotional disturbance.  (*Id*. at 48-49.)  Finally, Dr. O'Brien opined that, "at the time of the offense, his ability to appreciate the criminality of his conduct and his ability to conform his conduct to the requirements of the law was not substantially impaired." (PCRA NT 3/1/2007 Part 2 49.)

## 2.    State Court Decision

After the evidentiary hearing, the PCRA court denied relief on this claim, finding "although trial counsel admittedly devoted little time to developing mitigation evidence and presented little evidence at the penalty phase, there is in fact virtually no mitigation evidence available for [Mr. Koehler]."  *See Koehler-II*, 36 A.3d at 149 (citing PCRA Opinion). The Pennsylvania Supreme Court affirmed.  *See id*. at 147-52.  In doing so,

the state court resolved this claim as follows.

First, with respect to *Strickland*'s deficient performance prong, the Pennsylvania

Supreme Court found the following in its decision affirming the denial of PCRA relief:

> We begin by assuming for purposes of argument that Appellant has demonstrated the arguable merit of his ineffectiveness claim, and that trial counsel lacked a reasonable strategy in presenting a single mitigation witness, whose scant testimony revealed only that Appellant's childhood was less than ideal. It is clear that trial counsel's efforts were focused primarily on the guilt phase of trial, notwithstanding that Appellant faced two sentences of death in the penalty phase. Even assuming, however, that trial counsel's stewardship was constitutionally deficient, we have no hesitation concluding that Appellant has failed to demonstrate that he was prejudiced by trial counsel's regrettable performance in this regard. *See Lesko*, 15 A.3d at 374 (providing that if a claim fails under any element of the ineffectiveness test, the court may proceed to that element first).

*Koehler-II*, 36 A.3d at 150. Thus, the Pennsylvania Supreme Court held that Mr.

Koehler's attorney performed deficiently because he had no reasonable basis for

presenting only one lay witness who provided little testimony on Mr. Koehler's "less than

ideal" childhood.

Turning to the prejudice prong, the Pennsylvania Supreme Court found the

following:

> Considering the full record before us, it is not probable that at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the Commonwealth's aggravating circumstances had the juror been aware of the mitigation evidence proffered at the PCRA hearing. *See Wiggins*, at 537, 123 S. Ct. 2527 (standard for assessing prejudice from deficient stewardship in presentation of mitigating evidence is whether "there is a reasonable probability that at least one juror would have struck a different balance."). As recognized by the PCRA court, the mitigation

86

evidence presented at the PCRA hearing was far from compelling. Instead, the bulk of the mitigation evidence presented, *i.e.*, Dr. Dougherty's testimony demonstrating that Appellant manifested features of a personality disorder and suffered from ADHD, was expressly rejected as unworthy of belief by the PCRA court. A review of the Commonwealth's cross-examination of Dr. Dougherty sheds light on why the PCRA court rendered the testimony "weightless." PCRA Ct. Opinion, Jun. 30, 2009, at 9. The Commonwealth effectively cross-examined Dr. Dougherty by reiterating Appellant's meticulous planning, execution, and cover-up of the murders, and questioning the mental health expert regarding whether such acts were consistent with characteristics of a person who suffers from ADHD, and thereby has difficulty staying on task and completing an assignment. *See* N.T. May 31, 2006, at 194-99. Also on cross-examination, the Commonwealth challenged Dr. Dougherty's finding that Appellant manifested features of a personality disorder, and led Dr. Dougherty to acknowledge that he could not provide a definitive diagnosis of that particular impairment. *Id*. at 164. Because the record supports the PCRA court's conclusion that the jury would not have given much, if any, weight to Dr. Dougherty's testimony, we defer to that determination.

We next examine the life history evidence of mitigation presented by Appellant's sister and his sister's childhood friend. This evidence was informative as it illustrated effectively that Appellant was neglected and abused as a child, having been raised in an environment lacking supervision, stability, and love. While the scant testimony of Appellant's mother at Appellant's penalty trial touched upon these issues, the testimony presented at the PCRA hearing by Glover and Budinas contained much more detail and painted a clearer picture of Appellant's unfortunate childhood. Such evidence, however, pales in comparison with the aggravating circumstances found by the jury. As noted, in relation to Appellant's conviction of the first degree murder of Clark, the jury found the aggravating circumstance of conviction of another murder either before or at the time of the offense at issue, 42 Pa.C.S. § 9711(d)(11). This Court has recognized the substantial strength of the aggravating circumstance of multiple murders in determining prejudice allegedly suffered by counsel's failure to present sufficient mitigation evidence. *Lesko*, 15 A.3d at 385 (emphasizing the strength of the aggravating circumstance that defendant committed multiple

87

murders within a one-week period in connection with a claim challenging counsel's effectiveness for failing to present mitigation evidence); *Cox*, 983 A.2d at 697 (providing that where the defendant is responsible for multiple murders, he has greater difficulty in securing *Strickland* relief premised on foregone, supplemental mitigation evidence). Based on the entirety of the record, we likewise conclude that the mitigation evidence of Appellant's unfortunate childhood is clearly outweighed by the aggravating circumstance of senseless multiple murders of two innocent victims in a bizarre exercise to train another individual to become an assassin.

We reach the same conclusion regarding the weighing of aggravating and mitigating evidence relating to Appellant's conviction of the first degree murder of Clark's nine-year-old son, Hopper. Concerning that conviction, the jury found two aggravating circumstances, including conviction of another murder, and that the victim was less than twelve years' old. 42 Pa.C.S. § 9711(d)(16). The fact that the second victim was a defenseless child weighs far heavier in aggravation. Accordingly, we reach the inescapable conclusion that there is no reasonable probability that one juror would have struck a different balance and voted not to impose the death penalty for Hopper's murder if he or she had heard the more detailed life history mitigation evidence set forth at the PCRA hearing. Appellant is therefore not entitled to relief on this claim.

*Koehler-II*, 36 A.3d at 151-52.

### 3.   Analysis

As stated above, Mr. Koehler argues that trial counsel was ineffective for failing to investigate and present mitigating evidence during the penalty phase of his trial. The Court will discuss both prongs of the *Strickland* test in the disposition of this claim.

Under the Sixth and Fourteenth Amendments, a criminal defendant has the right to effective assistance of counsel. That right is violated if the attorney's performance falls "below an objective standard of reasonableness" and "the petitioner suffer[s] prejudice as a result of the deficiency." *Blystone v. Horn*, 664 F.3d 397, 418 (3d Cir.

2011) (citing *Strickland*, 466 U.S. at 687).  Once a *Strickland* claim has been

adjudicated on the merits by the state court, a habeas petitioner has the additional

burden of showing that the state court's decision about the reasonableness of counsel's

performance was itself unreasonable.  *Id*.  "The standards created by *Strickland* and §

2254(d) are both highly deferential, and when the two apply in tandem, review is doubly

so."  *Harrington*, 131 S. Ct. at 788.  "[S]trategic choices made after thorough

investigation of law and facts relevant to plausible options are virtually

unchallengeable."  *Strickland*, 466 U.S. at 690.

A successful claim of ineffective assistance of counsel requires proving both

deficient performance and prejudice.  In its review of the PCRA court decision, the

Pennsylvania Supreme Court correctly identified the governing standard relating to an

ineffectiveness claim, *see supra* note 6, at 21, and made determinations as to both the

deficient performance and prejudice prongs.  *Koehler-II*, 36 A.3d at 147-52.  As a result,

our review of the Supreme Court's determination of both prongs of this ineffectiveness

claim must apply the § 2254(d) deference.

### i.    Deficient Performance

To establish ineffectiveness, a "defendant must show that counsel's

representation fell below an objective standard of reasonableness."  *Strickland*, 466

U.S. at 688.  The United States Supreme Court explained a lawyer's duty to investigate

and the deference owed to decisions surrounding that investigation:

> [S]trategic choices made after thorough investigation of law
> and facts relevant to plausible options are virtually
> unchallengeable; and strategic choices made after less than
> complete investigation are reasonable precisely to the extent

> that reasonable professional judgments support the limitations on investigation.  In other words, counsel has the duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id*. at 690-91.  The relevant inquiry here "is not whether counsel should have presented a mitigation case.  Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Mr. Koehler's] background *was itself reasonable*."  *Wiggins*, 539 U.S. at 523 (emphasis in original).

A counsel's failure to make a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the judge or jury at sentencing, can constitute ineffective assistance.  *Id.*  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* at 521 (quotation marks omitted).  Where a jury in a capital case has been precluded from hearing mitigating evidence concerning the defendant's character or background because counsel has made an objectively unreasonable decision not to look for it, counsel's performance violates the dictates of *Strickland*.  *See Rompilla*, 545 U.S. at 380-81; *Wiggins*, 539 U.S. at 519-34; *Outten v. Kearney*, 464 F.3d 401, 417 (3d Cir. 2006); *Marshall v. Cathel*, 428 F.3d 452, 469 (3d Cir. 2005); *Laird v. Horn*, 159 F. Supp. 2d 58, 112 (E.D. Pa. 2001), *aff'd on other grounds*, 414 F.3d 419 (3d Cir. 2001).

Further, in assessing the reasonableness of an attorney's investigation, the quantum of evidence known to counsel must be considered, as well as whether that

evidence should have led a reasonable attorney to investigate further. *Wiggins*, 539 U.S. at 527.  In assessing counsel's investigation, the Court must conduct an objective review of his performance measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. *Id*. at 522-27 (quoting *Strickland*, 466 U.S. at 688-89) (internal quotations omitted); *see also Bobby v. Van Hook*, 538 U.S. 4, 5-12 (2009).  The United States Court of Appeals for the Third Circuit has explained that it is "only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997) (quoting *United States v. Gray*, 878 F.2d 702, 711 (3d Cir. 1989)).

Counsel in capital cases are under an obligation to understand the fundamental shift in their duties once their client has been found guilty and a sentencing hearing begins:

> The existence of a penalty phase in capital trials makes such trials radically different from ordinary criminal trials.  A full capital trial is in fact two separate but intimately related trials: a preliminary guilt trial focusing on issues pertaining to the commission of a capital offense, and a subsequent penalty trial about the convicted defendant's worthiness to live.  The guilt trial establishes the elements of the capital crime.  The penalty trial is a trial for life.  It is a trial for life in the sense that the defendant's life is at stake, and it is a trial about life, because a central issue is the meaning and value of the defendant's life.

*Marshall v. Hendricks*, 307 F.3d 36, 99 (3d Cir. 2002) (citation omitted).  "The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of

evidence to make the case for life.  The purpose of the investigation is to find witnesses *to help humanize* the defendant, given that the jury has found him guilty of a capital offense." *Id*. at 103 (emphasis in original).  Reasonable counsel should recognize that "death is different," *see Marshall*, 428 F.3d at 467, and that a person facing the death penalty has a constitutionally protected right to have available mitigating evidence presented on his behalf, *Williams*, 529 U.S. at 393 (stating that the petitioner "had a right - indeed, a constitutionally protected right - to provide the jury with the mitigating evidence that his trial court either failed to discover or failed to offer").

Finally, satisfying *Strickland*'s investigation mandate ultimately turns on counsel's adherence to the professional standards for investigation and preparation of a mitigation case at the time of trial.  In defining what constitutes a complete investigation in this matter, therefore, the Court looks to the prevailing professional norms as they existed in 1996.

In 1996, the ABA Standard for Criminal Justice ("Standard") stated:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

1 ABA Standards for Criminal Justice: Prosecution Function and Defense Function, 4–4.1 (2d ed.1982 Sup.); *see also Strickland*, 466 U.S. at 688–89 (discussing the use of ABA standards as guides for determining "prevailing norms of practice"); *Rompilla*,

355 F.3d at 259 n.14 (referring to the ABA standards as "important guides" although cautioning against viewing them as "a codification of the requirements of the Sixth Amendment").  The ABA standards, coupled with *Strickland*'s explicit language requiring a thorough investigation into facts relevant to both guilt and sentencing, clearly show that a separate penalty phase investigation was the very foundation of reasonable representation in 1995.  *See Strickland*, 466 U.S. at 690-91.

The United States Supreme Court frequently cites ABA standards in its discussions of reasonableness of a lawyer's performance.  *See, e.g.*, *Wiggins*, 539 U.S. at 524 (explaining that the Court has "long referred" to ABA standards "as guides to determining what is reasonable" (internal quotation omitted)); *Williams*, 529 U.S. at 396; *Rompilla*, 545 U.S. at 387.  The ABA guidelines in force at the time of Mr. Koehler's trial provide varying advice for lawyers representing a defendant facing the death penalty. In *Bridges v. Beard*, 941 F. Supp. 2d 584 (E.D. Pa. 2013), the Honorable Anita Brody aptly summarized these guides as follows:

> The ABA guidelines . . . advised lawyers to begin investigations relevant to sentencing immediately, and stressed that such an investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (hereinafter "Guidelines") 11.4.1(C) (1989).  The Guidelines advised counsel to investigate the client's medical history, educational history, and family and social history, among other areas.  Guidelines 11.4.1(D).  The Guidelines also advised counsel to secure expert assistance for the investigation and presentation of mitigation evidence, Guidelines 11.4.1(D)(7)(D), and recommended that lawyers use expert witnesses "to provide medical, psychological, sociological or other explanations for the offense(s) for which

the client is being sentenced." Guidelines 11.8.3(F)(2). Indeed, the Guideline commentary conveyed the importance of experts: "The assistance of one or more experts (e.g., social worker, psychologist, psychiatrist, investigator, etc.) may be determinative as to outcome." Commentary, Guideline 11.8.6. The Guidelines emphasized that counsel had a duty to present "*all* reasonably available evidence in mitigation unless there are strong strategic reasons to forego some portion of such evidence," Guidelines 11.8.6(A) (emphasis added), and that such a presentation should include medical history, family and social history, and expert testimony, Guidelines 11.8.6(B).

*Bridges*, 941 F. Supp. 2d at 613.

As set forth above, in *Koehler-II*, the Pennsylvania Supreme Court addressed the deficient performance prong, finding "trial counsel lacked a reasonable strategy in presenting a single mitigation witness, whose scant testimony revealed only that [Mr. Koehler's] childhood was less than ideal." *Koehler-II*, 36 A.3d at 150. Therefore, AEDPA's standard of review applies to this prong of the *Strickland* test. *See* 28 U.S.C. § 2254(d). In applying this standard, the Court is mindful that a federal habeas court is deferential to the merits determinations made by a state court. 28 U.S.C. § 2254(d), (e); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). Further, as stated by the United States Supreme Court, "when § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

As stated above, during the penalty phase, Attorney Frawley presented only one lay witness on behalf of Mr. Koehler. Mr. Koehler's mother, Ms. Tumminia, told the jury that she and Mr. Koehler's father divorced when Mr. Koehler was young; that she worked two jobs and, because of her work schedule, did not see Mr. Koehler or his

sisters often; and that her ex-husband was abusive to Mr. Koehler when she was not home.  Attorney Frawley presented no further evidence during the penalty hearing. There is nothing in the record indicating that Attorney Frawley obtained any background materials on Mr. Koehler, including school records or any possible previous mental health evaluations.  Instead, as the Pennsylvania Supreme Court noted, Attorney Frawley admittedly focused primarily on the guilt phase of Mr. Koehler's trial in his preparation, leaving little to nothing to present at a penalty hearing.  *See Koehler-II*, 36 A.3d at 150.  Attorney Frawley did so fully aware that Mr. Koehler faced two death sentences in the penalty phase.

"[I]nvestigation is essential to the lawyer's duties as both advisor and advocate." *Blystone*, 664 F.3d at 419 (citing 1 ABA Standards for Criminal Justice 4–4.1 (2d ed. 1980)).  "[C]ounsel's general duty to investigate takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death."  *Hendricks*, 307 F.3d at 99 (quotation marks omitted).  Counsel must make sufficient "efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."  *Wiggins*, 539 U.S. at 524.  "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant."  *Blystone*, 664 F.3d at 420 (quoting 1 ABA Standards, *supra*, 4–4.1).

In light of the standards with respect to a lawyer's duty to investigate and prepare a mitigation case in a criminal case involving the death penalty, as well as defense

95

counsel's awareness that his client was potentially facing two death sentences and a review of the record as a whole, the Court concludes that defense counsel's investigation and resulting presentation of mitigating evidence from one lay witness was not objectively reasonable.  Thus, the Court concludes that the Pennsylvania Supreme Court's determination that Mr. Koehler's attorney did not satisfy *Strickland*'s deferential standard on performance with respect to investigating and presenting mitigating evidence was a reasonable application of *Strickland* and was based on a reasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2); *Werts*, 228 F.3d at 204.

### ii.    Prejudice

Notwithstanding that counsel's performance was deficient under *Strickland*, the Court agrees with the Pennsylvania Supreme Court that Mr. Koehler was not prejudiced by his counsel's failure to investigate and present mitigating evidence at the penalty phase.  In Pennsylvania, the jury's decision on the death penalty must be unanimous. *Jermyn*, 266 F.3d at 308.  Accordingly, a petitioner can satisfy the prejudice prong if he can show that the presentation of the available mitigating evidence would have convinced even one juror to find that the mitigating factors outweighed the aggravating factors.  *Id*.  Therefore, this Court must weigh the totality of the mitigating evidence that could have been presented at trial with the aggravating evidence that was presented and determine whether, "had the jury been confronted with this . . . mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Wiggins*, 539 U.S. at 534, 536.

Applying these principles, the Court finds that Mr. Koehler has not made a

sufficient showing that the outcome of the penalty phase of his trial would have been different, and thus the Pennsylvania Supreme Court's decision is not contrary to, or an unreasonable application of, clearly established federal law.  The omitted and potentially mitigating evidence at issue relates to Mr. Koehler's disputed mental health issues and abuse history.  Had counsel's investigation not been deficient, the jury would have heard from an additional family member and a friend, as well as a mental health expert.  Testimony as to Mr. Koehler's upbringing in a turbulent household, as well as disputed evidence of Mr. Koehler's ADHD, would have provided the jury with greater detail than what Attorney Frawley presented at sentencing through the testimony of Mr. Koehler's mother.  Through his mother's testimony, the jury did hear that, after the age of seven, neither parent was present and that Mr. Koehler's sisters were his primary care givers.  In addition, the jury heard that Mr. Koehler's father favored Mr. Koehler's sisters, but showed little affection for Mr. Koehler.  Attorney Frawley stressed this background in his closing argument, effectively pointing out that Mr. Koehler grew up "on his own."  (Sentencing NT 4/12/1996 35.)  However, the jury was tasked with the burden of weighing this mitigation evidence with the overwhelming evidence in support of three aggravating factors offered by the Commonwealth.  Therefore, the Court is not persuaded that the introduction of the additional evidence presented at the PCRA hearing "might well have influenced [at least one juror's] appraisal of [Mr. Koehler's] moral culpability."  *Williams*, 429 U.S. at 398.

The United States Supreme Court has stated that "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable . . . to

emotional and mental health problems, may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *California v. Brown*, 479 U.S. 538, 545 (1987)).  Here the jury heard evidence of Mr. Koehler's background, including pertinent information related to his early home life.  The information presented at the PCRA hearing did little more than provide further detail as to the unfortunate childhood about which the jury already heard.  Further, although the jury was presented with no mental health testimony at trial, such testimony at the PCRA hearing was not compelling.  Specifically, Dr. Dougherty's testimony as to his diagnosis of a personality disorder and ADHD was successfully challenged by the Commonwealth's use of a competing expert opinion.  In light of what the jury did hear at trial compared with evidence presented at the PCRA hearing, the Court concludes that Mr. Koehler has not demonstrated a reasonable probability that the result of his sentencing hearing would have been different had counsel presented additional evidence after conducting a more thorough investigation of mitigating circumstances.  Thus, the state court decision was neither contrary to, or an unreasonable application of, any clearly established federal law.  28 U.S.C. § 2254(d).  Habeas relief on this claim will be denied.

**F.      Claim VI - The trial court erred when he denied Petitioner's pre-trial request for a continuance.**

In this claim, Mr. Koehler contends that the trial court erred when it denied his pre-trial request for a continuance.  Specifically, Mr. Koehler argues that when he made the request about one month before trial, he needed additional time to conduct an investigation of Commonwealth witnesses located in Arkansas; to conduct additional

DNA testing on certain evidence; and, to schedule an examination of Mr. Koehler by a psychiatrist or psychologist. He claims that the trial court denied his reasonable and well-supported request for a continuance, and consequently trial counsel was unable to adequately prepare for both phases of the trial. Without such preparation from his defense counsel, Mr. Koehler claims that he has, in essence, been stripped of his rights to due process, a fair trial, and a reliable sentencing determination in violation of his constitutional rights. After careful review, the Court will deny habeas relief on this claim.

The background of this claim is as follows. In February 1996, Mr. Koehler's counsel, Attorney Frawley, filed a motion for a continuance. On March 5, 1996, slightly less than one month prior to the start of trial, the trial court held a hearing on that motion. (*See* Doc. 34-9, App. 9, Notes of Testimony, Hearing on Motion for Continuance, 3/5/1996 ("Continuance NT 3/5/1996").) At that hearing, Attorney Frawley sought a continuance based on the following: (1) he wished to travel personally to Arkansas to interview witnesses, including Kerrien Ramsey (*Id*. at 4); (2) he wanted to conduct additional, independent DNA testing on a blood sample from Regina Clark and semen found on her body, as well as blood from Mr. Koehler, William Curley, and Kirk Schrader (*id*. at 11-17); (3) he sought to have Mr. Koehler evaluated by a psychologist or psychiatrist (*id*. at 19); and (4) due to recent work on another homicide case, he needed additional time to complete trial preparation in this case, (*id*. at 20-22). In response, the Commonwealth countered with the following. First, District Attorney McGuinness reminded the court that Attorney Frawley indicated that he had already spent approximately four to five hundred hours in preparation for trial. (*Id*. at 23.)

Further, the Commonwealth had already made arrangements for an expert witness and approximately twenty-seven police officers to be available to testify on the trial dates scheduled.  (*Id*. at 30.)  As to the witnesses in Arkansas, the District Attorney indicated that he, too, had not yet interviewed these witnesses.  (*Id*. at 23-24.)  He reminded the court that both he and Attorney Frawley had the police reports identifying the witnesses and their contact information for some time.  (*Id*.)  In addition, if he so desired, Attorney Frawley still had time to travel to Arkansas before trial.  (*Id*.)  With respect to the DNA testing, the District Attorney stated that he had tried to coordinate joint testing with Attorney Frawley, who refused the offer.  (*Id*. at 24-25.)  He also informed the court that the rape of Regina Clark was not at issue in the case, as all evidence showed that she was only having sexual relations with Mr. Koehler.  (*Id*. at 25.)  DNA or blood testing was performed on the semen found on Ms. Clark simply to exclude Mr. Curley and Mr. Schrader.  (*Id*.)  Finally, the District Attorney reminded the court that Attorney Frawley had ample time to talk to his client and have him evaluated prior to trial, but even with the four to five hundred hours of preparation time, he notably had not done so.  (*Id*. at 26.)  After hearing argument, the trial court denied the motion and the matter proceeded to trial as scheduled.

On direct appeal, Mr. Koehler, still represented by Attorney Frawley, argued that the trial court abused its discretion in not granting the continuance based on the reasoning set forth by his counsel at the March 5, 1996 hearing.  (Doc. 34-11, App. 11, Pet.'s Br.)  He did not, however, argue that he needed a continuance in order to schedule an examination of Mr. Koehler by a psychiatrist or psychologist.  (*Id*.)  Rather,

Attorney Frawley argued that he needed the continuance in order to travel to Arkansas to interview witnesses, to conduct further DNA testing, and generally to "complete its [sic] trial preparation."  (*Id*. at 58.)

In addressing this issue on direct appeal, the Pennsylvania Supreme Court combined its discussion of the trial court's denial of the Mr. Koehler's continuance request with his claim that the trial court erred in denying his motion to suppress DNA evidence, as it considered the two issues related.  *See Koehler-I*, 737 A.2d at 236-37. The state court framed those issues as follows:

> Appellant's trial was scheduled to begin in March of 1996.  In February of 1996, he moved for a continuance and a hearing was held on the motion on March 5, 1996.  At the hearing the defense asserted that it need[ed] a continuance so that defense counsel could travel to Arkansas to interview prospective witnesses personally, and that it needed an additional four to seven weeks so that the most "complete" type of DNA testing could be done on semen found on Regina's body, and on the blood of the Appellant, Curley and Kirk to determine the source of the semen.[i]  At the hearing the Commonwealth opposed the motion, arguing that the Appellant had sufficient preparation time, and that it had already scheduled renowned forensic pathologist, Isidore Mihalakis, M.D., who had performed autopsies on Regina and Austin, to testify at the March trial.  The Commonwealth also noted that it had rearranged police schedules so that approximately twenty-seven police officers would be available to testify at trial.  The trial court denied the continuance and Appellant now claims that the ruling relating to the continuance mandates the grant of a new trial.

*Id*. at 236 (footnote omitted).   With respect to the denial of a continuance, the state court held as follows:

> Under the circumstances of the instant matter, we find that the trial court did not abuse its discretion when it denied Appellant's continuance request.  As the trial court explained in its decision, "[t]he glaring weakness of [Appellant's] motion

> for a continuance for purposes of DNA testing was that there was no factual basis for the belief that the semen came from either Curley or Schrader.  [Appellant's] suggestion that either Curley or Schrader, or both, may have had sexual relations with Clark and then murdered her to prevent her from telling [Appellant] is a theory in search of facts.  There is no evidence whatsoever that Clark had sexual relations with anyone other than [Appellant]."  Trial court opinion at 7-8.  Since Appellant has failed to demonstrate that the trial court abused its discretion by this ruling, Appellant is entitled to no relief on this claim.

*Id*. at 236-37.

Mr. Koehler subsequently raised a claim related to the denial of a continuance in his PCRA petition.  At the PCRA hearing, Attorney Frawley testified about what impact the denial of the continuance had on his case preparation.  (PCRA NT 5/31/2006 p.m. Parts 1-2.)  First, with respect to interviewing witnesses located in Arkansas, Attorney Frawley testified that, because of the denial of his motion, he was not able to personally travel to Arkansas to interview witnesses on behalf of Mr. Koehler; rather, he had to rely on his investigator to conduct the interviews.  (PCRA NT 5/31/2006 p.m. Part 2 67-69.) The investigator did report back to him, and he testified that "I can't say that there was additional information out there that we didn't get [ ] that would be really significant." (*Id*. at 69.)  Second, with respect to the additional DNA testing, he testified that he was not able to have the semen found on Regina Clark tested by his own sources.  (*Id*. at 70.)  And third, with respect to the mental health evaluation of Mr. Koehler, Attorney Frawley testified that he requested an examination of Mr. Koehler during the hearing on the continuance motion because Mr. Koehler had told him that he had a tumor and was going to die.  (PCRA NT 5/31/2006 p.m. Part 1 12.)  Based on his belief that Mr. Koehler was a "sociopath," (*id*. at 16), Attorney Frawley stated that "my gut feeling is

that my focus then was on the tumor, because I, I didn't really think that there was much mitigation that would be found by way of a psychologist or psychiatrist," (*id*. at 17).  In fact, Attorney Frawley agreed that there was no reference to requesting a continuance because he needed additional time to prepare for the mitigation phase of Mr. Koehler's trial.  (PCRA NT 5/31/2006 p.m. Part 2 71.)

In the PCRA court's June 30, 2009 Order and Opinion addressing Mr. Koehler's PCRA petition, the court stated that Mr. Koehler initially raised nineteen claims, but only pursued three of those claims through the PCRA hearing and briefing.[21]  (Doc. 34-3, App. 3, *Commonwealth v. Koehler*, CP-08-CR-000309-1995 (Bradford Ct. Com. Pl. Dec. 30, 2009).)  Those three claims did not include one related to the motion for a continuance.  In addition, in its Rule 1925(a) statement, the PCRA court deemed this claim waived because it was not raised on direct appeal.  (Doc. 34-4, App. 4, *Commonwealth v. Koehler*, CP-08-CR-0000309-1995 (Dec. 30, 2009).)  Further, the PCRA court found that Mr. Koehler failed to establish that his counsel was ineffective for not raising the claim on direct appeal "because [Mr. Koehler] failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests."  (*Id*.)

---

[21] Those three claims, as set forth by the PCRA court, are as follows: (1) Mr. Koehler's right to due process was violated when the Commonwealth presented theories in the trial which differed from those presented in William Curley's trial; (2) Mr. Koehler's rights under *Brady v. Maryland*, 373 U.S. 83 (1963) were violated when the Commonwealth failed to disclose to the defense that (a) in exchange for William Curley's testimony at Mr. Koehler's trial, the Commonwealth dropped several charges against Mr. Curley, and (b) it had entered into a non-prosecution agreement with Kirk Schrader and failed to correct his testimony that there was no such agreement; and (3) trial counsel was ineffective for failing to pursue and present mitigation evidence.  (Doc. 34-3, App. 3, *Commonwealth v. Koehler*, CP-08-CR-000309-1995 (Bradford Ct. Com. Pl. June 30, 2009).)

Notably, in addressing Mr. Koehler's appeal from the denial of his PCRA petition, the Pennsylvania Supreme Court began its discussion of this claim by specifically stating, "Significantly, [Mr. Koehler] does not allege either trial or appellate counsel's ineffectiveness relating to this claim." *Koehler-II*, 36 A.3d at 160. The state court continued as follows:

> While [Mr. Koehler] acknowledges that he challenged the trial court's denial of his continuance request on direct appeal, he asserts, without elaboration, that this Court failed to address adequately the issue. The record does not support this contention. On direct appeal, this Court examined whether the trial court abused its discretion by failing to grant Appellant a continuance of his trial date so that defense counsel could travel to Arkansas to interview prospective witnesses personally, rather than sending an investigator to do so, and to complete DNA testing on semen found on Regina Clark's body.[1] The Court found no abuse of discretion. *Koehler*, 737 A.2d at 236-37.
>
> To the extent Appellant reiterates that a continuance of his trial date was warranted for the aforementioned reasons, the claim has been previously litigated on direct appeal. *See* 42 Pa. C. S. § 9544(a)(2) (providing that an issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue"). To the extent Appellant argues additional grounds in support of his request for a continuance that were not addressed on direct appeal, the claim is waived as Appellant has failed to even allege that such grounds were properly preserved at trial and on direct appeal. *See id.* at § 9544(b) (providing that a PCRA claim is waived "if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state post[-]conviction proceeding"). Further, he has failed to allege that counsel was ineffective for failing to preserve the independent grounds in support of a request for a continuance.

*Koehler-II*, 36 A.3d at 160-61. Thus, the Pennsylvania Supreme Court: (1) denied as previously litigated Mr. Koehler's claims related to interviewing witnesses in Arkansas

and to performing additional DNA testing; (2) deemed waived his claim related to a mental health evaluation; and (3) found that Mr. Koehler had failed to allege ineffective assistance of counsel related to any of these claims. *Id*.

Turning to this Court's analysis of this claim, first, from a review of the record, the Court notes that Mr. Koehler did not present to the state courts his claim that he needed a continuance in order to schedule a mental health examination by a psychiatrist or psychologist. In his brief on direct appeal, Mr. Koehler's attorney argued that he needed that continuance in order to travel to Arkansas to interview witnesses, to conduct further DNA testing, and generally to "complete its [sic] trial preparation." (Doc. 34-11 at 58, App. 11, Pet.'s Br.) Mr. Koehler also did not raise this issue in his appeal from the denial of his PCRA petition. *See Koehler-II*, 36 A.3d at 160-61. Thus, Mr. Koehler's claim of trial court error with respect to denying a motion for continuance based on the need to schedule a mental health examination has not been exhausted and is now procedurally defaulted. In his memorandum of law, Mr. Koehler asserts that trial counsel's ineffectiveness for failing to fully present and litigate the claim serves as cause for the procedural default. In order to determine whether such ineffectiveness can serve as cause for a procedural default, the Court must first determine whether the trial court erred when it denied the motion for a continuance. In doing so, the Court will apply this discussion to all of the circumstances presented with respect to the decision to grant a continuance.

Continuance of trial is a matter of discretion with the trial court and will not be disturbed unless a clear abuse of discretion has been shown. *Fontana v. United Bonding Ins. Co.*, 468 F.2d 168, 169-70 (3d Cir. 1972) (per curiam). However, "a

myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  Further, there is no mechanical test for evaluating a court's decision to deny a continuance; rather, such an evaluation "must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Id.*, 376 U.S. at 589-90; *United States v. Rankin*, 779 F.2d 956, 960 (3d Cir. 1986).

Mr. Koehler acknowledges that the question of whether a state trial court erred in denying a continuance is generally a state law concern.  Nevertheless, he argues that, in this case, the trial court's denial elevated this question to one of constitutional deprivation because, as a result of the trial court's action, Mr. Koehler was denied the opportunity to present a competent and reliable defense with effective counsel at both his trial and sentencing.  Consequently, his fundamental constitutional rights were violated.  However, the Court finds that the circumstances presented in this case do not satisfy such a showing.

First, as the Commonwealth noted in its rebuttal argument at the hearing on the continuance motion approximately two weeks prior to the start of trial, Attorney Frawley had already spent about four to five hundred hours in preparation for trial.  The Commonwealth and its witnesses were ready to proceed to trial on the previously scheduled date.  In addition, if Attorney Frawley felt the need to personally travel to Arkansas to interview witnesses rather than send his investigator, he still had time to do so before trial.  Moreover, Attorney Frawley admitted at the PCRA hearing that he did not know of any further significant information he could have gained from those

106

witnesses had he traveled to Arkansas himself.  The same reasoning holds true for the DNA testing.  At both the motion hearing and the PCRA hearing, Attorney Frawley failed to establish that any additional testing would have led to results favorable to his client.

In sum, in light of the circumstances surrounding defense counsel's preparation for trial and the Commonwealth's reasoning behind its opposition to counsel's motion for a continuance, the Court finds that the trial court did not abuse its discretion when it denied the motion for a continuance and, resultantly, Mr. Koehler's related constitutional rights were not violated.  To the extent that the Pennsylvania Supreme court addressed the merits of this claim, its decision is not contrary to, or an unreasonable application of, clearly established law.  28 U.S.C. § 2254(d)(1). Additionally, where the trial court did not abuse its discretion in denying the motion for a continuance, trial counsel cannot be ineffective for failing to litigate this claim by any other means such as a post-trial motion or on direct appeal.  *See Strickland*, 466 U.S. at 691 (reasoning counsel's performance cannot be deficient based on a failure to advance meritless claims).  Therefore, Mr. Koehler has not established cause for any procedural default of this claim.  Mr. Koehler is not entitled to habeas relief on this claim.

**G.   Claim VII - Mr. Koehler was denied his right to confrontation, due process and effective assistance of counsel because the trial court permitted the prosecution to read a key Commonwealth witness' entire hearsay police interview to the jury and failed to give a cautionary instruction.**

In this claim, Mr. Koehler argues that his right to due process was violated when

the trial court permitted a Pennsylvania State Trooper to read into evidence an entire police interview with William Curley as a prior consistent statement, in violation of Pennsylvania law.  He also claims that trial counsel was ineffective for failing to request an instruction limiting the jury's use of Mr. Curley's statement for substantive purposes.[22]  After careful review, the Court will deny habeas relief on this claim.

The background of this claim is as follows.  When investigators initially learned of Mr. Curley's connection to the homicides, Corporal Louis Altieri of the Pennsylvania State Police traveled to North Carolina to locate and interview him.  (Doc. 50-39, Notes of Testimony, Trial, 3/29/1996, Vol. X, 26-27 (Trial NT 3/29/1996 Vol. X").)  When he stopped Mr. Curley in his vehicle, according to Corporal Altieri, he introduced himself to Mr. Curley by stating, "I believe you know why I'm here . . . ."  (*Id*. at 29.)  Mr. Curley immediately confessed to the shootings, and subsequently was escorted to the Goldsboro, North Carolina Police Department and interviewed by Corporal Altieri.  (*Id*. at 29, 31.)  Mr. Koehler asserts that the recorded interview consists of seventy (70) transcript pages.[23]

At trial, and as acknowledged by the Pennsylvania Supreme Court, Mr. Curley served as the Commonwealth's principal witness against Mr. Koehler.  *See Koehler-I*,

---

[22] This ineffectiveness claim was not presented to the state courts and, thus, it is unexhausted and now procedurally defaulted.  Mr. Koehler makes no argument in favor of cause and prejudice or miscarriage of justice to excuse the procedural default.  Nevertheless, because the Court concludes that the underlying claim here is without merit, *see infra*, and counsel cannot be ineffective for failing to raise a meritless claim, the Court need not discuss the ineffectiveness claim.  *See Strickland*, 466 U.S. at 691 (reasoning counsel's performance cannot be deficient based on a failure to advance meritless claims).

[23] The interview transcript is not included in Mr. Koehler's trial transcript, nor has it been provided to the Court for review.  As such, the Court is unaware of the specific contents of that interview.

737 A.2d at 241.  On cross-examination, defense counsel Attorney Frawley "vigorously attempted to discredit Curley."  *Id*.  Specifically, in a later discussion, Attorney Frawley indicated to the trial court that he was focusing his impeachment of Mr. Curley on four areas relating to Mr. Curley's recollection of the facts of the case.[24]   From a review of the record, the Court notes, too, that Attorney Frawley challenged Mr. Curley with his previous interview in a number of other areas pertaining to the circumstances of the crimes, such as Mr. Koehler's efforts to recruit Mr. Curley as a hit man, (Trial NT 3/28/1996 a.m. Part 3 Vol. VII 145), and the timing of Mr. Koehler and Mr. Curley's discussion of murdering Ms. Clark and Austin Hopper, (*id*. at 174).  Attorney Frawley also used Mr. Curley's prior statement to challenge his account of when he received the gun used to commit the murders, (Doc. 50-32, Notes of Testimony, Trial, 3/28/1996 p.m., Part 3, Vol. VIII, at 6-11, 23 (Trial NT 3/28/1996 p.m. Part 3"), and where he made the decision to kill Ms. Clark, (*id*. at 29-30).)  In response to Attorney Frawley's cross-examination, District Attorney McGuinness stated that "it's my intention tomorrow, since Attorney Frawley has attacked this witness with the statement that he gave in North Carolina, to put Corporal Altieri on the stand and play the whole statement to the jury, I'm limiting my cross based on my belief that that is now a prior consistent statement which the jury can hear to determine whether or not there are inconsistencies."  (*Id*. at 81.)

---

[24] As noted by counsel at a sidebar on the following day of Mr. Koehler's trial, he was focusing his impeachment of Mr. Curley on these four issues: "[(1)] whether the gun was loaded when he was given the gun by Koehler, [(2)] whether, after returning from Settlers he wanted to stay at the Hunsinger-Mack residence to see Rick Hunsinger, . . . [(3)] whether he was given the gun in the car or at the Hunsingers, and [(4)] whether anyone else would have known about the crime."  (Trial NT 3/29/1996 Vol. X 1-2.)

The following day at trial, the trial court announced that, after an in Chambers conference and its own review of the issue, it would allow the Commonwealth to read into the record the entire interview.  (Trial NT 3/29/1996 Vol. X 3.)  The parties had the following relevant exchange:

| | |
|---|---|
| Trial Court: | Okay. And I'll just indicate here on the record as I've indicated in chambers that it's my belief that because the tenor of Mr. Frawley's cross-examination was that William Curley was providing this testimony for the purpose of feathering his nest, in effect, to help himself with the second stage of his proceedings, the guilt, excuse me, the penalty phase, that suggests that he is providing this testimony from a corrupt motive, and as I read the cases under those circumstances it is permissible for the Commonwealth to present this to show that this was . . . William Curley's statement before this particular motive arose.  We'll note as well that the District Attorney has indicated that he intends to present evidence that William Curley was apparently unaware at the time he gave the statement that the death penalty was one of the options. |
| Mr. Frawley: | I have another purpose I was trying to demonstrate, I am attempting to demonstrate that his version of the episode may also be a fabrication as a basis for him attempting to persuade the trier of fact that he committed no crime because of intimidation, he had no other choice but to do what he did. |
| Trial Court: | Okay, and again I think my reasoning is precisely the same, I think it even calls more strongly for [Mr. Curley's statement] to be admitted. |

(*Id*. at 3-4.) Following this exchange, and during Corporal Altieri's testimony on that same date, the entire interview between Corporal Altieri and Mr. Curley was read into the record. (*Id*. at 39.) Following the reading, the trial court instructed the jury to consider the content of the interview and not the method by which it was delivered in court. (*Id*. at 40.)

On direct appeal, Attorney Frawley raised this issue as a sub-claim under the heading, "Miscellaneous Evidentiary Trial Rulings." (Doc. 34-11, Ex. 11, App. Brief 60-64.) Initially, he generally argued,

> During the trial the Court committed numerous evidentiary trial errors. Either alone or in conjunction with each other those rulings prevented John Koehler from receiving a fair due process trial. The rulings were like little brush strokes that defined the painting or in this case the nature of the trial.

(*Id*. at 60.) More specifically, he argued that the evidence was irrelevant and immaterial, and, therefore, the trial court abused its discretion by allowing the entire interview to be read to the jury, stating

> The shear length, detail and content of the statement read to the jury gave the statement a status it did not deserve. It was not substantive evidence. The jury would have seen it as such, given its length, detail and content. Much of the statement involved facts not contested by the defense in its cross of William Curley.

(*Id*.) Counsel cited two Pennsylvania Superior Court cases and no federal law in support of his argument. (*Id*.)

In its decision on direct appeal, the Pennsylvania Supreme Court denied three of the challenges to the trial court's evidentiary rulings, including the instant challenge to the admittance of Mr. Curley's statement. *See Koehler-I*, 737 A.2d at 241-42.

Specifically, the state court framed Mr. Koehler's claim as follows and concluded:

> Appellant next claims that the court erred in admitting at trial the entirety of witness Curley's statement given while he was in custody in North Carolina. Appellant supports this argument by claiming that the length and detail of the statement gave it a status that it did not deserve. Again, we must disagree.
>
> Curley was the principal Commonwealth witness against the Appellant. On cross-examination, Appellant's attorney vigorously attempted to discredit Curley. The trial court then permitted the Commonwealth to rehabilitate its witness by allowing nearly the entirety of his North Carolina confession to be read into the record. Because a prior consistent statement is admissible to rebut an allegation of corrupt motive or recent fabrication by the witness, *Commonwealth v. Counterman*, 719 A.2d at 301-02, the admission of the statement was not error.

*Koehler-I*, 737 A.2d at 241.

The admission of evidence at a state court trial may, in some circumstances, rise to the level of a constitutional violation. *See Lesko v. Owens*, 881 F.2d 44, 51 (3d Cir. 1989); *see also Estelle v. McGuire*, 502 U.S. 62 (1991) (acknowledging propriety of habeas relief for evidentiary errors of constitutional signficance); *Keller v. Larkins*, 89 F. Supp. 2d 593, 604 (E.D. Pa. 2000). A federal court considering a petition for habeas relief should not merely review state evidentiary errors, as any such mistakes "are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial." *Bisaccia v. Attorney General*, 623 F.2d 307, 312 (3d Cir. 1980). "When it must be said that the probative value of such evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence by a state may rise to the posture of fundamental fairness and due process of

law." *Lesko*, 881 F.2d at 52 (quoting *Bisaccia*, 623 F.2d at 313); *see also id*. (looking to whether evidence's "probative value is so conspicuously outweighed by its inflammatory content . . . as to violate a defendant's constitutional right to a fair trial").  In making this assessment, this Court must accord the state court deference in its resolution of evidentiary matters.  *See id*. at 52.  It should also be noted that evidence may be unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise may cause a jury to base its decision on something other than the established propositions in this case.  *Lesko*, 881 F.2d at 55. Finally, in the Third Circuit Court of Appeals, trial court decisions on whether to admit evidence are reviewed for abuse of discretion.  *See United States v. Salmon*, 944 F.2d 1106, 1125-26 (3d Cir. 1991).

In the instant case, as stated above, the trial court permitted Mr. Curley's entire interview with Corporal Altieri to be read to the jury as evidence of a prior consistent statement.  The trial court made this decision after the Commonwealth argued that reading the entire interview was necessary due to defense counsel's cross-examination of Mr. Curley in which his direct testimony was repeatedly challenged using the interview, both through Attorney Frawley's questions and requiring Mr. Curley to read into the record portions of the interview.  The court reasoned that reading the entire interview to the jury was proper because of Attorney Frawley's allegation that Mr. Curley was providing his trial testimony from a corrupt motive, namely to receive leniency in the penalty phase of his own trial.  Therefore, the entire interview was necessary to show the fact of Mr. Curley's statement before that purported motive arose.

Under Pennsylvania law, a prior consistent statement is only admissible if it is

113

alleged that the witness recently fabricated his testimony, and the prior statement was made before the time when the motive to fabricate arose. *Commonwealth v. Gore*, 396 A.2d 1302, 1307 (Pa. Super. Ct. 1978); *Commonwealth v. Gaddy*, 362 A.2d 217, 223 (Pa. 1976). *See also* PA. R. EVID. 613. This rule was in effect at the time of Mr. Koehler's trial, *Gore*, 396 A.2d at 1307, and has been the prevailing rule in the United States for more than a century, *Tome v. United States*, 513 U.S. 150, 156 (1995). "[T]he applicable principle is that the prior consistent statement has no relevancy to refute the charge unless the consistent statement was made before the source of the bias, interest, influence or incapacity originated." *Id*. (quotations and citation omitted).

Here, Mr. Koehler argues that Mr. Curley's statement was not admissible as a prior consistent statement because Mr. Curley formed the motive to fabricate at the time he was arrested and knew he would be charged with the murders. However, as stated by the trial court and affirmed by the Pennsylvania Supreme Court, Mr. Curley's entire interview was admitted into evidence in order to rebut Attorney Frawley's allegation of Mr. Curley's corrupt motive - to receive leniency in his own penalty hearing. As a result, the probative value of the interview was limited. The state court did not abuse its discretion in ruling that the interview could be admitted for the purpose related to leniency or, in other words, that its probative value outweighed its prejudicial effect.

Moreover, based on the available record, even if the trial court did erroneously admit Mr. Curley's entire interview, Mr. Koehler has failed to demonstrate that the admission of that entire interview rendered his trial fundamentally unfair. Here, in addition to Mr. Curley's testimony, a substantial amount of other inculpatory evidence,

including other witness testimony and physical evidence, was admitted at trial

demonstrating Mr. Koehler's guilt in the homicides.  Based on the entire record, Mr.

Koehler has failed to show that the admission of Mr. Curley's interview confirming both

his and Mr. Koehler's participation in the murders served to render his entire trial

fundamentally unfair.  *See Keller*, 251 F.3d at 413.  Therefore, the state court decision

was neither contrary to, or an unreasonable application of, any clearly established

federal law.  28 U.S.C. § 2254(d)(1).  Habeas relief on this claim is not merited.

> **H.**     **Claim VIII - Mr. Koehler was denied his rights against self-incrimination and to counsel because the prosecution introduced an allegedly inculpatory statement Mr. Koehler made during custodial interrogation after asking for an attorney and after his *Miranda* warnings had become stale.**

Mr. Koehler contends that his right against self-incrimination was violated by the

admission of a statement he made in response to a question by former-District Attorney

Fleury while he was in Pennsylvania State Police custody.  Specifically, he claims that

the District Attorney's questioning violated his Fifth Amendment rights in two respects:

(1) although Mr. Koehler signed a written waiver of his rights under *Miranda v. Arizona*,

384 U.S. 436 (1966), that waiver was no longer effective when he responded to the

District Attorney's question because he had invoked his right to an attorney, and (2) Mr.

Koehler's *Miranda* warning had become stale by the time the District Attorney

questioned him.  Upon careful review, the Court will deny habeas relief on this claim.

The background of this claim is as follows.  Initially, the Court notes that the

Pennsylvania Supreme Court explained the factual circumstances relating to this claim

as follows:

On May 1, 1995, Appellant was formally interrogated at the Pennsylvania State Police Barracks in Towanda by Troopers Chester Goldyn and David Pelachick. The questioning took place in a small interrogation room at the barracks. Appellant admits that prior to questioning he was once again given his *Miranda* rights and signed a *Miranda* waiver form. Upon completion of the questioning, as Appellant and the troopers left the interrogation room and entered a larger squad room, the D.A. (whom the Appellant did not know) asked "is this the babykiller?" Appellant responded "Yes", and later sought to have this response suppressed, claiming that the previous *Miranda* colloquy was ineffective because it had become "stale".[FN19]

> FN 19. Appellant also claims that the District Attorney questioned him after he had requested to speak to an attorney and questioning by the two troopers had ceased. We note, however, that testimony was presented at the suppression hearing of 3/20/96 that Appellant asked to talk not to an "attorney" but to the District Attorney. See N.T. 3/20/96 p.7. *See also* N.T. 11/22/95 p. 74, in which Trooper Chester Goldyn also testified that Appellant asked to speak to the "District Attorney."

*Koehler-I*, 737 A.2d at 235. In addition to these relevant circumstances, the Court notes the following. Prior to trial, defense counsel moved to suppress Mr. Koehler's statement to the District Attorney as a *Miranda* violation. After a hearing, the trial court denied the suppression motion. At trial, the Commonwealth raised the issue of Mr. Koehler's statement in its direct examination of PSP Trooper Pelachick, one of the Troopers who interrogated Mr. Koehler. Trooper Pelachick described the end of the interview and subsequent encounter with the District Attorney as follows:

> [W]e were . . . sitting in the interview room. He states, he wants to see the District Attorney, and moments later, the door opens up and I – I didn't know if the District Attorney was going to come in, but he wasn't the one that opened the door. I'm not even sure who opened the door, but [the District Attorney]

116

said, it's time to go, we have to go.  And with that, [Mr. Koehler] was escorted outside of the interview room.

\* \* \*

The District Attorney, upon Mr. Koehler leaving the interview room, stated, is this the baby killer.

\* \* \*

[Mr. Koehler] looked at [the District Attorney] and said, yeah.

(Doc. 50-67, Notes of Testimony, Trial, 4/8/1996 p.m., Part 3, Vol. XXII, at 107-08 ("Trial NT 4/8/1996 Part 3 Vol. XXII").)  Trooper Pelachick also specified that the District Attorney's question occurred "right after" he had just conducted the interview in the interrogation room.  (*Id*. at 109.)

Both parts of this claim were presented to the state courts and decided on direct appeal.  *See Koehler-I*, 737 A.2d at 353-354.  The Pennsylvania Supreme Court addressed the issue of staleness as follows:

> This Court has held that not every renewal of an interrogation requires the repetition of *Miranda* warnings, and that a court must look at the circumstances of each case to determine whether previously provided *Miranda* warnings have become stale.  *Commonwealth v. Proctor*, 526 Pa. 246, 585 A.2d 454, 459 (1991).  The criteria used in making this determination are:
>
>> the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings.
>
> *Commonwealth v. Bennett*, 445 Pa. 8, 15, 282 A.2d 276, 280 (1971).

117

> In the instant matter, *Miranda* warnings were given [to] Appellant approximately one hour prior to his challenged statement. Appellant was in the same building and only [a] few feet away from the room in which he had been interrogated. Further, Appellant was accompanied by the same officer who had given the warnings. Under the circumstances presented we have no hesitation in finding that the *Miranda* warnings given to Appellant had not become stale so as to require their repetition and that the trial court correctly denied suppression to Appellant's Bradford County statement. *See also Commonwealth v. Ferguson*, 444 Pa. 478, 282 A.2d 378 (1971) (*Miranda* warnings given seven and a half and three hours prior to new interrogation of a sixteen-year-old held sufficient); *Commonwealth v. Jones*, 478 Pa. 172, 386 A.2d 495 (1978) (warnings given three hours before statement, in the same room and in the presence of the same officer, held sufficient).

*Id.*, 737 A.2d at 235-36.

As stated above, Mr. Koehler now argues that his right against self-incrimination and right to counsel were violated when: (1) the District Attorney questioned him after he had requested an attorney and his interrogation had ceased, and (2) the District Attorney questioned him after his previously-provided *Miranda* warnings had become stale. The Court will address the staleness argument prior to the issue of whether Mr. Koehler invoked his right to counsel before the District Attorney's remark.

Mr. Koehler first claims that his *Miranda* warnings became stale after the circumstances of his custody and questioning changed and, thus, any statement he made to the District Attorney should have been suppressed. While the United States Supreme Court has not squarely addressed the issue of staleness, other federal courts have considered whether intervening events between *Miranda* warnings and custodial interrogation renders the warnings "stale" by asking two questions:

118

> (1) At the time the *Miranda* warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

*United States v. Pruden*, 398 F.3d 241, 246-47 (3d Cir. 2005) (quoting *United States v. Vasquez*, 889 F. Supp. 171, 177 (M.D. Pa. 1995)).

Here, the Pennsylvania Supreme Court's decision on this issue was not based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(2).  The state court looked to similar factors in determining whether the initial warnings were stale and repeated warnings were necessary, including, "[t]he length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings."  *Koehler-I*, 737 A.2d at 235 (quoting *Commonwealth v. Bennett*, 282 A.2d at 280).  Using these factors, the state court determined that the warnings given to Mr. Koehler had not become stale at the time he made the statement to the District Attorney.  *Id*.  The court pointed to the following facts in support of its decision:

> *Miranda* warnings were given [to] [Mr. Koehler] approximately one hour prior to his challenged statement. [Mr. Koehler] was in the same building and only [a] few feet away from the room in which he had been interrogated.  Further, [Mr. Koehler] was accompanied by the same officer who had given the warnings.

*Id*.

Upon review, the Court agrees that Mr. Koehler had been properly advised of his *Miranda* rights and acknowledged that he understood his rights.  Mr. Koehler has failed to provide clear and convincing evidence contrary to the Pennsylvania Supreme Court's determination that no intervening event caused the rights to become stale.  28 U.S.C. § 2254(e)(1).  In the instant petition, Mr. Koehler relies upon a number of other facts, arguing that these facts rendered him unable to consider the effect of his waiver before making the statement to the District Attorney.[25]  But these facts are not sufficient to

---

[25] Mr. Koehler contends that the Pennsylvania Supreme Court failed to take into consideration the following facts:

- The only persons in the interrogation room with Petitioner were Troopers Pelachick and Goldyn, but when he entered the area outside the interrogation room, there were several new faces present, including District Attorney Fleury, Sergeant Fraley and Lieutenant Altavilla, NT 3/20/96 at 8;

- Trooper Pelachick was walking several feet behind Petitioner (*i.e.*, Trooper Pelachick was not visible to Petitioner), *id*. at 9, 11;

- Petitioner was physically escorted out of the interrogation room by Corporal Meyer, who had not been present during Petitioner's interrogation, *id*. at 54-56;

- District Attorney Fleury questioned Petitioner in a setting that was entirely different from the setting in which Petitioner had been *Mirandized* (*i.e.*, Petitioner had been interrogated while seated but was questioned by District Attorney Fleury while walking to a waiting police vehicle);

- Petitioner's formal interrogation was continuous and took place exclusively in the interview room until the interrogation ended and he was escorted out of the room, *id*. at 52-53; and

- District Attorney Fleury used a tone that was different from Troopers Pelachick and Goldyn (*i.e.*, an off-handed and provocative question versus formal interrogation).

120

rebut or outweigh the state court findings.  What remains is that Mr. Koehler was not

subjected to a coercive environment designed to induce a confession at the time he

made the statement.  Rather, he was made aware of his *Miranda* rights and voluntarily

chose to speak to law enforcement officials.  Mr. Koehler's rights had not grown stale

under *Miranda*, and his statement to the District Attorney was not in violation of the Fifth

Amendment's privilege against self-incrimination.  Thus, the Pennsylvania Supreme

Court's finding that Mr. Koehler's *Miranda* warnings had not grown stale was not

contrary to, or an unreasonable application of, clearly established federal law, nor was it

based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).

Turning to his other issue, Mr. Koehler argues that he invoked his right to

counsel prior to responding to the District Attorney's question, and therefore his

statement to the District Attorney should have been suppressed.  In support, he argues

that it was indisputable that he asked for an attorney during his interrogation because

the Troopers ended the interview after he asked for an attorney.  As such, any

questioning by the District Attorney was in violation of Mr. Koehler's right to counsel.

In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court established a

"bright-line" rule barring police-initiated interrogation following a suspect's request for

---

(Doc. 34 at 107.)  These facts were apparently gleaned from the transcript of the suppression hearing, which has not been provided to the Court in these habeas proceedings.  However, the Court notes that, in his trial testimony, Trooper Pelachick provided his account of the interrogation and subsequent events, including Mr. Koehler's response to the District Attorney's question.  (Trial NT 4/9/1996 p.m. Part 3 Vol. XXII 93-126.)  In that account, Trooper Pelachick detailed his first-hand observations of the exchange between the District Attorney and Mr. Koehler, including hearing the tone of the District Attorney's question and Mr. Koehler's response thereto, (*id*. at 108, 110), as well as the timing and location of the exchange, (*id*. at 111, 118).

counsel.  In *Edwards*, the suspect was arrested on state criminal charges.  He was

*Mirandized* and questioned until he requested a lawyer.  The next day, and without

having seen a lawyer, the suspect was again *Mirandized* and questioned.  At this time,

he gave a confession.  In ruling that Edwards' statements should have been

suppressed, the Court held:

> when an accused has invoked his right to have counsel
> present during custodial interrogation, a valid waiver of that
> right cannot be established by showing only that he responded
> to further police-initiated custodial interrogation even if he has
> been advised of his rights.[1]  We further hold that an accused,
> such as Edwards, having expressed his desire to deal with the
> police only through counsel, is not subject to further
> interrogation by authorities until counsel has been made
> available to him, unless the accused himself initiates further
> communication, exchanges, or conversations with the police.

*Id*. at 484-85.

In this case, as set forth above, the Pennsylvania Supreme Court addressed this

claim in its opinion on direct appeal.  *See Koehler-I*, 737 A.2d at 235 n.19.  Specifically,

the state court made a factual finding that Mr. Koehler asked not for an "attorney," but,

rather, for the District Attorney.  *Id*.  The Court notes, too, that Trooper Pelachick

testified that, towards the end of the interview, Mr. Koehler asked "to talk to the District

Attorney," a request Trooper Pelachick had never received from a suspect during his

tenure in the criminal investigations unit.  (Trial NT 4/8/1996 p.m. Part  Vol. XXII 107,

123.)  Upon review, the Court finds that the Pennsylvania Supreme Court's findings are

supported by record evidence that Mr. Koehler did not, in fact, ask for counsel, but

instead asked to speak with the attorney who potentially would be prosecuting his case.

As such, Mr. Koehler has not established that, at the time he made the statement to the

District Attorney, he had just "expressed his desire to deal with the police only through counsel." *Edwards*, 451 U.S. at 484. Mr. Koehler has failed to provide clear and convincing evidence to rebut the presumption of correctness of the state court findings. *See* 28 U.S.C. § 2254(e)(1). Thus, habeas relief on this issue will also be denied.

> **I.      Claim IX - Mr. Koehler was denied due process, a fair trial, reliable sentencing and effective assistance of counsel because the prosecutor engaged in repeated acts of prosecutorial misconduct which infected the entire proceeding and prior counsel failed to object to some of this misconduct or to raise it on direct appeal.**

In this claim, Mr. Koehler asserts numerous instances of prosecutorial misconduct which cumulatively were so prejudicial as to entitle him to relief from his conviction. In connection with this claim, he also contends that trial counsel was ineffective for failing to object to all of the prosecutor's acts of misconduct, for failing to request appropriate curative instructions, and for failing to adequately litigate these claims on direct appeal. In his memorandum of law in support of his habeas petition, Mr. Koehler places the instances of prosecutorial misconduct into five categories. (*See* Doc. 34.) After setting forth the overall standard by which the Court will review these claims, the Court will discuss the five categories in turn.[26] Upon careful review, the

---

[26] Mr. Koehler raised these instances of prosecutorial misconduct in either his direct appeal or in his PCRA petition. In its decision affirming the denial of PCRA relief on this claim, the Pennsylvania Supreme Court concluded that the substantive claim of prosecutorial misconduct was waived because trial counsel did not lodge a contemporaneous objection when any of the alleged instances of misconduct occurred. *Koehler-II*, 36 A.3d at 14. However, the court did consider on the merits the ineffectiveness of counsel claim premised on the same underlying alleged instances of misconduct. *Id*. at 144-47. As stated previously, *see supra*, p. 57-58, at the time of Mr. Koehler's direct appeal in January 1998, the Pennsylvania Supreme Court was still applying the "relaxed" waiver rule by which this Court might "reach the merits of claims brought by capital defendants which might otherwise have been barred by waiver." *Wilson v. Beard*, 589 F.3d 651, 658 (3d Cir. 2009). As such, the Court will address on the

Court will deny habeas relief on this claim.

In considering such claims of prosecutorial misconduct, the Court notes that improper statements by a prosecutor do not in and of themselves require reversal, but must be analyzed on a case-by-case basis pursuant to the harmless error doctrine. *United States v. Zehrbach*, 47 F.3d 1252, 1267 (3d Cir. 1995). "The harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review depends on whether the error was constitutional or non-constitutional." *United States v. Gambone*, 314 F.3d 163, 177 (3d Cir. 2003) (quoting *Zehrbach*, 47 F.3d at 1265). Non-constitutional error is harmless when it is highly probable that the error did not contribute to the judgment. *Id.* (quoting *Zehrbach*, 47 F.3d at 1265). Highly probable requires that the court possess a sure conviction that the error did not prejudice the defendant. *Id.* (quoting *Zehrbach*, 47 F.3d at 1265). If the error was unconstitutional, the court may affirm only if the error was harmless beyond a reasonable doubt. *Id.* (citing *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996).

The appropriate standard of review on habeas corpus for a claim of prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citing *Donnelly v. DeChristoforo*, 416

---

merits both Mr. Koehler's substantive claim of prosecutorial misconduct, as well as his associated claim of ineffective assistance of counsel. Where the state courts addressed the merits of the prosecutorial misconduct claim, the Court will apply AEDPA review; otherwise, the Court will review the claims *de novo*.

U.S. 637, 643 (1974)).  In making this determination, a court must examine the prosecutor's statements in context to determine their probable effect on the jury's ability to judge the evidence fairly.  *United States v. Young*, 470 U.S. 1, 11-14 (1985).  Stated otherwise, the arguments of counsel must be judged in the context in which they were made, bearing in mind that arguments of counsel carry less weight with a jury than do instructions from the court.  *Boyde v. California*, 494 U.S. 370, 384 (1990).  For example, a conviction will not be overturned on the grounds of prosecutorial statements where the prosecutor's comments were "invited" by defense counsel's improper statements, and went no further than necessary to "right the scale" of justice or to "neutralize" the defense's remarks.  *Young*, 470 U.S. at 12-13.  Further, habeas relief is not available simply because the prosecutor's comments were undesirable or even universally condemned.  *Darden*, 477 U.S. at 180-81; *Donnelly*, 416 U.S. at 643; *Lam v. Kelchner*, 304 F.3d 256, 271 (3d Cir. 2002).

### 1.     Alleged Instances of Prosecutorial Misconduct

Mr. Koehler asserts that the following instances of prosecutorial misconduct occurred during both the guilt and penalty phases of his trial.

### a.     Inflaming the Passions of the Jury

Mr. Koehler alleges that, during his guilt phase opening statement and the presentation of evidence at trial, the Commonwealth repeatedly violated the legal precept that prosecutors may not make comments calculated to arouse the passions or prejudices of the jury.  *See Viereck v. United States*, 318 U.S. 236, 247-48 (1943).  In support, he raises the following specific instances.

During his guilt phase opening statement, District Attorney McGuinness

characterized April 26, 1995 - the date Regina Clark's body was discovered - and Mr.

Koehler's involvement in that event as follows:

> [April 26th] is a date, to steal from Mr. Roosevelt, that will live
> in infamy. It is a date that will besmirch the peace and dignity
> of the people of Bradford County forever. We come today to
> this courtroom as Trooper Madigan and I representing the
> Commonwealth make a charge that this man [Mr. Koehler] is
> responsible for the horror of April 26th. The evidence that we
> will show you, and as I am about to outline, will indicate to you
> that this infraction upon the peace and dignity of our quiet
> community are the handiwork of that man. We charge him
> today with the most serious infraction of the peace and dignity
> of this Commonwealth that is known. We charge him with two
> counts of first degree murder. We charge him with the
> conspiracy to commit the murder of two individuals. We
> charge him further with kidnapping, and we charge him with
> burglary.

(Trial NT 3/25/1996 a.m. Part 1 Vol. I 10.) Further, after telling the jury about Mr.

Curley's account of the crimes, District Attorney McGuinness described the

Pennsylvania State Troopers' actions in retrieving Austin Hopper's body as follows:

> For out they go, and at 11:02 p.m., on the 28th, they shine a
> light into this sluice pipe and they find a blue blanket from
> which protrudes a little hand and a little foot wearing a
> sneaker. Just exactly where William Curley told them to look.
> Well, two other troopers that will testify, I've already mentioned
> Trooper Shiposh and another fellow by the name of Trooper
> Pelachick, they're a couple guys that it's been my pleasure to
> work with, a couple of real big rough guys. Well, Trooper
> Shiposh who related this story to me, and he and Trooper
> Pelachick will tell it to you, but on this April 28th evening, at
> about midnight, these two big guys, it's their job to go down
> into that sluice pipe and bring that little boy out. And not only
> that, before they can do that, they've got to photograph the
> whole inside of this thing and they've got to look for evidence.
> So you've got two of the roughest toughest state policemen
> that ever come down the pike, two big guys, and they were in
> this tunnel with this little boy, at midnight. And they do their

126

job. And Trooper Pelachick carries that little boy out and up to the guardrail, and get's [sic] to the guardrail and can't go any further, the peace and dignity of the Commonwealth of Pennsylvania. Well, that wasn't what was going though his mind I'm sure, and Trooper Shiposh, his friend, reaches over, puts his hand on his shoulder, and says, you're doing good Trooper, you can make it. And they pass the body of that little nine year-old boy over the railing and our friend, Mr. Farr, has the duty of taking this little boy, his murdered body, to the Robert Packer Hospital.

(*Id*. at 23-24.)

Towards the end of his opening statement, the prosecutor characterized the plan

to kill Ms. Clark and Austin Hopper, as well as the Troopers reaction to finding the

victims, as such:

It was all a ruse, a hoax. The real reason that they were coming to Bradford County Pennsylvania was so that man could get William Curley to help him kill Austin Wade Hopper and to kill Regina Clark and to dispose of their bodies. Now, when I think of Trooper John Kern and when I think of Trooper Pelachick, and I think of Trooper Kern looking down into that rusting, discarded refrigerator at this brutally murdered woman, he's saying to himself, who did this? And why? Who did this, and why? And I think Trooper Pelachick when he carries that small boy's body, rifled with holes, and he carries it in that wet soaking blanket to the guardrail and pauses, and Trooper Shiposh reaching down to his shoulder and saying you're doing good Trooper, you can make it, and I think of David Pelachick saying who did this, and why? Ladies and gentlemen, the reason that we assembled you folks from all over Bradford County, the reason that we imposed upon you for a week to go through jury selection, is because in this proceeding we want to answer those two questions. We want to know who did this, and why. And the Commonwealth's evidence will show you that who did this, is John Joseph Koehler, Jr. And why? Because Regina Clark wanted to go home.

(*Id*. at 35-36.)

Mr. Koehler contends that these arguments made by the prosecutor in his guilt

phase opening statement were calculated to improperly play to the emotions of the jury by the use of such emotionally-charged language that described the discovery of both victims' bodies as well as the reactions of law enforcement to those discoveries.  The Court disagrees.  The prosecution is "accorded reasonable latitude and may employ oratorical flair arguing its version of the case to the jury."  *Henry v. Horn*, 218 F. Supp. 2d 671, 705 (E.D. Pa. 2002) (quoting the Pennsylvania Supreme Court and noting that this standard is not contrary to the federal *Darden* standard for adjudging claims of prosecutorial misconduct).  The prosecutor here used that latitude in the challenged comments.  While he did employ oratorical flair to describe the crimes charged, as well as the discovery of the victims' bodies, he was not improperly appealing to the emotions of the jury; rather, he was simply asking the jury to imagine how these charges came about.  Notably, during his opening, the prosecutor did not display photographs of where the victims were discovered or the victims themselves.  He was merely describing how they were found.  Federal law does not prohibit a prosecutor from commenting upon a victim during a murder trial.  And while the prosecutor's comments may have been harmful to Mr. Koehler's defense, they were not unduly prejudicial such that they rendered the trial fundamentally unfair.

Turning to the presentation of the evidence during trial, Mr. Koehler challenges the following conduct of the prosecutor as "play[ing] to the emotions of the jury."  (Doc. 34 at 110.)  First, during the testimony of Rebecca Jones, Regina Clark's sister, District Attorney McGuinness and Ms. Jones had the following exchange when he asked her to look at photographs of Ms. Clark and Austin Hopper for identification purposes:

> Q:    Ma'am, I have something that I'm not really enjoying

doing, but I have to ask you if you'd take a look at that photograph there . . . ?

A:    Yes, sir.

Q:    Do you recognize the person that's depicted in that photograph?

A:    Yes, sir, I do.

Q:    You could turn that back down, upside down, now. . . . Could you tell those people on the jury who that is?

A:    It looks like Austin.

Q:    You're going to have to take your hand away, so they can hear you, I'm sorry.

A:    It looks like Austin.

Q:    Okay, now, sorry, I have [to] show you Number Thirteen as well, too.  Just take your time and when you're ready, you look at that.

A:    Oh, oh, God.  Yes, sir.

Q:    You can turn it upside down now, you don't have to look at it no more.  Who does that photograph depict?

A:    It looks like Austin.  It looks like Austin.

Q:    Ma'am, I'm again going to show you two things that you probably don't want to see.  So when you're ready, take a look at the top one, that's Number Four.

A:    Oh, God, I can't believe they done this!

(Doc. 50-20, Notes of Testimony, Trial, 3/26/1996 p.m., Part 3, Vol. II, at 102-03 ("Trial

NT 3/26/1996 p.m. Part 3 Vol. II").)  Mr. Koehler further challenges District Attorney

McGuinness' examination of Melissa Mack, the individual who hosted Mr. Koehler, Mr.

Curley, and the two victims at her home prior to the killings, and who later identified Ms.

129

Clark's body.  In asking her to describe her identification of the body at the hospital,

District Attorney McGuinness elicited the following exchange:

> A:    I had to identify Regina.
>
> Q:    And how did this take place?
>
> A:    What do you mean?  They had taken me in the room
>        and I had seen from here down.
>
> Q:    Alright, was this a photograph you looked at?
>
> A:    I had seen photographs earlier that day, but I had also
>        seen her body.
>
> Q:    How was the body displayed to you?
>
> A:    She was laying down, like I said I only seem from here
>        down at first.
>
> Q:    And when you saw that what did you say?
>
> A:    I said Oh My God that's her.
>
> Q:    And it was her?
>
> A:    Yes it was.

(Doc. 50-21, Notes of Testimony, Trial, 3/26/1996 a.m., Part 1, Vol. III, at 30-31 ("Trial

NT 3/26/1996 a.m. Part 3 Vol. III").)[27]

---

[27] Mr. Koehler claims that the prosecutor compounded the prejudicial effect of Ms. Mack's testimony when, during a recall of PSP Trooper Shiposh, who escorted Ms. Mack to the hospital for the identification, he elicited the following testimony from the Trooper as to Ms. Mack's reaction to seeing Ms. Clark's body:

> At first when we walked in she didn't want to look at the face, and we had her face covered. She walked in and looked at the remainder of the body and she immediately started crying and shaking, she covered her face and she said, oh my God, that's her.  So I calmed her down a little bit and waited a few minutes, and I explained to her how important it was that she did look at her face.  After a few minutes she agreed to do that and as soon as she looked at her face

Finally, Mr. Koehler alleges that the prosecutor presented irrelevant testimony intended to win sympathy for the Commonwealth's witnesses.  In particular, during his examination of Ms. Mack, District Attorney McGuinness made the following remark about Kato Kalin while questioning her about Mr. Curley:

> Q:    Okay.  Now, you were describing Mr. Curley.
>
> A:    He's tall, and he's about nineteen years old.
>
> Q:    And how long had he stayed at your residence?
>
> A:    For about a month, about a month I guess it was.
>
> Q:    And did he rent a room there, or what were the arrangements?
>
> A:    He was just staying there.
>
> Q:    Kind of like Kato Kalin, just staying there?

(Trial NT 3/26/1996 a.m. Part 1 Vol. III 13.)  However, upon objection by defense counsel, District Attorney McGuinness' remark about Kato Kalin was stricken from the record.  (*Id*. at 13-14.)  Also, during the testimony of PSP Corporal Altieri, one of the police officers who apprehended Mr. Curley in North Carolina, District Attorney McGuinness asked him how he noticed Mr. Curley's composure change once he got into the police vehicle. (Trial NT 3/29/1996 Vol. X 29).  Corporal Altieri responded, "Well he started to cry, he was kind of all shaken up, obviously something was on his, you

---

she just became really upset and I had to walk her right out of the morgue.  Once we walked outside she said she was 100% positive that that was the girl.

(Doc. 50-22, Notes of Testimony, Trial, 3/26/1996 a.m., Part 2, Vol. III, at 96 ("Trial NT 3/26/1996 a.m. Part 2 Vol. III").)

know, he was afraid of something apparently." (*Id.*)  And finally, during the testimony of

Vonda Heath, Mr. Schrader's neighbor who walked by the Schrader residence around

the time Ms. Clark was murdered, the prosecutor asked her if she recalled that

particular time, and, in doing so, asked her to recall if "something significant [was] going

on in your family, at that time."  (Doc. 50-37, Notes of Testimony, Trial, 3/29/1996, Part

2, Vol. XI, at 75-76 ("Trial NT 3/29/1996 Part 2 Vol. XI").)  Ms. Heath responded that her

father was dying at that time.  (*Id.* at 76.)

      Here, with these instances from the presentation of evidence at trial, Mr. Koehler

argues that the prosecutor's conduct, including eliciting emotionally-charged or

irrelevant testimony from the above witnesses, was again intended to improperly play to

the emotions of the jury so as to deny Mr. Koehler his right to due process.  And again

the Court disagrees.  First, as to the testimony of Ms. Jones and Ms. Mack, as well as

the associated testimony of Trooper Shiposh, it is apparent that Ms. Jones and Ms.

Mack were emotional in their exchanges with District Attorney McGuinness about

identifying Austin Hopper and Regina Clark, respectively.  However, the Court finds that

the prosecutor's questioning of these witnesses did not serve to inflame the passions of

the jury.  Rather, the prosecutor presented these witnesses as a means to identify the

victims.  It is reasonable to think that these witnesses may not have wanted to recount

identifying the victims and, therefore, reacted during trial in an impassioned manner, but

it is also reasonable to think that the prosecution needed these witnesses at trial for that

very purpose of identification.  Moreover, Trooper Shiposh's testimony as to Ms. Mack's

reaction to seeing Ms. Clark's body served only to confirm Ms. Mack's conviction by

which she did, in fact, identify the victim.  As such, the conduct of the prosecutor here

with respect to eliciting the challenged testimony from these witnesses was not unduly prejudicial such that it rendered the trial fundamentally unfair.

As to the remaining instances relating to irrelevant testimony, the Court finds the following. First, even though District Attorney McGuinness' remark about Kato Kalin was, in fact, irrelevant, not only was it stricken following an objection by defense counsel, but it did not amount to the kind of misconduct that would render Mr. Koehler's trial fundamentally unfair. Second, while Mr. Koehler claims that eliciting testimony from Corporal Altieri that Mr. Curley cried when police arrested him was simply an effort to gain the jury's sympathy for the Commonwealth's "star" witness, in light of Mr. Curley's testimony and the evidence presented relating to his own involvement in the crimes, the Court cannot find that this brief account of Mr. Curley's arrest would have served to inflame the passions of the jury so as to render Mr. Koehler's trial fundamentally unfair. Thus, the prosecutor's conduct in eliciting such testimony was not constitutionally infirm. And finally, having Ms. Heath confirm the time frame by which she witnessed the Schrader residence with reference to an event in her own life, albeit an unfortunate one, does not convince this Court that the prosecutor was eliciting such testimony for the sole purpose of inflaming the passions of the jury. Such conduct on the part of the prosecutor again does not amount to misconduct that renders Mr. Koehler's trial fundamentally unfair.

In sum, for the reasons stated above, Mr. Koehler is not entitled to relief on this category of prosecutorial misconduct.

### b.   Vouching for Witnesses/Expressing Personal Opinions

Next, Mr. Koehler argues that the prosecutor improperly vouched for the credibility and character of the Commonwealth witnesses and sought to engender sympathy for them.  He also argues that the prosecutor improperly expressed his personal opinion regarding evidence and the character and credibility of various witnesses.[28]  And finally, he argues that the prosecutor repeatedly injected improper remarks and personal attacks against the defense, defense counsel, and Mr. Koehler in an effort to prejudice the jury against Mr. Koehler.

A criminal prosecutor has a special obligation to avoid "improper suggestions, insinuations, and . . . assertions of personal knowledge" which may induce the jury to trust the Government's judgment rather than the jury's own view of the evidence. *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also Young*, 470 U.S. at 18-19 (1985).  Such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant, thus jeopardizing the defendant's right to be tried solely on the basis of the evidence presented to the jury.  *Young*, 470 U.S. at 18.  Vouching, expression of the prosecutor's personal belief regarding the credibility of the witnesses, is likely impermissible.  *United States v. Walker*, 155 F.3d 180, 184 (3d Cir. 1998) (citing *Lawn v. United States*, 355 U.S. 339, 359 n.15 (1958)).  "Although counsel may state his views of what the

---

[28] In his memorandum of law in support of his habeas petition, Mr. Koehler claims he is challenging such remarks made during the penalty phase closing argument; however, each citation thereof is to the prosecutor's closing argument from the trial's guilt phase.  (*See* Doc. 34 at 113-14.)  For purposes of discussion, the Court will assume that Mr. Koehler is challenging the cited remarks from the guilt phase.

evidence shows and the inferences and conclusions that the evidence supports, it is clearly improper to introduce information based on personal belief or knowledge." *Zehrbach*, 47 F.3d at 1266-67.  And again, as stated herein, improper statements by a prosecutor do not in and of themselves require reversal, but must be analyzed on a case-by-case basis pursuant to the harmless error doctrine.  *Id*. at 1267.

In the instant case, Mr. Koehler alleges instances of prosecutorial misconduct in support of these allegations at the following various stages of the trial.

### i.   Guilt Phase Opening Statement

First, with respect to the claim regarding vouching for Commonwealth witnesses, during his guilt phase opening statement, District Attorney McGuinness: (1) described Richard Albert Morris, Jr., the man who found Regina Clark's body in the abandoned refrigerator and immediately contacted the State Police, as a "good citizen," (Trial NT 3/25/1996 Part 1 Vol. I 10-11); (2) described Trooper Kern's traveling to the scene of the body as, "[h]e too went to that refrigerator hoping against hope that there was some sign of life," (*id*.); (3) called the coroner "all of our good friend," (*id*. at 12); (4) called Corporal Altieri "a gentleman you'll meet," and states, "William Curley tells him a story that Corporal Altieri will never forget, and you, ladies and gentlemen, will not forget, (*id*. at 15); (5) calls Troopers Pelachick and Shiposh "long suffering" after describing their lengthy involvement in the investigation, (*id*. at 25, 31); (6) when informing the jurors that they will hear the testimony of Troopers Pelachick and Shiposh, described them as "a couple guys that it's been my pleasure to work with . . . ," (*id*. at 23-24); (7) repeatedly refers to the Troopers involved in the case as performing their "duties," (*id*.

135

at 14) (Trooper Shiposh "has the duty and obligation to transport Ms. Mack to the

Robert Packer Hospital where at this point lies the body of Regina Ann Clark"); (*id*. at

24) (describing the Troopers who carried Austin Hopper out of the sluice pipe as "they

do their job"); (*id*. at 25) ("Troopers Shiposh and Pelachick performed the duties"); and

(8) described Dr. Mihalakis, the forensic pathologist who performed the autopsies on

the victims, as "one of the nation's leading forensic pathologists," who determined Ms.

Clark's cause of death and "had the misfortune to have to perform an autopsy" on

Austin Hopper, (*id*. at 24-25).  Mr. Koehler asserts that, during the same opening

statement, District Attorney McGuinness expressed his personal belief in Mr. Koehler's

guilt when he stated that, "[o]ver the next week, ten days, two weeks, a month - -

whatever it takes, we're going to put witnesses in that chair, just the kind that I told you

about, to present evidence and when you hear all that evidence, you will be then asked

to judge whether that evidence is sufficient beyond a reasonable doubt to prove the

charges against Mr. Koehler there."  (*Id*. at 33.)  According to Mr. Koehler, District

Attorney McGuinness also expressed his personal belief when he concluded his

opening statement with, "Ladies and gentlemen, however long it takes, however long it

takes, we'll be here and we'll put the evidence on.  Because it's time for us all to right

the peace and dignity of Bradford County.  Thank you."  (*Id*. at 36-37.)

　　　Prior to discussing these instances, the Court notes that the trial court provided

the jury with the following instruction before the opening statements of counsel at the

guilt phase, in relevant part:

> [Y]ou are the sole judge of the facts.  It is your recollection of
> the evidence and not mine or counsel's on which you must rely
> during your deliberations.  You are not bound by any opinion

you might think counsel or I have expressed concerning guilt or innocence, credibility of witnesses, weight of evidence, facts proven by the evidence or inferences to be drawn from the facts.

(*Id.* at 6.)

Upon review, the Court concludes that, taken in context, the prosecutor's challenged statements were not improper, as not one suggests personal knowledge of the witnesses' credibility, but instead they either appealed to the jury's opinion or simply served as a valid description of a witness' role in the case.  By way of example, the Court sees no impropriety in the prosecutor calling Mr. Morris a "good citizen" for contacting the police upon finding Ms. Clark's body in the refrigerator.  Nor is there impropriety in describing the Troopers' actions in this case as performing their "duties."  Furthermore, it is beyond belief that the prosecutor's statements regarding how long it would take for him to present the Commonwealth's case would serve as an expression of personal belief that may induce the jury to trust him rather than its own view of the evidence.  Moreover, even if the jury had viewed the prosecutor's remarks here as statements of his personal knowledge or belief, the trial court's instructions prior to opening statements that the jury must base its verdict on its recollection of the evidence and must not be bound by any expressed opinion held by the court or counsel, helped to ensure that the jury would not be improperly swayed.  As a result, the Court finds that the prosecutor's statements highlighted here by Mr. Koehler as objectionable did not "infect[ ] the trial with unfairness" to such an extent that his conviction denied him due process of law.  *Darden*, 477 U.S. at 180-81.

### ii.     Guilt Phase Closing Argument

Second, as to vouching for witnesses and expressing personal opinions during the guilt phase closing argument, Mr. Koehler cites the following examples of District Attorney McGuinness's alleged misconduct.  In discussing the circumstantial evidence in support of Mr. Koehler's guilt, District Attorney McGuinness described two witnesses who contradicted Mr. Koehler's account of the day of the murders as "a nice old couple . . . [l]ooked like they came off a Norman Rockwell calendar."  (Trial NT 4/10/1996 p.m. Part 1 Vol. XXVI 9-10.)  After referencing their testimony, District Attorney McGuinness called Mr. Koehler a "liar."  (*Id*. at 10.)  Also, Mr. Koehler claims that District Attorney McGuinness argued that because the jury heard Trooper Pelachick testify twenty-five times, it must find him guilty, (Doc. 34 at 114); however, what District Attorney McGuinness actually said in his argument was, "Now, Trooper Pelachick, I don't know, you've heard him testify twenty-five times, so you're going to have to determine his credibility," (Trial NT 4/10/1996 p.m. Part 1 Vol. XXVI 11).  In addition, when discussing Mr. Curley's statement in connection with the circumstantial evidence, District Attorney McGuinness described Mr. Curley as follows:

> With all our physical evidence, with a day of testimony and cross examination, where did Bill Curley lie?  You looked at him.  You saw him.  That was an eighteen year old kid, just turned nineteen.  A year ago, just turned eighteen.  He sat there and he bawled like a baby.  He saw the reaction, when he saw the pictures.  He's an eighteen year old kid.  Everybody that saw him, thought to himself [sic], I can't believe this guy did a crime like this.

(*Id*. at 16.)

Also in connection with his claim that District Attorney McGuinness lodged

138

personal attacks against Attorney Frawley during his guilt phase closing argument, Mr.

Koehler cites several pages of the closing argument transcript.[29]  First, at the beginning

of his argument, District Attorney McGuinness stated:

> Ladies and Gentlemen, at this point, I would like to go back
> and review all of the evidence for you, in as summary fashion
> as I can.  I don't think I have to be quit[e] as long winded as
> Mr. Frawley, because I believe that, as loud as I can speak, the
> evidence in this case, for ten long days, spoke to you louder
> than [my] voice.

(*Id*. at 1.)  In discussing Attorney Frawley's representation of Mr. Koehler's interview

with PSP Corporal Meyers, District Attorney McGuinness stated: "[Mr. Koehler]'s been

read his *Miranda* warnings, he knows what he says can and will be used against him in

a court of law.  Attorney Frawley says, well, we'll fumble through the pages and there's

not really an inconsistent statement here."  (*Id*. at 10.)  Further, in discussing part of

Attorney Frawley's theory of the case to the jury, District Attorney McGuinness stated,

"Now, Mr. Frawley, he's a smart man and he stands up here and he says to you, well, if

Austin is a loose link, Kirk Schrader is a loose link and he should have been killed too, if

Mr. Koehler did this.  Pretty clever."  (*Id*. at 14.)  Also, in challenging Attorney Frawley's

theory that Mr. Curley could not have realistically thought Mr. Koehler was a hit man,

District Attorney McGuinness called Attorney Frawley an "educated fifty year old man."

(*Id*. at 18.)  Finally, in summarizing Attorney Frawley's closing argument, in part, District

Attorney McGuinness stated, "Mr. Frawley suggested that you should find him . . . not

guilty to protect your families, your children and yourselves.  That's a stretch."  (*Id*. at

---

[29] Mr. Koehler does not challenge specific language; rather, he simply cites to pages from the transcript.  (*See* Doc. 34 at 114.)  Upon close review of the transcript, the Court presumes Mr. Koehler is referring to the language the Court has set forth here.

40.)

Prior to discussing these instances, the Court notes that the trial court provided

the following instruction following the presentation of evidence and closing arguments of

counsel, in relevant part:

> The speeches of counsel are not part of the evidence, and you should not consider them as such.  However, in deciding the case you should carefully consider the evidence in the light of the various reasons and arguments which each lawyer presented.  It is the right and duty of each lawyer to discuss the evidence in a manner which is most favorable to the side he represents.  You should be guided by each lawyer's arguments to the extent they are supported by the evidence and insofar as they aid you in applying your own reason and common sense.  However, you are not required to accept the arguments of either lawyer.  It is for you and you alone to decide the case based on the evidence, as it was presented from the witness stand and in accordance with the instructions which I am now giving you.
>
> * * *
>
> The question for you to decide, based on all the considerations I am discussing with you, is not which side produced the most evidence, but, instead, which evidence you believe.  As judges of the facts, you are the sole judges of the credibility of the witnesses and their testimony.

(Trial NT 4/11/1996 a.m. Part 1 Vol. XXVII 7-8.)

Upon review, the Court finds that, taken in context, none of the prosecutor's

statements here represent any impropriety such that Mr. Koehler's trial should be

rendered fundamentally unfair.  For example, the prosecutor's statement regarding Mr.

Curley's testimony, which included references to Mr. Curley's age and reactions while

testifying, was tempered by an appeal to the jury's own perspective on the testimony

("You looked at him.  You saw him.").  Further, Mr. Koehler conveniently omitted the

portion of the prosecutor's statement with regard to Trooper Pelachick testifying

"twenty-five times" in which he added, "so you're going to have to determine his

credibility."  Viewed in context and as a whole, there is nothing in the prosecutor's

statement to suggest that the jury should find Trooper Pelachick credible simply

because he testified numerous times; rather, the prosecutor properly appealed to the

jury's own perspective on the matter.

In addition, in its decision on direct appeal the Pennsylvania Supreme Court

correctly found the following with respect to Mr. Koehler's argument that the prosecutor

indicated that he did not believe Mr. Koehler and called him a liar:

> We agree with Appellant that it is improper for a prosecutor to
> express a personal opinion as to a defendant's guilt or the
> credibility of a defendant or other witnesses.  However, the
> prosecutor is permitted to respond to defense arguments and
> is free to present his or her case with logical force and vigor.
> Moreover, this Court has held that a prosecutor's comments
> stating that a defendant had lied were neither unfair nor
> prejudicial when given in response to the comments of defense
> counsel in relation to the credibility of witnesses, and when
> they were supported by the evidence.  A review of the record
> reveals that this is precisely what occurred in the instant action
> and, accordingly, this claim provides Appellant no relief.[FN23]
>
>> FN23.   We note that at no point did the
>> prosecutor ever state that "in his opinion" the
>> Appellant had lied.

*Id*. at 240-41 (citations omitted).

As to Mr. Koehler's allegations of personal attacks upon Attorney Frawley by the

prosecutor during his closing argument, applying the relevant principles set forth herein

and in considering the foregoing statements in view of the record as a whole, the Court

finds that none of the statements represented an improper expression by the

prosecutor of his own personal opinion that would infect Mr. Koehler's trial with unfairness so as to deny him due process.  None of the challenged statements were so inflammatory or prejudicial as to rise to the level of a constitutional violation.  For example, the prosecutor's statements about Attorney Frawley in connection with Mr. Schrader also being a loose link and whether Mr. Curley could have realistically thought Mr. Koehler was a hit man were in direct response to defense counsel's own remarks about the same.  But, more importantly, the Court is not convinced that any of these supposed "attacks" upon Attorney Frawley by the prosecutor deprived Mr. Koehler of a fair trial.  Mr. Koehler has simply not established a finding of prosecutorial misconduct with regard to these statements.

### iii.    Presentation of Evidence

Next, turning to Mr. Koehler's assertion that District Attorney McGuinness made improper remarks and lodged personal attacks during the presentation of evidence, Mr. Koehler cites the following examples.  He claims that District Attorney McGuinness made a sarcastic reference to Attorney Frawley's opening statement when he asked Ms. Mack during her testimony, "During [Attorney Frawley's] opening statement counsel says that [Ms. Clark] would sit on [Mr. Koehler's] lap and be affectionate with him, did you observe any of that?"  (Trial NT 3/26/1996 a.m. Part 2 Vol. III 84.)  However, after Attorney Frawley objected to the form of question, the trial court sustained, deeming the question as leading.  (*Id*. at 84-85.)  Further, during Kerrien Ramsey's testimony, defense counsel objected to certain questioning by District Attorney McGuinness, and, at an immediate side bar, informed the court that District Attorney McGuinness "seemed to roll his eyes."  (Doc. 50-42, Notes of Testimony, Trial, 4/1/1996 p.m., Part 3,

Vol. XIII, at 109-110 ("Trial NT 4/1/1996 p.m. Part 3 Vol. XIII").)  In addition, after defense counsel left the courtroom in order to retrieve his writing pad, the prosecutor asked the trial court if he could continue examining a witness while counsel was absent. (Doc. 50-25, Notes of Testimony, Trial, 3/26/1996 p.m., Part 2, Vol. IV, at 68 ("Trial NT 3/26/1996 p.m. Part 2 Vol. IV").)  Also, when asking Trooper Madigan to state his name for the record, District Attorney McGuinness added, "[t]he only man who hates Side Bars more than the jury," in reference to Trooper Madigan.  (Doc. 50-53, Notes of Testimony, Trial, 4/3/1996 p.m., Part 2, Vol. XVIII, at 62 ("Trial NT 4/3/1996 p.m. Part 2 Vol. XVIII").)  And finally, when Attorney Frawley requested that Mr. Koehler be permitted to stand in a position that would allow him to view a videotape being shown to the jury, District Attorney McGuinness replied that Mr. Koehler must be "appropriately guarded" if he was to stand close to the jury.  (Trial NT 4/4/1996 a.m. Part 2 Vol. XIX 95.)

Upon review, just as the Court found above, there is no suggestion here that the alleged personal attacks upon Attorney Frawley by the prosecutor rise to the level of a constitutional violation.  Viewed in context, the prosecutor's statements or actions did not improperly suggest to the jury that it should disregard the evidence and instead credit only the argument of the Commonwealth.  Even if the jury had viewed the prosecutor's remarks as statements of his personal belief, the trial court's instructions at the beginning of the trial and at the end of closing arguments that the jury must base its verdict on the evidence before it, and not on arguments of counsel, served to ensure that the jury would not be improperly swayed.

The Court also notes that the Pennsylvania Supreme Court addressed Mr.

143

Koehler's challenge to the prosecutor's comment that he should be "appropriately guarded" while he stood near the jury while a videotape was being played.  *See Koehler-I*, 737 A.2d at 240.  In his direct appeal, Mr. Koehler argued that the prosecutor's remark suggested that he might harm the jury or public, or might take flight.  In addition, he argued that the remark suggested that he was guilty of the charges.  In response, the Pennsylvania Supreme Court concluded:

> [W]e must disagree with Appellant's contention that the comment was of such magnitude that a new trial was required. While the comment *may have been uncalled for*, we simply do not find it objectionable enough to find that it had an unavoidable effect that would form in the minds of the jury a fixed bias and hostility toward the Appellant so that the jury would abandon its responsibility and be unable to weigh the evidence objectively and arrive at a true verdict.[FN22]

>> FN22.  The trial court, in its opinion denying Appellant's post-verdict motions, suggested a second possible interpretation of the challenged language.  Earlier in the trial, Regina's sister had attacked the Appellant as he sat at the defense table.  The court posited that the jury could have construed the prosecutor's comment as suggesting a guard for Appellant's protection.

*Id*. (emphasis in original).  While the Pennsylvania Supreme Court did not cite Supreme Court precedent, it appropriately relied on its own state court cases, which articulate the proper standard.[30]  Viewed in context and as a whole, the Court agrees with the state

---

[30] *See, e.g.*, *Commonwealth v. Copenhefer*, 719 A.2d 242, 257 (Pa. 1998) (citing *Commonwealth v. Green*, 581 A.2d 544, 561-62 (Pa. 1990)).  In *Green*, the Pennsylvania Supreme Court cited with approval observations made by Chief Justice Berger in *Young*, 470 U.S. at 10:

> [Our] standards reflect a consensus of the profession that the courts must not lose sight of the reality that [a] criminal trial does not unfold like a play with actors following a script.  It should come as no

court that the prosecutor's statement would not improperly sway the jury. Thus, the decision is not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d).

In sum, for the reasons stated above, Mr. Koehler is not entitled to relief on this category of prosecutorial misconduct.

### c.   Introducing Prior Bad Act Evidence

Mr. Koehler argues that, during the presentation of evidence, the prosecutor injected improper evidence of other alleged uncharged crimes by Mr. Koehler, thereby creating a risk that the jury would find Mr. Koehler guilty of the instant crimes charged.[31]

---

> surprise that in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused. Nevertheless, a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statement or conduct must be view in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.

*Green*, 581 A.2d at 561-62 (internal citations and quotations omitted).

[31] The Pennsylvania Supreme Court addressed Mr. Koehler's challenge to the admission of this evidence in its decision affirming the denial of PCRA relief, but under a claim challenging the evidentiary rulings of the trial court rather than under a prosecutorial misconduct claim. *See Koehler-II*, 36 A.3d at 241-242. The court addressed the claim as follows:

> Appellant next challenges the admission of evidence given by Curley and his sister Lea Curley (Lea) regarding Appellant's threat, some years previously, to kidnap Lea. Appellant also objects to the admission of evidence by Lea that Appellant had told her that he was a hit man and also spoke about killing Curley's stepfather. Appellant claims that this evidence served only to blacken his character in the eyes of the jury and had limited probative value.[1] We do not agree and we say again that evidentiary rulings are committed to the sound discretion of the trial court and we will not disturb these rules on appeal absent a clear abuse of discretion. *Commonwealth v. Johnson*, 727 A.2d 1089, 1102 (Pa. 1999). The trial court permitted the admission of this evidence to show why Curley feared Appellant. In its opinion denying post-trial motions the

In support, he references testimony elicited from two Commonwealth witnesses.

First, Mr. Koehler contends that District Attorney McGuinness improperly elicited testimony from Mr. Curley that Mr. Koehler was a hit man and, in doing so, prejudiced Mr. Koehler by creating the risk that the jury would find him guilty based on this testimony.  The Court notes the following portion of the trial record relevant to this argument.  District Attorney McGuinness asked Mr. Curley what Mr. Koehler told him he did for a living, and Mr. Curley responded that he said he was a hit man who kills people.  (Trial NT 3/28/1996 Part 1, Vol. VII 6.)  At that point, counsel and the trial court had a lengthy side bar regarding the hit man testimony.  (*Id*. at 7-11.)  During the side bar, defense counsel moved for the following:

> The motion is that "A", the testimony be stricken, the testimony that's just been given that the defendant indicated he was a hit man, and "B", the court would – I would ask the court to direct that there be no questions raised dealing with whether or not

---

> court succinctly explained its reasoning: "The evidence of [Appellant's] prior kidnapping threat, coupled with evidence that Curley had for many years heard [Appellant] brag that he was a "hit man" for the CIA and the mafia, was relevant to prove that Curley had come to believe that [Appellant] was a dangerous person whose commands were not to be ignored."  Trial Court opinion at 24-25. We agree that the challenged evidence was relevant[ ] for this purpose and find that the trial court did not abuse its discretion in making its evidentiary rulings.[FN27]
>
> > FN27.  We also note that the trial court gave a limiting instruction during Lea Curley's testimony that the evidence was not to be considered by them with respect to whether Appellant actually was a hit man but only to explain what may have been in the mind of William Curley.  N.T. Vol. X, p. 17.  The court repeated this cautionary instruction during its final charge to the jury.  N.T. Vol. XXVII, pp. 16-17.

*Koehler-II*, 36 A.3d at 241-42.

> Mr. Koehler was a hit man or said he was a hit man, because it's too prejudicial to the defendant and has very limited probative value.  The focus isn't on whether he was a hit man or said he was a hit man, but rather whether or not [Mr. Curley] thought he would be – he was being trained to be a hit man.

(*Id*. at 8.)  Further, after the trial court asked if an instruction should be provided that the jury would not hear evidence that Mr. Koehler was, in fact, a hit man, the prosecutor stated that he did not think such an instruction should be given, reasoning,

> Mr. Frawley wants to bring in evidence and show that [Mr. Koehler] was unemployed and didn't have money and nobody should believe that he was a hit man.  I think that I'm – I'm entitled to rebut that evidence by meeting it and showing that there was a reasonable basis for [Mr. Curley] to believe that this fellow was, in fact, a hit man and there was a reasonable basis for him to fear him and do what he did.

(*Id*. at 9.)  Apparently agreeing that Mr. Koehler's claim to be a hit man was relevant to establish Mr. Curley's state of mind, and therefore should be admitted, the trial court gave the jury the following cautionary instruction:

> Ladies and Gentleman of the Jury, you have previously heard, in this case, and you're going to hear it again probably a number of times in the trial, testimony about statements attributed to the defendant to the effect that he was a hit man.
>
> I want to caution that your job, in this case, is to decide whether the defendant is proven guilty beyond a reasonable doubt of any of the crimes charged by the Commonwealth in this case.  It should have no bearing on your decision whether or not you believe that the defendant was a hit man at some other point.  That has no bearing on this case.  All right?  This is presented to you only so that you can understand the Commonwealth's theory of the case.  It's presented to you so that you can understand the Commonwealth's claims of why this witness, Mr. Curley, acted as he claims he acted.

(*Id*. at 11-12.)  The trial then proceeded with the court allowing testimony regarding Mr. Koehler's declaration that he was a hit man.

147

Mr. Koehler also contends that, during the testimony of Lee Curley, Mr. Curley's sister, the prosecutor elicited evidence that Mr. Koehler had allegedly volunteered to kill Mr. Curley's stepfather.[32]  Specifically, Ms. Curley testified that, in a discussion Mr. Koehler had with Mr. Curley in her presence about being a hit man, he told Mr. Curley, "if he ever wanted [his] step-dad killed, let him know and he could have him killed at any point."  (Trial NT 3/29/1996 Part 1 Vol. X 16.)  However, after this testimony, the trial court provided the jury with the following limiting instruction:

> I want to make the limiting instruction to the jury.  Ladies and gentlemen of the jury, let me caution you that the testimony you just heard is not to be considered by you with respect to the question of whether or not [Mr. Koehler] is or was in fact a hit man.  Again, I have allowed this evidence to be presented to you only for the purpose of allowing you to decide what was or may have been in the mind of William Curley.

(*Id.* at 17.)  In addition, the trial court provided another cautionary instruction during its final charge to the jury:

> You have heard evidence tending to prove that the defendant was guilty of an offense or improper conduct for which he is not on trial.  I am speaking of the testimony to the effect that the defendant claimed to be a hit man, as well as the evidence that the defendant – defendant once threatened to kidnap Lea Curley, William Curley's sister.  This evidence is before you for a limited purpose and this is for the purpose of tending to show the state of mind of William Curley.  This evidence must not be considered by you in any way other than for the purpose I just stated.  You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.  If you find the

---

[32] In his memorandum of law, Mr. Koehler also contends that the prosecutor elicited testimony from Ms. Curley that Mr. Koehler purportedly plotted to kill Christy Long, a woman he met in Arkansas.  (Doc. 34 at 115.)  However, from a review of Ms. Curley's testimony, the Court finds no reference to such an alleged plot and, thus, will not consider Mr. Koehler's related contention here.

> defendant guilty, it must be because you are convinced by the evidence that he committed the crime charged – crime or crimes charged and not because you believe he is wicked or has committed other offenses or improper conduct.

(Trial NT 4/11/1996 a.m. Part 1 Vol. XXVII 16-17.)

Without acknowledging these limiting instructions, Mr. Koehler argues here that the prosecution created a risk that the jury would find him guilty of the crimes charged based on the witness testimony of uncharged, unproven crimes with which he may have been acting in conformity.

In some circumstances, the admission of evidence in a state criminal proceeding can rise to the level of a constitutional error. In such cases, the petitioner must show that the "use of the evidence" caused "fundamental unfairness" in violation of due process. *Kontakis v. Beyer*, 19 F.3d 110, 120 (3d Cir. 1994) (citing *Lisenba v. California*, 314 U.S. 219, 236 (1941)). However, just as "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice, not every error in balancing probative value against prejudicial effect amounts to error which rises to constitutional dimensions." *Lesko*, 881 F.2d at 51 (citations and quotations omitted). Nevertheless, the scope of review in these circumstances is "whether the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial." *Id*. at 52. In conducting this inquiry, the court must accord great deference to the state trial court given that it is in a unique position to assess the relative probative value and inflammatory effect of proffered testimony. *Id*. (citing *United States v. Guerrero*, 803

149

F.2d 783, 785 (3d Cir. 1986)).  Additionally, it should be noted that evidence may be

unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror,

provokes its instinct to punish, or otherwise may cause a jury to base its decision on

something other than the established propositions in the case."  *Id*. at 55 (quoting

*Guerrero*, 803 F.2d at 785).

Under Pennsylvania law, evidence of other unrelated crimes is generally

inadmissible to prove the commission of a crime unless it is being offered to prove (1)

motive, (2) intent, (3) a common scheme or plan involving the commission of two or

more crimes so closely related that proof of one tends to prove the other, (4) the identity

of the perpetrator, or (5) the absence of mistake or accident.  *Id*. at 52 (citing

*Commonwealth v. Styles*, 431 A.2d 978, 980 (Pa. 1981)).  In addition, "other crimes"

evidence, though relevant, must be excluded if the probative value is outweighed by the

danger that the facts offered may unduly arouse the jury's prejudice or hostility.  *Id*.

(citing *Commonwealth v. Travaglia*, 467 A.2d 288, 297 (Pa. 1983)).

Here, the evidence regarding Mr. Koehler's assertion that he was a hit man was

probative as to the state of mind of Mr. Curley at the time of the crimes.  Given Mr.

Curley's key role in these crimes, the probative value of his testimony, as well as the

testimony of his sister, as to the motive to kill the victims based in part on Mr. Koehler's

assertion, outweighs the prejudicial impact of such testimony.  Further, the testimony of

both witnesses was also probative to rebut Mr. Koehler's defense challenging Mr.

Curley's state of mind regarding his belief of whether Mr. Koehler was in fact a hit man.

Moreover, any potential for unfair prejudice by the admission of the testimony was

limited by the clear limiting instructions the jury received at the time the testimony was given and during the final charge.[33]  "When testimony is offered for a specific, proper purpose, limiting instructions have the ability to forestall its possible prejudicial effects." *Lesko*, 881 F.2d at 55.

In sum, for the reasons stated above, the Court finds that the prosecutor's conduct here did not render the trial fundamentally unfair and Mr. Koehler is not entitled to relief on this category of prosecutorial misconduct.

> **d.    Improperly Shifting the Burden of Proof to the Defense**

Next, Mr. Koehler argues that the prosecutor elicited testimony from Trooper Pelachick for the sole purpose of unconstitutionally shifting the burden of proof to the defense.  He also claims that District Attorney McGuinness unconstitutionally shifted this same burden during his guilt phase closing argument.

First, as to Trooper Pelachick, through his testimony, defense counsel established that he was the officer who photographed the Schrader garage - the scene

---

[33] The Court also notes that the trial court here made a factual determination that the evidence of Mr. Koehler claiming to be a hit man was offered only for the purpose of showing Mr. Curley's state of mind, and not for the fact that Mr. Koehler was a hit man.  The court conveyed this finding to counsel and to the jury in its limiting instructions.  Under AEDPA, such a factual determination is "presumed to be correct," 28 U.S.C. § 2254(e)(1), and a petitioner, like Mr. Koehler, bears "the burden of rebutting the presumption of correctness by clear and convincing evidence," *id*.  Mr. Koehler has not met that burden here.  The trial court had ample support for its conclusion.  At side bar, the prosecutor even explained that he intended to rebut defense counsel's contrary evidence by showing that "there was a reasonable basis for [Mr. Curley] to believe that this fellow was, in fact, a hit man and there was a reasonable basis for him to fear him and do what he did."  (Trial NT 3/28/1996 Part 1, Vol. VII 8.)  And the prosecutor's line of questioning with both Mr. Curley and his sister did just that.  The evidence elicited from these witnesses was sufficient to support the trial court's determination.  Thus, AEDPA's presumption of correctness applies and the Court will not disturb the trial court's decision.

of the crimes - searched the scene, tried to identify any evidence, collected such evidence and ensured that it was all preserved.  (Trial NT 4/1/1996 Part 2 Vol. XIII 49.) In his cross-examination, Attorney Frawley asked Trooper Pelachick a series of questions about what was done with the evidence found at the scene, purportedly to ascertain the chain of evidence.[34]  (Trial NT 4/1/1996 Part 1 Vol. XIII 27-37; 44-49.)

---

[34] By way of example, Attorney Frawley and Trooper had the following exchange:

| | |
|---|---|
| Mr. Frawley: | So in regard to all the items of evidence that – that I've talked to you about in my cross, in regards to those items that you took possession of, you turned all the items over to Trooper Shiposh? |
| Trooper Pelachick: | Correct. |
| Mr. Frawley: | And that would have been on April the 29th? |
| Trooper Pelachick: | Yes, he was at the scene with us. |
| Mr. Frawley: | And I assume you turned over those items to Trooper Shiposh at the scene? |
| Trooper Pelachick: | Correct, inside the garage. |
| Mr. Frawley: | All right.  In regard to the items that, again, are set out in the drawing of Trooper Batterson, the items that you say were – came in to the possession of Trooper Stitzer, do you know what he did with those items, once he took possession of them? |
| Trooper Pelachick: | Yes, he placed them in envelopes and turned them over to Trooper Shiposh. |
| Mr. Frawley: | All right, so then it would be fair to state that all of the items that are identified in the drawing by Trooper Batterson, on April the 29th, were turned over to Trooper Shiposh? |
| Trooper Pelachick: | That's correct. |

(Trial NT 4/1/1996 Part 1 Vol. XIII 36-37.)

Importantly, he also asked if, at any point, photographs were removed from the

investigation file.  (*Id.* at 35.)  Trooper Pelachick responded that, yes, he removed all of

the photographs from the file several weeks before the trial in order for the prosecutor

to view them.  (*Id.*)  In his redirect examination, the prosecutor asked Trooper Pelachick

if all of the physical evidence was also made available to Attorney Frawley and the

defense team prior to trial.  (Trial NT 4/1/1996 Part 2 Vol. XIII 49-50.)  Trooper

Pelachick responded in the affirmative.  (*Id.* at 50.)  Mr. Koehler argues here that this

question posed to Trooper Pelachick from the prosecutor implied that the defense had

the burden to conduct an investigation to establish Mr. Koehler's innocence and,

because it did not do so, Mr. Koehler must be guilty.  (Doc. 34 at 116.)

Turning to District Attorney McGuinness' guilt phase closing argument, Mr.

Koehler again argues that the prosecutor unconstitutionally shifted the burden of proof

onto Mr. Koehler.  In doing so, Mr. Koehler simply cites to a transcript page from that

closing argument and elaborates no further.  (*See id.*) (citing Trial NT 4/10/1996 p.m.

Vol. XXVI 24).  On that page, the prosecutor made the following argument about the K-

Mart receipt noting the purchase of spray paint by Mr. Curley:

> And K-Marts, we heard on the receipt that it printed 7:20 P.M.
> We had witnesses here from K-Marts and you could have said,
> now, K-Mart people, I realize that this was April and, in April,
> you know, like clocks get changed forward, can you tell us
> whether or not it's accurate on that receipt that it was 7:20
> P.M., when that purchase was made, or maybe like your clocks
> weren't changed or maybe something else, maybe that clock
> was broke that day and every receipt said 7:20.  They didn't
> ask that question.  They didn't verify that time.  We were
> interested, of course, in who the clerk was and the color,

_____

> because she said white, and we said, red, but I think that got
> cleared up.  But nobody asked about the – the receipt.

(Trial NT 4/10/1996 p.m. Vol. XXVI 24.)

The Court also notes that the trial court provided the following relevant instruction to the jury's deliberations:

> A fundamental principle of our system of criminal law is that
> the defendant is presumed to be innocent.  The mere fact that
> he was arrested and is accused of a crime is not any evidence
> against him.  Furthermore, the defendant is presumed innocent
> throughout the trial, and unless and until you conclude, based
> on careful and impartial consideration of the evidence, that the
> Commonwealth has proven him guilty beyond a reasonable
> doubt.
>
> It is not the defendant's burden to prove that he is not guilty.
> Instead, it is the Commonwealth that always has the burden of
> proving each and every element of the crime charged, and that
> the defendant is guilty of that crime beyond a reasonable
> doubt.  The person accused of a crime is not required to
> present evidence or prove anything in his own defense.  If the
> Commonwealth's evidence fails to meet its burden, then your
> verdict must be not guilty.  On the other hand, if the
> Commonwealth's evidence does prove beyond a reasonable
> doubt that the defendant is guilty, then your verdict should be
> guilty.

(Trial NT 4/11/1996 a.m. Part 1 Vol. XXVII 2-3.)

Again, it is axiomatic that prosecutorial misconduct does not always warrant the granting of relief.  *Zehrbach*, 47 F.3d at 1265.  Indeed, the Supreme Court has acknowledged that, given the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial.  *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508-09 (1983)).  In deciding whether the prosecution has improperly commented at trial, the court should look to the overall context of the statements in the trial record.  *United*

154

*States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir. 1999) (citing *Young*, 470 U.S. at 11).

Improper prosecutorial comments may lead the jury to infer that the prosecutor knows

undisclosed facts which he could not present to the jury.  *Id*.  *See also United States v.*

*Walker*, 155 F.3d 180, 186 (3d Cir. 1998).  Similarly, a prosecutor's summation should

be limited to the facts in evidence and all reasonable inferences derived therefrom.

*Commonwealth v. Moretti*, 516 A.2d 1222, 1225 (Pa. Super. Ct. 1986).  *See also*

*Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc.*, 63 F.3d 1267, 1274 (3d

Cir. 1995).

Turning to the instant challenged prosecutorial misconduct, first, as to the

prosecutor's line of questioning of Trooper Pelachick, from a review of the record, the

Court finds that the prosecutor was simply establishing that both the Commonwealth

and defense counsel had access to pertinent evidence or, stated otherwise, no party

was denied access to evidence.  The Court finds nothing in the prosecutor's question or

Trooper Pelachick's response to suggest that the prosecution was implying, or

attempting to elicit testimony from the witness, that defense counsel was not performing

his duty as counsel to Mr. Koehler.  Looking at the exchange as a whole and in context,

the prosecutor was establishing a chain of custody as to certain evidence and whether

counsel had access to that evidence.  Thus, the prosecutor's line of questioning here

did not infect the proceedings with unfairness.  Moreover, any potential for unfair

prejudice by the admission of the testimony was limited by the trial court's clear

instructions on the burden of proof the jury received prior to its deliberations.

Second, as to the prosecutor's relevant guilt phase closing remarks, while it is

true that a prosecutor's summation should be limited to the facts in evidence and all

reasonable inferences derived therefrom, taken in context there is nothing in those remarks that suggests to the Court that District Attorney McGuinness was shifting the burden of proof to the defense.  Emphasizing what the defense did not ask of a witness is not necessarily a shifting of the burden of proof.  Even so, as with the challenge set forth above, any potential for unfair prejudice by the admission of the prosecutor's remarks here was limited by the trial court's clear instructions to the jury regarding the burden of proof prior to its deliberations.

In sum, for the reasons stated above, Mr. Koehler is not entitled to relief on this category of prosecutorial misconduct.

### e. Presenting and Relying on False and Misleading Testimony

Finally, Mr. Koehler argues that, in both the guilt and penalty phases of trial, the prosecutor presented false or misleading testimony or argument in violation of his constitutional rights.  In support, he raises several instances from both phases of trial. The Court will discuss each phase of trial separately.

Addressing the guilt phase first, Mr. Koehler contends that the prosecutor elicited false and misleading testimony with respect to the Commonwealth's undisclosed agreements with Mr. Curley and Mr. Schrader, two key prosecution witnesses. Specifically, he claims that, throughout the examination of each witness, the prosecutor elicited testimony from each that no "deals" or offers of immunity were promised in return for testimony.  As Mr. Koehler provides no citation to the record with respect to where such testimony lies, the Court will rely on the background set forth in this Memorandum's discussion of Claim I.  *See supra*, pp. 24-28; 37-43.

Next, Mr. Koehler argues that the prosecutor misrepresented the evidence

presented at trial in his guilt phase closing argument in violation of Mr. Koehler's right to

due process.  Specifically, he references the following remarks.  First, District Attorney

McGuinness referred to a semen sample taken from Ms. Clark's body as "his," meaning

Mr. Koehler's, when, in fact, that sample was not shown to be Mr. Koehler's during trial.

(Trial NT 4/10/1996 p.m. Vol. XXVI 2.)  Second, when questioning why Mr. Curley

would believe Mr. Koehler was a hit man, District Attorney McGuinness stated that Mr.

Curley saw Mr. Koehler "flash money in the past."  (*Id*. at 18.)  The Court notes here

that, while Mr. Koehler objects to this argument on the basis that "no such evidence

was presented," (Doc. 34 at 117), in fact, during Mr. Curley's testimony he stated,

"When I was younger, [Mr. Koehler] used to have a lot of money," in response to

defense counsel's question of whether he ever saw Mr. Koehler with "a lot of money on

him," (Trial NT 3/28/1996 Part 3 157-58).  Third, in discussing the testimony of various

witnesses, District Attorney McGuinness made the following remarks about Kerrien

Ramsey and her testimony:

> Is she the citizen of the year?  Maybe not.  Is she my friend?
> No.  [Attorney Frawley's] friend.  Mr. Frawley says, she's got
> severe psychological problems.  What did she tell you?  Said
> a little depression; she had to take some medication from time
> to time.  Who tells you this stuff about breaking out of mental
> hospitals and stuff?  Joseph Byerly, the pal from Arkansas.
> Real credible source?  You decide.

(Trial NT 4/10/1996 p.m. Vol. XXVI 19.)[35]  And fourth, when arguing Mr. Koehler's role

---

[35] As a counterpoint, the Court notes that defense counsel made the following statement
about Ms. Ramsey in his own closing argument during the guilt phase: "What do we know of
Kerrien Ramsey?  Well, we know that she has a psychiatric history.  She takes medication.
She's been hospitalized.  She's left the hospital without approval.  It's up to you to decide

in the crimes, he stated that Mr. Koehler "scared Kirk Schrader." (*Id.* at 21.)  The Court

does note that, during his testimony, Mr. Schrader stated several times that he was

"scared" by the entire situation involving the killing of both victims.  (Doc. 50-56, Notes

of Testimony, Trial, 4/3/1996 a.m., Part 3, Vol. XVII, 104 ("Trial NT 4/3/1996 a.m. Part 3

Vol. XVII"); Trial NT 4/3/1996 p.m. Part 1 Vol. XVIII 36).

At the end of testimony at the guilt phase, the trial court provided the following

charge to the jury, in pertinent part:

> The speeches of counsel are not part of the evidence, and you
> should not consider them as such.  However, in deciding the
> case you should carefully consider the evidence in the light of
> the various reasons and arguments which each lawyer
> presented.  It is the right and duty of each lawyer to discuss
> the evidence in a manner which is most favorable to the side
> he represents.  You should be guided by each lawyer's
> arguments to the extent they are supported by the evidence
> and insofar as they aid you in applying your own reason and
> common sense.  However, you are not required to accept the
> arguments of either lawyer.  It is for you and you alone to
> decide the case based on the evidence, as it was presented
> from the witness stand and in accordance with the instructions
> which I am now giving you.

(Trial NT 4/11/1996 a.m. Part 1 Vol. XXVII 7-8.)

In analyzing these guilt phase statements, the Court notes that a "state may not

knowingly use false evidence, including false testimony, to obtain a tainted conviction."

*Napue v. Illinois*, 360 U.S. 264, 269 (1959).  As to Mr. Koehler's contention that the

prosecutor elicited false and misleading testimony regarding the Commonwealth's

undisclosed agreements with Mr. Curley and Mr. Schrader, the Court herein has

---

whether or not that psychiatric history came into play when she was in New Jersey."
(Trial NT 4/10/1996 a.m. Part 1 Vol. XXV 36.)

already determined that Mr. Koehler's claims regarding the agreements themselves are without merit.  *See supra*, pp. 28-37; 43-50.  Specifically, the Court has found that, (1) with respect to an agreement with Mr. Curley, "the state court's decision that there was no undisclosed agreement and, therefore, nothing for the Commonwealth to disclose under *Brady*, is not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1)-(2)." *see supra, id.* at 32-33; and (2) with respect to an agreement with Mr. Schrader, "The state court's decision that there was no undisclosed agreement which may have impeached Mr. Schrader and no undisclosed exculpatory evidence, is not contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(1)-(2)." *see supra*, *id*. at 46.  In light of these conclusions, the Court need not discuss here whether any prosecutorial misconduct occurred during the testimony of either witness in connection with undisclosed agreements.

As to the allegedly false or misleading statements made by the prosecutor during the guilt phase argument, the Court finds that none of the challenged statements so tainted the trial that Mr. Koehler was denied due process.  Rather, the record indicates that the alleged false or misleading statements were either supported by other statements in the record or were acceptable arguments based on trial testimony and the defense's arguments.  Specifically, when District Attorney McGuinness referred to a semen sample taken from Ms. Clark's body as originating from Mr. Koehler, he was expressing a fair inference since testimony had been offered that excluded Mr. Curley and Mr. Schrader as sources of the semen, but did not exclude Mr. Koehler, a known

sexual partner of Ms. Clark, as the source.  *See Koehler-I*, 737 A.2d at 237.  Further, as to the prosecutor's statement that Mr. Koehler "flashed" money in the presence of Mr. Curley, the Court has already noted that Mr. Curley's testimony confirms this assertion. *See supra*, p. 157.  In addition, when the prosecutor remarked upon any mental illness of Ms. Ramsey, not only did he appear to downplay any psychological problems, but he also was permissibly responsive to defense counsel's closing summation on the same subject matter.  *See Darden*, 477 U.S. at 182.  *See also supra* note 35, at 157-58.  And finally, although Mr. Schrader did not directly testify that Mr. Koehler "scared" him, he did in fact testify that the entire situation did.  (Trial NT 4/3/1996 a.m. Part 3 Vol. XVII 104; Trial NT 4/3/1996 p.m. Part 1 Vol. XVIII 36.)  Because the prosecutor was permissibly arguing Mr. Koehler's role in the crimes, this inference during his closing argument was fair.  Moreover, the Court also notes that the trial court provided adequate instruction to cure any harm that could have been caused by the prosecutor's characterizations of the evidence.  It instructed the jurors to decide the case based on the evidence presented, to apply their own reason and common sense, and not to consider the speeches of counsel as evidence.  As a result, considering the prosecutor's statements here within the context of the case, the Court finds no constitutional violation.

Turning to the penalty phase of the trial, Mr. Koehler argues that the prosecutor repeatedly misled the jury about the applicable law.[36]  In support, he cites the following

---

[36] Mr. Koehler adds a final general argument to this section that, "the core of the prosecution's argument was, in essence, to tell the jury to 'show the defendant the same mercy he showed the victims.'"  (Doc. 34 at 118.)  He claims that the prosecution "stripped Petitioner of a constitutional sentencing proceeding by making an argument for moral equivalence which

statements.  First, the prosecutor made the following statement about mitigating

circumstances in comparing them with aggravating circumstances:

> Now, aggravating and mitigating circumstances.  A mitigating
> circumstance can be anything that sugar-coats the case.  And
> you can pile them on.  You can say he had a tough childhood
> and he was an accomplice and pile them on to the scale.  But
> then you must ask yourself, do you give the same weight to
> that, when you consider that he killed two people, that he used
> an eighteen year old boy in a contract killing, and that he killed
> a little nine year old boy.  Are they the same?

(Sentencing NT 4/12/1996 a.m. Part 1 28.)  Mr. Koehler argues that, by characterizing

mitigating circumstances as "sugar coating," the prosecutor conveyed to the jury that it

should disregard the defense's evidence rather than give it proper consideration.

Second, Mr. Koehler also takes issue with the prosecutor's additional statement

about mitigating circumstances:

> The Judge will read to you various instructions.  It does not say
> anywhere in that instruction that having a difficult childhood is
> a mitigating circumstance.  You can find it to be that, if you
> think it is.  Think about your own lives and individual's children
> that had difficult childhoods.  They didn't grow up to do these
> sorts of things.  You are not required, under the law, to find a
> mitigating circumstance.   Tears from a mother are not a
> mitigating circumstance, just as tears from a grandmother are
> not an aggravating circumstance.
> You are not required to find that.

(*Id*. at 29.)  Isolating the prosecutor's remark "You are not required, under the law, to

find a mitigating circumstance," Mr. Koehler argues that the prosecutor failed to state

---

effectively eliminated mercy as a consideration."  (*Id*.)  In making this argument, he cites no
portion of the transcript and no relevant case law.  In light of the many other specific examples
of alleged prosecutorial misconduct cited by Mr. Koehler in his petition, without more, the Court
will not consider this cursory argument seemingly added as a sort of conclusion to this section
of his memorandum.

Pennsylvania law that "the jury is required to find the existence of any mitigating circumstances that have been proven by a preponderance of the evidence." (Doc. 34 at 117) (citing *Commonwealth v. Rizzuto*, 777 A.2d 1069, 1089 (Pa. 2001)).

Third, Mr. Koehler contends that, in arguing against life, the prosecutor asked the jury to consider non-statutory aggravating factors, a violation of Pennsylvania law. In support, he posits that, when District Attorney McGuinness stated, "he used an eighteen year old boy in a contract killing," (Sentencing NT 4/12/1996 a.m. Part 1 28),[37] he was asking the jury to consider the age of Mr. Curley as an aggravating factor, which is an impermissible sentencing consideration. He also argues the statement was an impermissible sentencing consideration in that there is no statutory aggravating factor involving coercion of an accomplice.

Importantly, as to Mr. Koehler's issues regarding the prosecution's argument on aggravating and mitigating circumstances, the Court notes that, after both the Commonwealth and defense counsel presented their closing arguments, the trial court instructed the jury that its sentence for Mr. Koehler would depend on what it finds about aggravating and mitigating circumstances. (*Id*. at 36.) After first describing to the jury what the possible aggravating and mitigating circumstances were for this case, the trial court then instructed, in relevant part:

> As I told you earlier, you must agree unanimously on one of two general findings, before you can sentence the defendant to death. They are a finding that there is at least one aggravating circumstance and no mitigating circumstances or a finding that there are one or more aggravating circumstances which outweigh any mitigating circumstances. In deciding

---

[37] The entire passage of the prosecutor's relevant statement is cited *supra*, p. 161.

whether aggravating outweigh mitigating circumstances, do not simply count their number. Compare the seriousness and importance of the aggravating with the mitigating circumstances.

If you all agree on either one of the two general findings, then you can and must sentence the defendant to death. When voting on the general findings, you are to regard a particular aggravating circumstance as present only if you all agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present, despite what other jurors may believe.

This different treatment of aggravating and mitigating circumstances is one of the law's safeguards against unjust death sentences. It gives a defendant the full benefit of any mitigating circumstances. It is closely related to the burden of proof requirements. Remember, the Commonwealth must prove any aggravating circumstance beyond a reasonable doubt, which the defendant only has to prove any mitigating circumstance by a preponderance of the evidence. You would have to agree unanimously before you could make a finding of any aggravating circumstance, but any one of you can find any mitigating circumstance.

(*Id*. at 39-40.)

In analyzing these challenges to the prosecutor's penalty phase statements, the

Court notes the Third Circuit Court of Appeal's observations in *Lesko*:

The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system. It is clearly the most critical legal proceeding from the standpoint of the defendant whose life is at stake. Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices.

*Lesko*, 925 F.2d at 1541 (citing *Berger*, 295 U.S. at 88).

Further, while a prosecutor must be careful not to infect a trial with unfairness, he

may properly counsel the jury to avoid emotional responses not rooted in the trial

evidence and can argue in favor of the purposes of the death penalty, including the objectives of retribution and deterrence.  *See Darden*, 477 U.S. at 181; *Lesko*, 925 F.2d at 1545.  He may not direct his comments, however, to passion and prejudice rather than to an understanding of the facts and of the law nor may he misstate the law.  *Id*. (citing *United States ex rel. Perry v. Mulligan*, 544 F.2d 674, 680 (3d Cir. 1976)).

The Court finds that none of the challenged statements from the prosecutor's penalty phase closing argument so tainted the trial that Mr. Koehler was denied due process.  First, the prosecutor's assertion that mitigating circumstances "can be anything that sugar coats the case" was made in the context of his argument that any mitigating circumstances in the case, stated by the prosecutor as Mr. Koehler's "tough childhood" and the fact that he was an accomplice, should be outweighed by the aggravating circumstances.  (Sentencing NT 4/12/1996 a.m. Part 1 28.)  This is proper argument.  Second, the prosecutor's remark "You are not required, under the law, to find a mitigating circumstance," taken in context, is not a misstatement of the law.  *See* 42 Pa. Cons. Stat. Ann. § 9711.  Third, and finally, the prosecutor's statement regarding "us[ing] an eighteen year old boy in a contract killing," taken in context, was not a request that the jury consider it as a non-statutory aggravating factor.  Rather, the prosecutor was permitted to emphasize this circumstance of the case to rebut the defense's argument that there was no aggravating circumstance based on an agreement between Mr. Koehler and Mr. Curley.  (*See* Sentencing NT 4/12/1996 a.m. Part 1 33-34.)  Moreover, the trial court provided adequate instruction to cure any harm that could have been caused by the prosecutor's characterizations of the law.  It instructed the jurors as to the finding of aggravating and mitigating circumstances, as

well as the weighing of those circumstances.  As a result, considering the prosecutor's statements here within the context of the case, the Court finds no constitutional violation.

In sum, for the reasons stated above, Mr. Koehler is not entitled to relief on this category of prosecutorial misconduct.

### 2.  Cumulative Effect of Prosecutorial Comments

Mr. Koehler also argues that cumulatively these alleged acts of prosecutorial misconduct had a substantial prejudicial effect on the defense.  However, as set forth above, the comments and conduct Mr. Koehler recites were either not improper or, if they were improper, were not prejudicial.  As such, Mr. Koehler has also failed to demonstrate any trial court error in failing to correct such alleged prosecutorial misconduct.  As the Court has discussed, in several instances, the trial court itself either did, in fact, correct an error, or provided a limiting instruction in order to limit any potential for unfair prejudice.  As a result, taken together, the cumulative effect of the challenged acts of prosecutorial misconduct could not have deprived Mr. Koehler of a fair trial.

### 3.  Ineffective Assistance of Counsel

Noting first that defense counsel only objected to or sought to correct a handful of acts of prosecutorial misconduct, in a summary fashion, Mr. Koehler now asserts that counsel was ineffective for failing to object to all of the other acts of prosecutorial misconduct alleged in his habeas petition.  He adds that counsel was also ineffective for failing to request appropriate curative instructions for those acts of misconduct, and

for failing to adequately litigate these claims on direct appeal.

The Pennsylvania Supreme Court addressed both prongs of this ineffectiveness claim in its decision affirming the denial of PCRA relief. *See Koehler-II*, 36 A.3d at 144-47. The state court found that Mr. Koehler failed to satisfy his burden of proving that counsel was ineffective because he did not present evidence of counsel's reasonable basis for failing to pursue claims of prosecutorial misconduct on appeal. *Id*. at 146-47. Specifically, the court reasoned as follows:

> The PCRA court did not address the arguable merit of this claim, but rejected it, as it did various other claims, on the grounds that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests. *See* PCRA Ct. Opinion, Dec. 30, 2009, at 1. Like the Commonwealth, the court emphasized that it is the petitioner's burden to prove all three prongs of the ineffectiveness standard and that Appellant failed to satisfy this burden. Finally, it noted that Appellant failed to establish that direct appeal counsel[1] lacked a strategic basis for choosing to forego the claims identified in the PCRA petition.

> Upon review of the record, we find support for the PCRA court's conclusion that Appellant failed to demonstrate that trial counsel lacked a reasonable basis for failing to lodge objections and/or seek cautionary instructions relating to each instance of purported prosecutorial misconduct.[FN23] As noted, this is not a case of summary dismissal of PCRA relief; rather an evidentiary hearing was conducted and Appellant was afforded the opportunity to present evidence in support of all of his claims. Nevertheless, Appellant posed no questions to trial counsel relating to any allegations of prosecutorial misconduct, and the lack of a strategic basis for failing to object is not self-evident.

>> FN23. We further note that trial counsel raised three claims of prosecutorial misconduct at trial that are related to Appellant's current claims of prosecutorial misconduct, and pursued those claims on direct appeal. *See Koehler*, 737 A.2d

166

> at 240-41.   Appellant does not discuss why it
> was unreasonable for trial counsel to pursue
> those claims, as opposed to the claims of
> prosecutorial misconduct proffered herein.
>
> Appellant attempts to overcome his failure to elicit trial
> counsel's thought process regarding this particular claim by
> emphasizing trial counsel's general PCRA hearing testimony
> that he had no strategic purpose for failing to raise meritorious
> claims on appeal.  *See* N.T. May 31, 2006, at 50 (wherein trial
> counsel testifies that his general appellate practice was to
> raise any issue on appeal "that might well be viable.").   Trial
> counsel's general appellate practice, however, sheds no light
> on the only relevant inquiry of whether trial counsel acted
> reasonably by failing to lodge objections and/or seek
> cautionary instructions at trial for each of the several alleged
> instances of prosecutorial misconduct.

*Koehler-II*, 36 A.3d at 146.  After citing case law supporting its conclusion that Mr.

Koehler failed to satisfy his burden of proof as to whether trial counsel acted

reasonably, the court also noted that Mr. Koehler failed to establish prejudice.

Specifically, the court held,

> Moreover, Appellant has not shown a reasonable probability
> that the outcome of the sentencing proceeding would have
> differed had trial counsel objected and/or sought a cautionary
> instruction regarding any one of the many alleged instances of
> prosecutorial misconduct.   Considering the overwhelming
> evidence of Appellant's guilt as demonstrated primarily by the
> testimony of Curley and Schrader, Appellant's generic claim of
> prejudice is insufficient to address the myriad of sub-issues
> alleging prosecutorial misconduct.

*Id*. at 147 n.25.

In reviewing this claim of ineffective assistance of counsel, the Court "must

indulge a strong presumption that counsel's conduct falls within a wide range of

reasonable professional assistance."  *Berryman v. Morton*, 100 F.3d 1089, 1094 (3d

Cir. 1996) (citing *Strickland*, 466 U.S. at 689).  That is to say, the "defendant must

overcome the presumption that, under the circumstances, the challenged action 'might

be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v.*

*Louisiana*, 350 U.S. 91, 101 (1955)).  Indulging this presumption after reviewing each of

the claims, as well as acknowledging the state court's finding that Mr. Koehler failed to

demonstrate that trial counsel lacked a reasonable basis for failing to lodge objections

and/or seek cautionary instructions relating to each instance of purported prosecutorial

misconduct, the Court is satisfied that prior counsel provided reasonable professional

assistance.  Even assuming error by counsel, Mr. Koehler has failed to demonstrate

that any alleged deficient performance actually prejudiced his defense.  *Berryman*, 100

F.3d at 1094.  That would require a showing that counsel's errors were so serious as to

deprive Mr. Koehler of a fair trial.  As discussed above, Mr. Koehler has failed to

convince the Court that he was deprived of a fair trial with respect to his challenged

claims of prosecutorial misconduct.  Thus, the Court agrees with the Pennsylvania

Supreme Court's holding on this ineffectiveness claim, as it is not contrary to, or an

unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  Mr.

Koehler is not entitled to habeas relief on this claim.

> **J.     Claim X - The trial court erred in disallowing cross-examination about Witness Kerrien Ramsey's drug use during the timeframe referenced in her direct testimony; counsel ineffectively litigated this claim at trial and on appeal.**

Mr. Koehler argues that the trial court improperly limited the scope of the cross-

examination of a witness, Kerrien Ramsey, after she asserted her Fifth Amendment

privilege against self-incrimination.  He also makes a related ineffective assistance of

counsel claim for failure to litigate this issue.  After careful review, the Court will deny

habeas relief on this claim.

The background of this claim is as follows.  At trial, Kerrien Ramsey, a Commonwealth witness, testified on direct examination about her relationships with Mr. Koehler and Ms. Clark at the time they all traveled from Arkansas to New Jersey in early 1995, a time shortly before the killings.  She recalled, generally, Mr. Koehler telling her he was a hit man, (Doc. 50-41, Notes of Testimony, Trial, 4/1/1996 p.m., Part 2, Vol. XIII, at 62 ("Trial NT 4/1/1996 p.m. Part 2 Vol. XIII")), and that he had a large amount of money from "illegal actions," (*Id*. at 73).  She also recalled that Mr. Koehler and Ms. Clark were in a romantic relationship, but had arguments about "money, jobs, lying, things of that nature."  (*Id*. at 75.)  More specifically, Ms. Ramsey recalled that, on April 16, 1995, Mr. Koehler showed her a gun and told her that he would kill her, Ms. Clark, Austin Hopper, and then himself.  (*Id*. at 83-85.)  Ms. Ramsey also described several other interactions with Mr. Koehler in the two days following that April 16th conversation, including at least one telephone conversation.  (Trial NT 4/1/1996 p.m. Part 3 Vol. XIII 98-113.)  She also referenced several other telephone conversations with Mr. Koehler in the following weeks, and another after Mr. Koehler was arrested for the murders.  (*Id*. at 113-117; 119-121.)

The trial court held an *in camera* proceeding the day after Ms. Ramsey's direct examination for purposes of defense counsel's initial cross-examination.  (Doc. 50-48, Notes of Testimony, Trial, 4/2/1996 a.m., Part 1, Vol. XIV, at 1-48 ("Trial NT 4/2/1996 a.m. Part 1 Vol. XIV"); Doc. 50-49, Notes of Testimony, Trial, 4/2/1996 a.m. Part 2, Vol. XIV, at 49-61 ("Trial NT 4/2/1996 a.m. Part 2 Vol. XIV").)  The court stated that it wanted this initial cross-examination done outside the presence of the jury because

some of defense counsel's questions may be determined to be inadmissible.  (*Id*. at 2.)

During this cross-examination, Attorney Frawley asked Ms. Ramsey about the trip from

Arkansas to New Jersey, specifically asking, "[D]uring that trip, was there any occasion

when the car was stopped and you went in to a bathroom and used any illegal drug?"

(Trial NT 4/2/1996 a.m. Part 1 Vol. XIV 5.)  At that point, Ms. Ramsey asserted her Fifth

Amendment privilege against self-incrimination.  (*Id*.)  A lengthy discussion between

counsel and the trial court followed.  (*Id*. at 5-16.)  Initially, the prosecutor asked that

Attorney Frawley provide a time frame for his questioning, given that Ms. Ramsey had

testified on direct examination to specific events that occurred on the trip from Arkansas

to New Jersey.  (*Id*. at 5-6.)  District Attorney McGuinness also asked that Attorney

Frawley's questions be limited to whether she was under the influence of drugs during

any specific times referred to in her direct testimony.  (*Id*. at 11.)  Construing his

question as an objection based on relevancy, the trial court agreed with the

Commonwealth that "the question is whether [Ms. Ramsey] was under the influence of

a particular drug at a particular time that is relevant to the testimony that she gave on

direct examination."  (*Id*. at 12.)  Counsel and the trial court then had the following

exchange:

> Mr. Frawley:  Your Honor, I think [Ms. Ramsey] may say that during this incident at the Tumminia home when the defendant had the gun and threatened, that she was not using drugs that day.  And again, when we talk about her credibility, I think we have the right to demonstrate she was using drugs on a regular basis, and therefore it's less than plausible that on the night of April 16/17 she was using drugs.

* * *

> The question isn't whether she used drugs on the 16th or 17th, it is, if she says no I think we can show that she was using them right up to then and we have some evidence that she used it that day, too.

* * *

Trial Court:   I think the fact that she may have used drugs Monday is not probative if the question is whether she used drugs on Tuesday.

* * *

> The reason we brought this here was an objection to the testimony about drug use at unspecified time come up [sic] from Arkansas. I agree with Mr. McGuinness that unless you relate it to the events that the witness testified about on direct examination that occurred during the trip to [New Jersey], that it would not be relevant.

* * *

> And by the way, I'm not saying you can get around this problem, but you diminish it more if instead of asking her if she used drugs at points A, B, and C, she was asked simply whether she was under the influence of drugs at points A, B, and C. Now, again, her response may tend to incriminate her, but I think under the circumstances she may nonetheless be more inclined to answer.

(*Id.* at 12-14; 16.)

As a result of this discussion, the trial court ruled that if Attorney Frawley "relate[d] the times [of drug use] to events that this witness testified about yesterday in front of the jury, then I would conclude that it would be relevant." (*Id.* at 18.)  However,

171

Attorney Frawley then proceeded to ask Ms. Ramsey a number of questions which were deemed by the trial court as overly broad or irrelevant.  (*Id*. at 17-19.)

Later during the *in camera* cross-examination, Attorney Frawley asked Ms. Ramsey, "While you were in route with Regina and Austin and the defendant from Arkansas to . . . New Jersey, did you use any meth crystal?"  (*Id*. at 42.)  In response, Ms. Ramsey again exercised her Fifth Amendment privilege against self-incrimination.  (*Id*.)  Immediately, Attorney Frawley requested that Ms. Ramsey's direct testimony be stricken "because of her refusal to answer questions on cross," including questions encompassing the time period from when she met Mr. Koehler through when she left New Jersey prior to the killings.[38]  (*Id*. at 42-43.)  The trial court sustained the prosecutor's objection to this request, stating, "I agree it's within a time period, but I can't say that because it's within a time period that it is relevant to any of the specific events that the witness testified to on direct."  (*Id*. at 43.)  The court then sustained subsequent objections to defense counsel's general questions about Ms. Ramsey's drug use prior to, and after, meeting Ms. Clark and Mr. Koehler in Arkansas.  (*Id*. at 44-48.)  The court also clarified its rulings as such, "And I want to make it clear that as long as they do not relate to specific instances or times testified to on the witness's direct

---

[38] In his petition, Mr. Koehler asserts, for the first time, that Ms. Ramsey's direct testimony should have been stricken based on her invocation of the Fifth Amendment privilege on cross-examination.  (Doc. 34 at 125-26.)  Because this issue was not presented to the state courts, it is unexhausted and now procedurally defaulted.  Thus, the Court is precluded from reviewing it.  Nevertheless, this issue would fail on the merits on the basis of the Court's conclusion, *infra*, that the Pennsylvania Supreme Court's decision on this claim is not based on an unreasonable application of clearly established federal law, or on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(1)-(2).  In light of this determination, striking Ms. Ramsey's direct testimony would not have been the proper remedy.

examination, then I think it's not relevant." (*Id*. at 48.)

After hearing the testimony of Ms. Ramsey in the *in camera* proceeding, the trial court ruled that none of the testimony presented in the proceeding was appropriate for cross-examination before the jury. (*Id*. at 60.) Therefore, during the open court cross-examination, defense counsel only asked whether, during the evening of April 16/17, 1995, Ms. Ramsey used illegal drugs. (Doc. 50-50, Notes of Testimony, Trial, 4/2/1996 a.m., Part 3, Vol. XIV, at 104 ("Trial NT 4/2/1996 a.m. Part 3 Vol. XIV").) Ms. Ramsey answered that she could not recall, and later explained, "I can't exclude that possibility, no." (*Id*. at 104, 107.)

The Fifth Amendment's privilege against self-incrimination clause protects two distinct rights: first, a defendant's right not to take the witness stand at his own criminal trial and, second, the privilege of any witness, in any formal or informal governmental proceeding, not to answer questions when the answers might incriminate him. *Roach v. Nat'l Transp. Safety Bd.*, 804 F.2d 1147, 1151 (10th Cir. 1986). *See, e.g., United States v. Housing Found. of America*, 176 F.2d 665, 666 (3d Cir. 1949).

As to the second protection, the witness' privilege against self-incrimination "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Roach*, 804 F.2d at 1151 (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)).

A witness can prevail in his assertion of the privilege only when he has

"reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). The claim of privilege cannot be sustained if the fear of self-incrimination rests on "remote and speculative possibilities;" the privilege protects only against "real dangers." *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478 (1972).

Further, the Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right to cross-examine witnesses against him. *See Douglas v. Alabama*, 380 U.S. 415, 418 (1965). However, the Confrontation Clause, while guaranteeing "an *opportunity* for effective cross-examination," does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original). If a witness' invocation of her rights under the Fifth Amendment could interfere with a defendant's right to cross-examine, the court must ensure that the invocation did not "effectively . . . emasculate the right of cross-examination itself." *Id*. at 19. Courts often prevent an emasculation of the confrontation right by striking the testimony of a nonrespondent witness. *United States v. McGlory*, 968 F.2d 309, 344 (3d Cir. 1992) (citing *Bagby v. Kuhlman*, 932 F.2d 131, 135 (2d Cir.), *cert. denied*, 502 U.S. 926 (1991)).

In some instances, a defendant's Sixth Amendment right to confrontation will be denied as a result of a witness' invocation of her Fifth Amendment privilege against self-incrimination. *Bagby*, 932 F.2d at 135. However, "the Sixth Amendment is violated only when assertion of the privilege undermines the defendant's opportunity to test the truth of the witness' direct testimony." *Id*. As stated by the United States Court of

174

Appeals for the Second Circuit,

> To reconcile a defendant's rights under the confrontation clause with a witness' assertion of the fifth amendment privilege, a court must initially consider: (1) whether the matter about which the witness refuses to testify is collateral to his or her direct testimony, and (2) whether the assertion of the privilege precludes inquiry into the details of his or her direct testimony. *See Dunbar* [*v. Harris*, 612 F.2d 690, 692-3 (2d Cir. 1979);] *see also Klein* [*v. Harris*, 667 F.2d 274, 289 (2d Cir. 1981)]. If the court determines that the privilege has been invoked with respect to a collateral matter, or that the invocation does not preclude inquiry into the witness' direct testimony, then the defendant's right to cross-examine has not been impinged and no corrective action is necessary. Conversely, the sixth amendment is violated when a witness asserts the privilege with respect to a non-collateral matter *and* the defendant is deprived of a meaningful opportunity to test the truth of the witness' direct testimony. To remedy such a violation, the court must determine whether the witness truly waived the privilege by testifying on direct examination. *Klein*, 667 F.2d at 287-88; *see also Brown v. United States*, 256 U.S. 148, 154-57, 78 S. Ct. 622, 626-28, 2 L. Ed.2d 589 (1958). If the privilege is deemed to have been waived, the court should compel the witness to respond to the defense's cross-examination. *Klein*, 667 F.2d at 289; [*United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963)]. On the other hand, if the privilege has not been waived, or if the witness simply refuses to testify, the witness' direct testimony should be stricken in whole or in part. *Klein*, 667 F.2d at 289; *Cardillo*, 316 F.2d at 611.

*Bagby*, 932 F.2d at 135 (emphasis in original). Further, the Third Circuit Court of Appeals has "recognized that reversible error, on Sixth Amendment grounds, may occur where the witness' testimony "add[s] critical weight to the prosecution's case in a form not subject to cross-examination." *McGlory*, 968 F.2d at 344 (quoting *Todaro v. Fulcomer*, 944 F.2d 1079, 1084-85 (3d Cir. 1991)).

Turning to the instant case, Mr. Koehler raised this claim in both his direct appeal

and on appeal from the denial of PCRA relief.  On direct appeal, Mr. Koehler argued

that the trial court erred by limiting the cross-examination of Ms. Ramsey.  The

Pennsylvania Supreme Court addressed this claim as follows:

> Appellant next claims that the defense should have been given
> more latitude to cross-examine Ramsey about any illegal drug
> use from the time that the witness met the Appellant (in
> February or March 1995) to April 18, 1995.  Appellant makes
> little argument on this claim in his brief, merely arguing that the
> trial court erred in refusing to allow questioning of the witness
> that did not identify a specific date of the alleged drug use.
> This claim is without merit because, while a witness may be
> questioned about drug or alcohol use at the time of the events
> about which he or she is testifying, questions about a witness's
> drug use at a time other than the time about which the witness
> is testifying are not permitted.  *Commonwealth v. Fisher*, 545
> Pa. 233, 681 A.2d 130 (1996); *Commonwealth v. Yost*, 478
> Pa. 327, 337, 386 A.2d 956, 961 (1978).  Accordingly, the trial
> court did not err and the Appellant is entitled to no relief on this
> claim.

*Koehler-I*, 737 A.2d at 239-40.  In his PCRA proceedings Mr. Koehler expressly argued

that his rights were violated when Ms. Ramsey was permitted to invoke the Fifth

Amendment during her cross-examination in order to avoid testifying about her illegal

drug use, and added a claim that appellate counsel was ineffective in the manner by

which he litigated the claim on direct appeal.  In affirming the denial of PCRA relief, the

Pennsylvania Supreme Court concluded as follows:

> The record supports the PCRA court's conclusion that
> Appellant had the opportunity to question counsel regarding
> why he failed to pursue the Fifth Amendment claim on direct
> appeal, but asked counsel no questions relating to this
> allegation of ineffectiveness.  Nevertheless, we reject the
> ineffectiveness claim for lack of arguable merit, as Ramsey
> clearly could have subjected herself to criminal liability by
> responding to questions concerning whether she used illegal
> drugs on her travels with Appellant and the victims.  In fact,
> prior to her testimony on cross-examination, the trial court

expressly cautioned Ramsey that she was going to be asked about her illegal drug use, and informed her that she had a Fifth Amendment privilege to refuse to testify about those matters.  N.T. Apr. 2, 1996, Vol. XIV, at 2-3.  Thus, Appellant is not entitled to relief on this claim because Ramsey had a reasonable basis for believing that her response would be incriminating. *See Commonwealth v. McGrogan*, 523 Pa. 614, 568 A.2d 924, 930 (1990) (holding that the privilege against self-incrimination prevents an individual from providing evidence which may lead to his own prosecution and may be invoked by an individual who has a reasonable basis for believing his testimony will be incriminatory).

*Koehler-II*, 36 A.3d at 153.

Upon review, the Court concludes that the Pennsylvania Supreme Court's decision that this claim lacks merit was not an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1).  Nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2).  The record reveals that, on direct examination, Ms. Ramsey testified generally about her travels from Arkansas to New Jersey with Mr. Koehler and Ms. Clark.  She did, however, specifically refer to her conversation with Mr. Koehler on April 16, 1995, once they reached the New Jersey home of his mother.  During that conversation, he showed her a gun and threatened to kill her, Ms. Clark, Austin Hopper, and then himself.  Subsequently, on cross-examination during the *in camera* proceeding, Ms. Ramsey asserted her Fifth Amendment privilege at two points: First, in response to defense counsel's question, "[D]uring that trip [from Arkansas to New Jersey], was there any occasion when the car was stopped and you went in to a bathroom and used any illegal drug?" (Trial NT 4/2/1996 a.m. Part 1 Vol. XIV 5), and, second, when defense counsel asked, "While

177

you were in route with Regina and Austin and the defendant from Arkansas to . . . New Jersey, did you use any meth crystal?" (*Id*. at 42).  The trial court permitted her to assert the privilege on these two instances, ruling that, *inter alia*, "as long as [the questions] do not relate to specific instances or times testified to on the witness's direct examination, then I think it's not relevant."  (*Id*. at 48.)  *See Mitchell v. United States*, 526 U.S. 314, 321 (1999) (stating that, although the Fifth Amendment "privilege is waived for the matters to which the witness testifies, . . . the scope of the 'waiver is determined by the scope of relevant cross-examination") (quoting *Brown v. United States*, 356 U.S. 148, 154-55 (1958)).  Notably, in his later cross-examination before the jury, defense counsel was permitted to ask Ms. Ramsey if she used illegal drugs during the evening of April 16/17, 1995, the time frame for the conversation with Mr. Koehler she testified to on direct examination.  (Trial NT 4/2/1996 a.m. Part 3 Vol. XIV 104.)  As such, Ms. Ramsey was only declining to respond to inquiries about her general illegal drug use during the trip from Arkansas to New Jersey.

The Court is not persuaded by Mr. Koehler's argument that any testimony about Ms. Ramsey's illegal drug use during the trip from Arkansas to New Jersey would have called into question her ability to perceive and recall the more specific events once in New Jersey that she testified about on direct examination.  In fact, Ms. Ramsey's assertion of the privilege in these circumstances did not "preclude[ ] inquiry into the details of [her] direct testimony" nor "deprive [Mr. Koehler] of the right to test the truth of [her] direct testimony" with respect to those more specific events.  *Cardillo*, 316 F.2d at 611.  As such, the Pennsylvania Supreme Court's determination on this claim was sound based on its finding that Ms. Ramsey had "a reasonable basis for believing that

her response [to the inquiry of whether she used illegal drugs on her travels with Mr.

Koehler and the victims] would be incriminating." *Koehler-II*, 36 A.3d at 153.  As a

result, too, the state court's conclusion that Mr. Koehler's associated claim of ineffective

assistance of counsel fails was not an unreasonable application of clearly established

federal law.  28 U.S.C. § 2254(d).

> **K.**  **Claim XI - Petitioner's first degree murder conviction must be vacated because, as a result of trial court error and ineffective assistance of counsel, the jury was not charged that presence and knowledge are insufficient to establish conspiracy beyond a reasonable doubt in violation of due process.**

In this claim, Mr. Koehler argues that trial counsel was ineffective for failing to

litigate a claim that the trial court erred by not giving a jury instruction stating that mere

presence at the crime scene and knowledge of the crime are insufficient to establish

conspiracy beyond a reasonable doubt.  Upon careful review, the Court will deny

habeas relief on this claim.

The background of this claim is as follows.  In its instruction to the jury, the trial

court charged the crime of conspiracy to commit murder as follows:

> In order to find the defendant guilty of conspiracy to commit murder, you must be satisfied, initially, that the following two elements of conspiracy have been proven beyond a reasonable doubt.  First, that the defendant agreed with another person or persons that they or one of them would engage in conduct which constitutes the crime of murder or an attempt to commit the crime of murder.  Second, that the defendant did so with the intent of promoting or facilitating commission of the crime of murder.
>
> No person may be convicted of conspiracy, unless an overt act in pursuance of the conspiracy is alleged and proven to have been done by him or by a person with whom he conspired.  In this case, it is – it is alleged that the following were overt acts:

the killing of Regina Clark, the killing of Austin Hopper.  Thus, you cannot find the defendant guilty, unless, in addition to the two elements of conspiracy, you are satisfied, beyond a reasonable doubt, that the defendant or a – or a person with whom the defendant conspired did the alleged over act in pursuance of the conspiracy.

A conspiracy requires an agreement between two or more persons.   The agreement may be a formal or explicit agreement, but it does not have to be.  It is not necessary that the parties meet together and state in words or writing what the scheme is or how it is to be carried out.  The agreement may be in whole or in part a tacit, unspoken agreement.   A conspiracy may be proved by circumstantial evidence, as well as by direct evidence.  The existence of a conspiracy may, in a proper case, be inferred from the relation, conduct or circumstances of the parties.

It is not necessary that the crime which is the object of a conspiracy be committed or even attempted.  This is because the essence of the crime of conspiracy is the agreement. However, it is necessary that at least one of the parties do something more than merely conspiring with his fellow conspirator.  After the conspiracy comes into existence, he must – he must perform an overt act in pursuance of the conspiracy.  Once he does such an act, he and his fellow conspirators are subject to trial and punishment for their conspiracy. It is not necessary to the guilt of other conspirators that they join him in the overt act or even know about it.  It is not necessary that the overt act be a very significant step toward commission of the crime which is the object of the conspiracy.  All that is required is that the party who performs the overt act does it in pursuance of the conspiracy.

(Trial NT 4/11/1996 a.m. Part 1 Vol. XXVII 35-37.)  Earlier in the charge, the trial court

provided other instruction on liability and causation with respect to conspiracy, as

follows:

A defendant may, by reason of being a member of a conspiracy, become liable for a crime he did not personally commit.  He may be found guilty under this conspiracy theory in some situations where he could not be convicted under accomplice liability.   You may define – you may find the

defendant guilty of the crime of murder, as a conspirator, if you [are] satisfied, beyond reasonable doubt, first, that the defendant agreed with William Curley that they or one or more of them would commit the crime of murder or that the defendant would aid William Curley in committing the crime, the crime of murder.  Second, that the defendant so agreed with the intent of promoting or facilitating the commission of that crime.  Third, that, while the agreement remained in effect, the crime of murder was committed by William Curley and, fourth, that the crime of murder was committed by William Curley in furtherance of his and the defendant's common design.

* * *

You cannot find the defendant or an accomplice or a co-conspirator killed Regina Clark or Austin Hopper, unless you are satisfied, beyond a reasonable doubt, that the defendant's conduct or that of an accomplice or co-conspirator was a direct cause of their deaths.  In order to be a direct cause of a death, a person's conduct must be a direct and substantial factor in bringing about the death.  There can be more than one direct cause of a death.  A defendant who is a direct cause of a death may be criminally liable, even though there are other direct causes.  A defendant's conduct may be a direct cause of a death, even though his conduct was not the last or immediate cause of the death.  Thus, a defendant's conduct may be a direct cause of a death, if it initiates an unbroken chain of events leading to the death of the victim.

(*Id*. at 22-23; 29.)

In its decision affirming the denial of PCRA relief, the Pennsylvania Supreme

Court found the following:

The PCRA court summarily rejected this claim, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness.   It emphasized that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests.   PCRA Ct. Opinion, Dec. 30, 2009, at 1.  The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal.  *Id*. at 6.

181

> We agree with the PCRA court that Appellant is not entitled to relief. The record supports the court's conclusion that Appellant failed to explore at the PCRA hearing trial counsel's strategy in not requesting the "mere presence and knowledge" charge. More significantly, however, we conclude that the proposed charge, while an accurate statement of the law, was unnecessary given that the trial court correctly charged the jury on the elements of conspiracy.[ ] "The trial court had broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Smith*, 609 Pa. 605, 662, 17 A.3d 873, 906 (2011) (citing *Commonwealth v. Williams*, 602 Pa. 360, 980 A.2d 510, 523 (2009)). Merely because the trial court did not choose the precise language suggested by Appellant does not render the charge inadequate. Thus, we reject Appellant's ineffectiveness claim for lack of merit.

*Koehler-II*, 36 A.3d at 157.

The Due Process Clause of the Fourteenth Amendment requires the government to prove beyond a reasonable doubt every element of the crime with which a defendant is charged. *In re Winship*, 397 U.S. 358, 364 (1970); *United States v. Gaudin*, 515 U.S. 506, 510, 522-23 (1995). Accordingly, a criminal conviction violates due process when the trial court fails to instruct the jury on an element that the prosecution must prove beyond reasonable doubt. *Gaudin*, 515 U.S. at 522-23. More specifically, where a petitioner alleges no specific constitutional violation, the issue is "whether the ailing instructions by themselves so infected the entire trial that the resulting conviction violates due process," *Cupp v. Naughten*, 414 U.S. 141, 147 (1973), not merely whether the instruction is "undesirable, erroneous, or even 'universally condemned,'" *id.*, 414 U.S. at 146. *See also Estelle*, 502 U.S. 62. However, a single deficient instruction does not render a judgment of conviction invalid if the charge, considered as

182

a whole, clearly informs the jury of the correct legal principle.  *Henderson v. Kibbe*, 431

U.S. 145, 153-55 (1977); *see also Commonwealth v. Baker*, 963 A.2d 495, 507 (Pa.

Super Ct. 2008) ("A charge is considered adequate unless the jury was palpably misled

by what the trial judge said or there is an omission which is tantamount to fundamental

error.  Consequently, the trial court has wide discretion in fashioning jury instructions.").

       To convict a defendant of conspiracy in Pennsylvania, the trier of fact must find

three things from the evidence: "(1) the defendant intended to commit or aid in the

commission of the criminal act; (2) the defendant entered into an agreement with

another . . . to engage in the crime; and (3) the defendant or one or more of the other

co-conspirators committed an overt act in furtherance of the agreed upon crime."

*Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008).  First-degree murder

requires the specific intent to kill, and that *mens rea* is also required of accomplices and

co-conspirators.  *See* 18 PA. CONS. STAT. ANN. § 2502(a); *Smith v. Horn*, 120 F.3d 400,

410 (3d Cir. 1997) (citing *Commonwealth v. Huffman*, 628 A.2d 961 (Pa. 1994)).  In

addition, mere presence at the scene of a crime is insufficient to sustain a conviction for

conspiracy.  *Commonwealth v. La*, 640 A.2d 1336, 1344-45 (Pa. Super. Ct. 1994).

       Upon review, the Court finds that the Pennsylvania Supreme Court's conclusion

that Mr. Koehler's challenge to the conspiracy instruction lacks merit was not an

unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1).

Nor did it result in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

2254(d)(2).  The challenged conspiracy charge, when taken in context, was clear and

comported with Pennsylvania's suggested standard jury instruction on conspiracy.[39]

Specifically, because the jury was required to find that Mr. Koehler entered into an

agreement with at least one co-conspirator to a crime, the jury necessarily had to find

more than mere presence or knowledge.  Hence, the state court's decision that

"[m]erely because the trial court did not choose the precise language suggested by [Mr.

Koehler] does not render the charge inadequate," *Koehler-II*, 36 A.3d at 157, is not

unreasonable.

Moreover, because the jury instructions were sufficient and thus the underlying

claim lacks merit, Mr. Koehler's trial counsel cannot be ineffective for failing to request a

conspiracy instruction that included express language on mere presence and

knowledge, and appellate counsel cannot be ineffective for failing to properly raise,

preserve, and litigate this issue.  *See Strickland*, 466 U.S. at 691 (reasoning counsel's

performance cannot be deficient based on a failure to advance meritless claims).  Mr.

---

[39] Pennsylvania's Standard Jury Instruction 12.903B provides:

> I want to point out that, if you believe that (name of alleged co-conspirators) committed the (_____) and that the defendant was in their company, present at the scene and knew they were committing that crime, you cannot infer, from those facts alone, that the defendant was guilty of conspiracy.  The defendant is not guilty unless he and the others had an agreement or common understanding and shared the intention to commit the (_____).  Consider all the evidence, including the evidence of the defendant's presence and knowledge and the words and behavior of the defendant and the others, when you are deciding whether the required elements of agreement and shared intent have been proven beyond a reasonable doubt.  Put simply, if you convict the defendant of the conspiracy charge, it must be because he was a party to a conspiracy and not just a knowing spectator to a crime committed by his companion.

Pa. Standard Jury Ins. 12.903B.

Koehler is not entitled to habeas relief on this claim.

**L.    Claim XII - The trial court erroneously instructed the jury that it could infer Mr. Koehler's specific intent from the actions of his accomplice.  Counsel was ineffective for failing to litigate this issue.**

In this claim, Mr. Koehler argues that the trial court denied him the right to due process when it erroneously instructed the jury that it could infer his specific intent to kill from the actions of his accomplice, Mr. Curley.  He also claims counsel was ineffective for failing to litigate this claim.  Mr. Koehler presented both his claims of denial of due process and ineffective assistance to counsel to the state courts, but the Pennsylvania Supreme Court addressed only the ineffectiveness claim in its decision affirming the denial of PCRA relief.  Thus, the Court will apply *de novo* review to the due process claim, but will employ AEDPA review to the ineffectiveness claim.  Upon careful review, the Court will deny habeas relief on both issues related to this claim.

The background of this claim is as follows.  In its charge on the specific intent for first degree murder, the trial court instructed the jury as follows:

> A person has the specific intent to kill, if he has a fully formed intent to kill and is conscious of his own intention.  As my earlier definition of malice indicates, a killing by a person who has the specific intent to kill is a killing with malice.  Stated differently, a killing is with specific intent, if it is willful, deliberate and premeditated.  The specific intent to kill, including the premeditation needed for first degree murder, does not require planning or previous thought or any particular length of time.  It can occur quickly.  All that is necessary is that there be time enough so that the defendant can and does fully form an – intent to kill and is conscious of that intention.
>
> When deciding whether the defendant had the specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that may show

185

his state of mind.  If you believe that the defendant *or an accomplice or co-conspirator* intentionally used a deadly weapon on a vital part of the victim's body, you - you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant had the specific intent to kill.

(Trial NT 4/11/1996 a.m. Part 1 Vol. XXVII 28-29) (emphasis added).  Additionally, prior

to this instruction on specific intent, the trial court provided the following instruction on

liability or criminal responsibility, with a focus on accomplice liability and conspiracy

liability, in pertinent part:

You may find the defendant guilty of a crime, without finding that he personally engaged in the conduct required for commission of that crime or even that he was personally present when the crime was committed.  A defendant is guilty of a crime, if he is an accomplice of another person who commits that crime.   A defendant does not become an accomplice merely by being present at the scene or knowing about the crime.  He is an accomplice, if, with the intent of promotion or facilitating commission of the crime, he solicits, commands, encourages or requests the other person to commit it or aids, agrees to aid or attempts to aid the other person in planning or committing it.

You may find the defendant guilty of a crime on the theory that he was an accomplice, as long as you are satisfied, beyond a reasonable doubt, that the crime was committed and that the defendant was an accomplice of the person who committed it. It does not matter whether the person you believe committed the crime has not been prosecuted or convicted, has been convicted of a different crime or degree of crime, has an immunity to prosecution or conviction or has been acquitted.

A defendant may, by reason of being a member of a conspiracy, become liable for a crime he did not personally commit.  He may be found guilty under this conspiracy theory in some situations where he could not be convicted under accomplice theory.   You may define – you may find the defendant guilty of the crime of murder, as a conspirator, if you [are] satisfied, beyond a reasonable doubt, first, that the defendant agreed with William Curley that they or one or more

186

of them could commit the crime of murder or that the defendant would aid William Curley in committing that crime, the crime of murder.  Second, that the defendant so agreed with the intent of promoting or facilitating the commission of that crime.  Third, that, while the agreement remained in effect, the crime of murder was committed by William Curley and, fourth, that the crime of murder was committed by William Curley in furtherance of his and the defendant's common design.

* * *

You cannot find the defendant or an accomplice or a co-conspirator killed Regina Clark or Austin Hopper, unless you are satisfied, beyond a reasonable doubt, that the defendant's conduct or that of an accomplice or a co-conspirator was a direct cause of their deaths.  In order to be a direct cause of death, a person's conduct must be a direct and substantial factor in bringing about the death.  There can be more than one direct cause of a death. A defendant who is a direct cause of a death may be criminally liable, even though there are other direct causes.  A defendant's conduct may be a direct cause of a death, even though his conduct was not the last or immediate cause of the death.  Thus, a defendant's conduct may be a direct cause of death, if it initiates an unbroken chain of events leading to the death of the victim.

(*Id*. at 19-21, 27.)

At the close of its instruction on the charges, the trial court held a side bar with counsel to discuss any objections to the charge thus far.  (*Id*. at 35-43.)  Defense counsel asked for further instructions on the concepts of "murder one, murder two, murder three, kidnapping, conspiracy, [and] concepts of co-conspirators and accomplice liability."  (*Id*. at 36.)  The trial court offered to give a "shorthand synopsis that indicates that the Commonwealth alleges that the defendant committed these acts as a co-conspirator and/or accomplice and that, if they find that the acts were committed say by a co-conspirator or by someone who's acting as an accomplice and

187

has done so in pursuance of their conspiracy or their partnership, then that act is deemed to be the act of the defendant." (*Id*. at 37.)  However, the trial court expressed its "grave concern" that such a shorthand synopsis would prejudice Mr. Koehler by oversimplifying the instructions. (*Id*.)  Both counsel agreed, but defense counsel did not withdraw his request for "a more enlightened series of instructions on these issues." (*Id*. at 37-38.)  No further instruction was subsequently given to the jury.  However, during its deliberations the jury returned to the trial court with a request that the court re-read the instructions for all three degrees of murder previously provided.   (Doc. 50-73, Notes of Testimony, Trial, 4/11/1996 p.m., Part 1, Vol. XXVIII, 1-6 ("Trial NT 4/11/1996 p.m. Part 1 Vol. XXVIII").)    After further deliberations, the jury returned a verdict, in pertinent part, of guilty of murder in the first, second, and third degrees and conspiracy to commit murder for the killings of both Ms. Clark and Austin Hopper.  (*Id*. at 15-16.)

In its decision affirming the denial of PCRA relief, the Pennsylvania Supreme Court found the following:

> The PCRA court summarily rejected this claim, not on the prejudice prong as suggested by the Commonwealth, but on the grounds that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests.   PCRA Ct. Opinion, Dec. 30, 2009, at 1.  The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal.  *Id*. at 6.  Alternatively, however, the PCRA court held that the ineffectiveness claim lacked arguable merit because Appellant's underlying *Huffman* challenge ignored the context of the court's broader instructions regarding accomplice and co-conspirator liability. *Id*. at 5 n.6.   The court further emphasized the factual difference between *Huffman* and the instant case by pointing out that in *Huffman*, the defendant and another individual simultaneously beat a man to death, and that the trial court

188

erred by instructing the jury that the principal's state of mind could establish the accomplice's specific intent to kill.  Here, the PCRA court opined, there was no suggestion that anyone other than Appellant's codefendant shot and killed the victims - the prosecution's theory was that Appellant supplied the gun, planned the killings, brought the victims to Curley, and encouraged, ordered, and threatened Curley to kill them. Unlike in *Huffman*, the PCRA court held that because the codefendant used a deadly weapon on vital parts of the victims' bodies pursuant to Appellant's commands, the jury could infer that Appellant himself had the specific intent to kill because he conspired with and assisted the codefendant. PCRA Ct. Opinion, Dec. 30, 2009, at 5 n.6.

Upon examination of the arguments set forth by the parties and the rationale provided by the PCRA court, we agree that Appellant is not entitled to relief on this claim.  Rather than denying relief based upon the arguable merit or reasonable basis prongs of the ineffectiveness test, as did the PCRA court, we find it more expeditious to dispose of the claim as suggested by the Commonwealth.   We agree with the Commonwealth that, pursuant to our decision in *Daniels*, Appellant's ineffectiveness claim fails for lack of prejudice. Even assuming for purposes of argument that the portion of the charge cited by Appellant is in tension with our holding in *Huffman*, when read in its entirety, the instruction correctly described accomplice liability and criminal conspiracy, N.T. Apr. 11, 1996, Vol. XXVII, at 19-21, the elements of first degree murder, including that the defendant must possess the specific intent to kill, *id*. at 28-29,FN33, and informed the jury that the Commonwealth bore the burden of proving every element of the crime beyond a reasonable doubt.  *Id*. at 2, 3. Thus, as in *Daniels*, we conclude that Appellant was not prejudiced as there is not a reasonable probability that the outcome of the trial would have changed had trial counsel objected to the jury charge.

> FN33.  Specifically, the trial court charged the jury as follows:
>
>> You may find the defendant guilty of first degree murder, if you are satisfied that the following three elements have been proven beyond a reasonable doubt.  First,

> that Regina Clark, in the one charge, or Austin Hopper, in the other charge, is dead.  Second, that the defendant or an accomplice or co-conspirator killed her.  Regina Clark, in the one charge, or him, Austin Hopper, in the other charge, and third, *that the defendant did so with the specific intent to kill and with malice*.

> *Id*. at 28 (emphasis added).

*Koehler-II*, 36 A.3d at 155-56.

As stated above, Mr. Koehler argues here that the jury instruction violated his right to due process because it misinformed the jury that it may infer that he had the specific intent to kill based only on the actions and conduct of his co-conspirator.  Under Pennsylvania law, a defendant may not be convicted of first-degree murder under a co-conspirator liability theory unless the jury finds that the defendant personally had the specific intent to kill.  *See Smith*, 120 F.3d at 410; *see also* 18 PA. CONS. STAT. ANN. § 2502(a); *Commonwealth v. Huffman*, 638 A.2d 961, 962-63 (Pa. 1994).  "The general rule of law [in Pennsylvania] pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy."  *Commonwealth v. Wayne*, 720 A.2d 456, 463 (Pa. 1998).  However, "[t]o be guilty of first degree murder, each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder - *the specific intent to kill*."  *Id*. at 464 (emphasis in original).  This principle was settled at the time of Mr. Koehler's trial.  *See Huffman*, 638

A.2d at 962.

In determining whether the jury instruction on specific intent to kill in this case runs afoul of due process, the Court "must focus initially on the specific language challenged." *Francis v. Franklin*, 471 U.S. 307, 315 (1985); *Smith*, 120 F.3d at 411. The Court must then consider the challenged language in the context of the jury charge as a whole. *Francis*, 471 U.S. at 309, 318-19; *Smith*, 120 F.3d at 411. The ultimate question is "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)); *Smith*, 120 F.3d at 411. Under *Boyde*, it is not enough that a disputed charge might have been, or could have been, misinterpreted by the jury, or that a single juror or some number less than all of the jurors was confused by the instruction. *Boyde*, 494 U.S. at 378-80. The *Boyde* standard requires the petitioner to demonstrate a reasonable probability that all of the jurors were sufficiently confused by the disputed instruction as to have interpreted the charge in an unconstitutional manner. *Id*. *See also Weeks v. Angelone*, 528 U.S. 225, 238 (2000) (rejecting notion that possibility, rather than reasonable probability, of total jury confusion is sufficient for constitutional error).

Nonetheless, even if a jury instruction is found to violate due process, a district court should grant a new trial only if the error is not harmless. *Neder v. United States*, 527 U.S. 1, 9 (1999) (holding that harmless error analysis applies to jury instructions that violate the principle of *Gaudin*); *Smith*, 120 F.3d at 417-18 (applying the harmless error standard from *Brecht* to habeas petitioner's claim that trial court improperly

191

instructed the jury that it could convict without finding that the petitioner had specific intent to kill).

Upon review, the Court finds that Mr. Koehler's challenge to the specific intent to kill instruction lacks merit. The Court makes such a finding based on its reading of the jury charge as a whole. Taken in context, the challenged accomplice liability charge was clear, as was the trial court's instruction on specific intent. In light of the trial court's instruction distinguishing between the degrees of murder, as well as how accomplice liability and the act of being a co-conspirator play into those degrees, there is no reason to believe that the jurors could or did conclude from it that, if they found that Mr. Koehler was an accomplice to a non-intentional homicide, they should convict him of first-degree murder. This is especially true given that after the trial court instructed the jury on causation in criminal homicide as it relates to accomplice liability and liability as a co-conspirator, it moved immediately into a discussion of the intent requirements for the different degrees of murder. Moreover, from a reading of the charge as a whole, it is clear that, in deciding whether Mr. Koehler was guilty of conspiracy, the jury had to determine whether he had the specific intent to kill.[40] (Trial

---

[40] In *Commonwealth v. Wayne*, the Pennsylvania Supreme Court explained:

> A conspiracy to kill presupposes the deliberate premeditated *shared* specific intent to commit murder . . . . In this case, the conspiracy was a conspiracy to kill. The conspiracy had only one object, the deliberate decision to take a life. Once this jury determined that appellant was guilty of conspiracy, given the sole object of that conspiracy, the only logical conclusion to reach it that this jury also determined, beyond a reasonable doubt, that appellant possessed the specific intent to kill.

*Wayne*, 720 A.2d 456, 465 (Pa. 1998) (emphasis in original) (quoted with approval in *Bronshtein v. Horn*, 404 F.3d 700, 714 (3d Cir. 2005)).

NT 4/11/1996 a.m. Part 1 Vol. XXVII 20-21.)  As such, the trial court properly instructed the jury on the specific intent to kill and Mr. Koehler, therefore, was not denied his right to due process here.

Turning to the ineffectiveness claim, in its decision, the Pennsylvania Supreme Court found that Mr. Koehler was not prejudiced "as there is not a reasonable probability that the outcome of the trial could have changed had trial counsel objected to the jury charge." *Koehler-II*, 36 A.3d at 156.  In doing so, the state court found that the instructions on accomplice liability and criminal conspiracy, as well as those on the elements of first degree murder and specific intent to kill, comported with Pennsylvania law. *Id*.  As set forth above, this Court agrees with such a finding.  Viewing the instruction as a whole, the jury was clearly instructed on the need to find Mr. Koehler himself possessed the specific intent to commit first degree murder.  The instructions accurately recited Pennsylvania law.  Thus, the Pennsylvania Supreme Court's conclusion that Mr. Koehler's claim of ineffective assistance of counsel fails for lack of prejudice was not an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d).  Mr. Koehler is not entitled to habeas relief on this claim.

**M.**  **Claim XIII - As a result of trial court error, prosecutorial misconduct and ineffective assistance of counsel, the jury considered non-statutory aggravating factors in violation of the Sixth, Eighth and Fourteenth Amendments.**

In this claim, Mr. Koehler contends that, as a result of trial court error, prosecutorial misconduct, and ineffective assistance of counsel, the jury considered non-statutory aggravating factors referenced by the prosecutor during the penalty phase of the trial.  While this claim is set forth in Mr. Koehler's habeas petition, (Doc. 1),

as "Claim XIII," there is no mention or discussion of it in his supporting memorandum of law, (Doc. 34), or reply brief, (Doc. 48).  In fact, "Claim XIII" in Mr. Koehler's supporting memorandum and reply brief are, instead, what is listed as "Claim XIV" in his habeas petition, meaning that the habeas petition presents fifteen (15) claims while the memorandum of law presents only fourteen (14) claims.  (*See* Docs. 34 & 48.)  Further, "Claim XIII" in Mr. Koehler's habeas petition cites no case law, and makes only cursory citations to the record from other claims set forth in his petition.  (*See* Doc. 1 ¶¶ 225-236.)  Respondents provide no response to the habeas petition's "Claim XIII."  (*See* Doc. 37.)  As such, the Court is unable to determine whether Mr. Koehler intended to litigate "Claim XIII" as one of his habeas claims before this Court.

Nevertheless, it appears that Mr. Koehler attempted to also raise this claim before the state courts, at least in the form of an ineffectiveness claim, and notably through counsel representing him in the instant habeas proceeding.  *See Koehler-II*, 36 A.3d at 157-58.  In its decision affirming the denial of PCRA relief, the Pennsylvania Supreme Court noted that Mr. Koehler's arguments in support of this claim contained little to no elaboration or citation to the record, as well as little analysis.[41]  *Id*.  Further,

---

[41] The Pennsylvania Supreme Court set forth Mr. Koehler's claim and response from the Commonwealth as follows:

> Appellant contends that trial counsel was ineffective for failing to object when the prosecutor referenced non-statutory aggravating factors during the penalty phase of trial.  *Without elaboration or citation to the record*, he further argues that "the trial court failed to instruct the jury that it was precluded from considering this evidence of Appellant's prior bad acts and future dangerousness when making its sentencing determination."  Initial Brief of Appellant at 83.  *Again without citation to the record*, Appellant asserts that his sentencing proceeding was compromised by the prosecution's use of victim impact testimony and argument.  He maintains that throughout the

the Court concluded:

> The PCRA court summarily rejected this claim, finding that the substantive claim was waived, and that Appellant failed to satisfy his burden of demonstrating ineffectiveness.   It emphasized that Appellant failed to produce evidence that counsel's chosen course of action had no reasonable basis designed to effectuate his client's interests.   PCRA Ct. Opinion, Dec. 30, 2009, at 1.   The court further stated that Appellant failed to explore appellate counsel's reasoning in failing to preserve the claim on appeal.   *Id*. at 6.   While the record supports the PCRA court's conclusion in this regard, we deny relief based on the lack of arguable merit due to Appellant's failure to identify those portions of the record which he found objectionable.   *See Commonwealth v. Smith*, 604 Pa. 126, 985 A.2d 886, 906 (2009) (holding that the defendant's

> trial, "the prosecutor injected argument and evidence regarding how the murders affected the police investigators, the coroners, acquaintances, family members and Bradford County."   *Id*. at 84. Appellant submits that trial counsel's lodging of objections to some of this evidence at trial demonstrates that he lacked a reasonable basis for failing to object to the same evidence during the penalty phase.[FN35]   Finally, Appellant concludes, *without analysis*, that the jury's consideration of non-statutory aggravating factors prejudiced him.

>> FN35.   Appellant does not identify that portion of the record where counsel objected at trial or the portion of the record where he should have objected during the penalty phase.

> The Commonwealth responds that this ineffectiveness claim fails for lack of arguable merit because Appellant has failed to identify the testimony, evidence, or argument to which trial counsel was ineffective for failing to object.   *See Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 341 (2011) (rejecting a claim as waived for lack of development where the defendant fails to refer to particular evidence of record supporting the claim and fails to develop his argument).   The Commonwealth also contends that the claim fails because Appellant did not question trial counsel regarding this claim at the PCRA evidentiary hearing, and, therefore, did not demonstrate that he lacked a reasonable basis for failing to object during the penalty phase of trial.

*Koehler-II*, 36 A.3d at 157-58 (emphasis added).

> failure to develop properly his argument with proper citation to
> the record results in waiver of the claim).

*Id*. at 158.  In light of this analysis by the Pennsylvania Supreme Court, the Court

concludes that Mr. Koehler failed to develop the factual basis for this claim in state

court.

The state court's factual finding that Mr. Koehler's claim lacked arguable merit

based on his failure to identify the portions of the record he found objectionable is a

finding of fact presumed correct on habeas review.  28 U.S.C. § 2254(e)(1).  To

overcome that presumption, Mr. Koehler is required to provide this Court with clear and

convincing evidence sufficient to rebut the state court's factual determination that he

failed to develop his claim.  Mr. Koehler has made no such showing, and, in fact, does

not even acknowledge that the Pennsylvania Supreme Court addressed this claim in

the manner in which it did.

Under Section 2254(e)(2), where as here a petitioner fails to develop the factual

basis of a claim in state court, a federal court cannot consider factual evidence on the

claim unless the petitioner shows that:

> (A) the claim relies on –
>
>                                   \* \* \*
>
>     (ii) a factual predicate that could not have been
> previously discovered through the exercise of due diligence;
> and
>
> (B) the facts underlying the claim would be sufficient to
> establish by clear and convincing evidence that but for
> constitutional error, no reasonable factfinder would have found
> the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  A petitioner can be excused from showing compliance with this

subsection's requirements only if there has been no lack of diligence on his own part. *See Schwartz v. Colleran*, 287 F. App'x 218, 222 (3d Cir. 2008) (citing *Williams v. Taylor*, 529 U.S. 420, 437 (2000)). From a reading of the instant petition, and as stated above, Mr. Koehler has not even acknowledged the state court decision with respect to this claim, let alone provided this Court with evidence to rebut the state court's factual determination. Because it was incumbent on Mr. Koehler to provide evidence to satisfy 28 U.S.C. § 2254(e)(2) and he presumably willfully failed to do so, the Court will not consider this claim on the merits. As such, Mr. Koehler is not entitled to habeas relief on this claim.

**N.    Claim XIV - The court failed to instruct the jury that a life sentence means life without possibility of parole; trial counsel was ineffective for failing to request such an instruction.**

In this claim, Mr. Koehler contends that, because the Commonwealth introduced evidence of his future dangerousness into the case, the trial court should have instructed the jury that a sentence of life in prison for first degree murder rendered Mr. Koehler ineligible for parole, as is required under *Simmons v. South Carolina*, 512 U.S. 154 (1994) and its progeny. Related to this argument, Mr. Koehler claims that trial counsel was ineffective for failing to request this "life means life" instruction. He also argues that the trial court's failure to provide such an instruction led to a number of constitutional violations.[42] After careful review, the Court will deny habeas relief on this

---

[42] In his habeas petition, Mr. Koehler sets forth those constitutional violations as follows: [W]hen . . . a capitally charged defendant faces sentencing options of life without parole or death, the failure to instruct the jury that the defendant was statutorily ineligible for parole from a life sentence:

- violates the hallmark Eighth Amendment requirement that

claim.

In support of his contention that the Commonwealth placed his future

dangerousness at issue, Mr. Koehler relies on several portions of the record from the

guilt phase of his trial.  First, he argues that the prosecution relied heavily on the

allegations that Mr. Koehler had represented to others that he was a "hit man."  During

the prosecutor's recitation of the facts of the case in his opening statement, District

---

a capital sentencing jury must be permitted to consider
and give full effect to all relevant mitigating evidence,

- presents the jury with a false choice of sentencing options
in violation of the Eighth Amendment requirement of truth
in capital sentencing, the Eighth and Fourteenth
Amendment heightened procedural safeguards, and the
Eighth Amendment bar against arbitrary and capricious
sentencing determinations,

- offends the evolving standards of decency in violation of
the Eighth Amendment,

- violates the due process prohibition against imposing a
death sentence on the basis of inaccurate information that
the defendant has no opportunity to rebut or explain,

- violates due process by subjecting the defendant to a
sentence imposed on the basis of inaccurate information
that was material to the sentencing decision,

- violates the due process life and liberty interest in having
his punishment fixed by a jury that would choose between
the sentencing options of "life without the possibility of
parole" and "death" set forth in Pennsylvania's death
penalty statute, [and]

- skews the consideration and weighing of aggravating and
mitigating evidence in a manner that significantly impairs
the jury's ability to follow the law and fairly consider
imposition of a sentence of life without parole, in violation
of his right to an impartial jury.

(Doc. 1 at 112-13.)

Attorney McGuinness recounted Mr. Curley's statement about his relationship with Mr.

Koehler as follows:

> William Curley tells [Corporal Altieri] a story that Corporal Altieri will never forget, and you, ladies and gentlemen, will not forget.   A horrific story.   He tells of knowing a Mr. John Koehler, he tells that Mr. John Koehler is an individual that tells him that he, Mr. Koehler, is a hit-man, a hired killer, a murderer for profit.   He tells him that he has made a lot of money doing this.   Alternatively he tells him he works for the mob, or he works for the CIA.   He's got a lot of stories about contract killing.   William Curley is an eighteen year old boy.   He looks up to Mr. Koehler, and he thinks well, maybe he saw too many pulp fiction movies, or maybe he saw too many other glamorizations of killers, natural born killers, who knows.   He looks up to this guy right now.

(Trial NT 3/25/1996 a.m. Part 1 Vol. 1 15.)   During the direct testimony of

Commonwealth witness Joe Byerly, District Attorney McGuinness asked him about

what Mr. Koehler had told him about his relationship with Mr. Curley.   (Doc. 50-24,

Notes of Testimony, Trial, 3/26/1996 p.m., Part 1, Vol. IX, at 39-40;44-45 ("Trial NT

3/26/1996 p.m. Part 1 Vol. IX").)   Mr. Byerly stated that Mr. Koehler had told him he was

a hit man and was teaching Mr. Curley how to be one as well.   (*Id*. at 39-40.)   Mr.

Koehler also told him that he worked for the mafia and the CIA as a hit man.   (*Id*. at 44-

45.)   Another Commonwealth witness, Charlene Benefield, testified on direct that Mr.

Koehler had told her in 1994 that he was a hit man involved with the mafia and the CIA.

(Doc. 50-26, Notes of Testimony, Trial, 3/26/1996 p.m., Part 3, Vo. IV, at 103 ("Trial NT

3/26/1996 p.m. Part 3 Vol. IV").)   Lee Curley, Mr. Curley's sister, testified for the

Commonwealth that, over a period of at least four years, she occasionally heard Mr.

Koehler tell Mr. Curley that he was a hit man.   (Trial NT 3/29/1996 Vol. X 15-16.)   She

also heard Mr. Koehler tell him that he could have Mr. Curley's step-father "killed at any

point." (*Id*. at 16.)  Later, Ms. Curley testified that Mr. Koehler had threatened to kidnap her when she was twelve or thirteen years old, approximately five years prior to the trial in this case.  (*Id*. at 18-19.)  Finally, William Curley testified that Mr. Koehler had talked in the past about being a hit man and the amount of money one can make being a hit man, and encouraged Mr. Curley to pursue that line of work.  (Trial NT 3/28/96 a.m. Part 1 Vol. VII 18-20.)  Mr. Koehler also talked to Mr. Curley about killing an individual named Christy Long.[43]  (*Id*. at 19.)

Mr. Koehler presented this claim to the Pennsylvania Supreme Court in the post-conviction proceedings, framed as an ineffective assistance of counsel claim.  *See Koehler-II*, 36 A.3d at 158-160.  In denying the claim, the Pennsylvania Supreme Court addressed both the underlying arguable merit of the *Simmons* claim, as well as the ineffectiveness claim.  Specifically, the court determined:

> We agree with the PCRA court that Appellant is not entitled to relief.  To the extent that Appellant argues that his prior bad acts implicate his future dangerousness, this Court has expressly rejected such contention, thus, the ineffectiveness claim fails for lack of arguable merit.  *See Commonwealth v. Paddy*, 15 A.3d 431, 454 (Pa. 2011) (rejecting for lack of arguable merit a claim that trial counsel was ineffective for failing to request a *Simmons* charge because the prosecutor's reference to the defendant's past acts did not place the defendant's future dangerousness at issue).  We similarly reject Appellant's contention that trial counsel was ineffective

---

[43] In his habeas petition, Mr. Koehler also cites to Mr. Curley's testimony that referred to threats to kill three individuals in Arkansas, threats purportedly made by Mr. Koehler.  (*See* Doc. 1 at 110.)  This testimony was part of Mr. Curley's interview with Corporal Altieri, and was read into the record by the Corporal.  (Trial NT 3/29/1996 Vol. X 39) ("Interview of William Curley read into the record.").  However, that record was not transcribed by the courtroom reporter into the March 29, 1996 trial transcript, nor has Mr. Koehler provided a copy of that interview in the record filed in this habeas matter.  Thus, this testimony will not be considered by the Court with respect to this claim.

for failing to request a *Simmons* instruction after the prosecutor referred to him as a "hit man." Presumably, if the Commonwealth suggested to the jury that Appellant portrayed himself as being a "hit man," one could reasonably draw the inference that, if released into the general population, Appellant would resume his violent profession.[FN38] Considering that we are addressing a claim of ineffective assistance of counsel, however, the determination of whether the Commonwealth invoked Appellant's future dangerousness is not dispositive where the claim fails for lack of prejudice. When considering the aggravating circumstances that Appellant was responsible for the deaths of two innocent people, one of which was a child, it is not probable that at least one juror would have voted for life imprisonment had he or she only been instructed that a life sentence means life without parole. Accordingly, Appellant's ineffectiveness claim fails.

> FN38. That is not to say that the Commonwealth's purpose in making the "hit man" references was to inject Appellant's future dangerousness into the case. Rather, it is clear that Appellant's portrayal of himself as an assassin was the key to the factual premise underlying both murders.

*Id*. at 159-60. Because the state court addressed this claim on the merits, the Court will review this habeas claim using AEDPA's deferential standards.

In *Simmons*, the United States Supreme Court held that not informing a jury that a defendant would never be released on parole if sentenced to life is a violation of due process requiring a new sentencing phase. *Simmons*, 512 U.S. 154. However, that requirement is only applicable when the prosecution argues future dangerousness. *See id*. at 156. In the plurality opinion, the Court reasoned that "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole." *Id*. at 171. More specifically, in her

concurrence, Justice O'Connor phrased the dispositive question as whether "the

prosecution argues that the defendant will pose a threat to society in the future." *Id*. at

177 (O'Connor, J., concurring).   The Third Circuit Court of Appeals recognizes this

narrower view as controlling.   *See Robinson v. Beard*, 762 F.3d 316, 325 (3d Cir. 2014)

(citing *Bronshtein v. Horn*, 404 F.3d 700, 716 (3d Cir. 2005); *Rompilla*, 355 F.3d at

265).   As explained by the Third Circuit Court of Appeals in *Robinson*,

> The fundamental takeaway from *Simmons* is that a jury cannot be presented with generalized arguments regarding the defendant's future dangerousness while also being prevented from learning that the defendant will never be released on parole.   While we recognize that the evidence in many, if not all, capital cases will tend to show that a defendant may be dangerous in the future, *Simmons* does not require a parole eligibility instruction in every case.

*Robinson*, 762 F.3d at 327.[44]

Further, the Third Circuit Court of Appeals has emphasized that, in reviewing the

constitutionality of the Commonwealth's conduct, "[t]he relevant question is whether the

---

[44] The Court also notes with interest that, in *Robinson*, the Third Circuit Court of Appeals discussed a related Supreme Court case, *Kelly v. South Carolina*, 534 U.S. 246 (2002).   In *Kelly*, the Supreme Court held that the trial court in that case should have provided a parole ineligibility instruction because the state "accentuated the clear implication of future dangerousness raised by the evidence."   *Id*. at 255.   The majority in *Kelly* explained that "[e]vidence of future dangerousness under *Simmons* is evidence with a tendency to prove dangerousness in the future; its relevance to the point does not disappear merely because it might support other inferences or be described in other terms."   *Id*. at 254.   In *Robinson*, the Third Circuit noted that Kelly "arguably broadened the holding in *Simmons*."   *Robinson*, 762 F.3d at 326 (quoting *Rompilla*, 355 F.3d at 266).   However, because the Supreme Court decided *Kelly* after Robinson's conviction became final, the Third Circuit Court of Appeals declined to apply *Kelly* to Robinson's case.   *Id*. at 327.   In the instant case, Mr. Koehler's conviction became final on October 2, 2000.   *See Koehler v. Pennsylvania*, 531 U.S. 829 (2000).   Because the state court decision in Mr. Koehler's case preceded *Kelly*, like in *Robinson*, this Court will not apply *Kelly* here.   *See Robinson*, 762 F.3d at 326-27 (determining that, because the Supreme Court decided *Kelly* after Robinson's conviction became final, and, therefore, state court decision in *Robinson* preceded the *Kelly* decision, *Kelly* is not applicable in a determination of whether the state court's application of *Simmons* was unreasonable).

prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Thomas v. Horn*, 570 F.3d 105, 120 (3d Cir. 2009) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted)).  It has further instructed that, in evaluating a claim like the one at issue here, the habeas court must not consider the alleged improper argument and evidence in isolation.  *Thomas*, 570 F.3d at 120-21.  Rather, they must be considered in context to see if the Commonwealth urged the jury to consider future dangerousness when contemplating the death penalty and created an unacceptable risk that the jury believed, in error, that the defendant could be released on parole if he were not sentenced to death.  *Id*.

In this case, when considered in context, the Court finds that the prosecutor's comments and questioning did not convey a message that Mr. Koehler posed a threat of future dangerousness if not sentenced to death.  Eliciting testimony from various witnesses about Mr. Koehler's statements to them regarding his status as a "hit man" did not expressly suggest to the jury that Mr. Koehler would pose a danger to society if he was released from prison.  Nor did the prosecutor's statements and line of questioning imply that the jury should choose to sentence Mr. Koehler to death as an "act of self-protection."  *Robinson*, 762 F.3d at 328.  Rather, viewing the Commonwealth's case as a whole, the Court agrees with Respondents that introducing this evidence relating to Mr. Koehler's status as a "hit man" served the purpose of proving why Mr. Curley committed the murders.  Notably, the Commonwealth did not contend that Mr. Koehler actually was a "hit man;" rather, only that he held himself out as a "hit man" and that Mr. Curley believed him and acted upon that belief.  As a result, the prosecutor's relevant questions and comments during the guilt phase cannot be

read as an encouragement to the jury to consider any future danger Mr. Koehler may have posed to others if he was not sentenced to death.  Moreover, the relevant portion of the prosecutor's opening and questions to witnesses did not create an unacceptable risk that the jury believed that, if it did not impose the death penalty, Mr. Koehler could be released on parole.  Thus, the Court concludes that the state court's decision is not contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d).  Further, because the underlying claim set forth by Mr. Koehler is without merit, and counsel's performance cannot be deficient based on a failure to advance meritless claims, *Strickland*, 466 U.S. at 691, a claim of ineffective assistance of counsel must fail.  And finally, because the Court finds the state court decision regarding whether the trial court erred in failing to provide a *Simmons* instruction cannot be disturbed under AEDPA, Mr. Koehler's claims relating to further constitutional violations here fail also.  Mr. Koehler is not entitled to habeas relief on this claim.

### O.    Claim XV - Cumulative error.

Mr. Koehler contends that, even if he is not entitled to relief on any particular claim, the cumulative effect of all the errors alleged in his petition denied him a fair trial. The Third Circuit Court of Appeals has established that "[i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (quoting *Albrecht v. Horn*, 471 F.3d 435, 468 (3d Cir. 2006)).  *See also Marshall*, 307 F.3d at 94 (finding that certain errors, harmless when viewed individually, may be so

prejudicial when taken cumulatively as to warrant a new trial) (citing *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 17 (3d Cir. 1980)).  Cumulative errors will only be deemed not harmless where "they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish 'actual prejudice.'" *Fahy*, 516 F.3d at 205 (internal citation omitted); *see Brecht*, 507 U.S. at 637.  To demonstrate actual prejudice, Mr. Koehler must show that the errors during his trial created more than a possibility of prejudice; he must show that the errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray*, 477 U.S. at 494.

Here, the Pennsylvania Supreme Court considered this claim on the merits in its decision affirming the denial of PCRA relief.  *Koehler-II*, 36 A.3d at 161.  Specifically, the state court concluded that, because it already decided that Mr. Koehler's claims individually did not prejudice him, under this claim for relief those claims, when considered in the aggregate, still did not prejudice him.  *Id*.  This decision is not contrary to, or an unreasonable determination of, federal law.  28 U.S.C. § 2254(d).  Mr. Koehler has failed to demonstrate any such cumulative prejudicial effect.  This Court has found all of Mr. Koehler's claims relating to both the guilt phase and the sentencing phase to be meritless.  Even considering cumulatively the few instances of harmless error identified by Mr. Koehler and recognized by the Court, their overall effect is not so prejudicial to the fairness of the proceedings as to warrant a new trial.  *See generally Marshall*, 307 F.3d at 94.  Therefore, this claim will be denied.

**V.      Conclusion**

Based on the foregoing, the Court will deny Mr. Koehler's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit, at the time a final order denying a petition under 28 U.S.C. § 2254 is entered, the district court must make a determination as to whether a certificate of appealability should issue.  3d. Cir. L.A.R. 22.2.  A certificate of appealability should issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To meet this burden a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484-5 (2000) (internal citations and quotations omitted).  In the present matter, the Court will deny a certificate of appealability because jurists of reason would not debate whether the Court properly resolved the issues presented.  However, Mr. Koehler is advised that he has the right for thirty (30) days to appeal the Court's order denying his § 2254 petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and that the Court's denial of a certificate of appealability does not prevent him from doing so, as long as he also seeks a certificate of appealability from the Third Circuit Court of Appeals.  *See* FED. R. APP. P. 22; Local Rule of App. P. 22.1.

The Court will issue an appropriate order.


s/A. Richard Caputo
**A. RICHARD CAPUTO**
**United States District Judge**


**Dated:** May 14, 2015.